UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN CHEN, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:22-cv-09836-JSR |
| Plaintiff, | |
| v. | <u>CLASS ACTION</u> |
| MISSFRESH LIMITED, ZHENG XU, JUN WANG, YUAN SUN, ZHAOHUI LI, COLLEEN A. DE VRIES, HANSONG ZHU, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, AMTD GLOBAL MARKETS LIMITED, ICBC INTERNATIONAL SECURITIES LIMITED, NEEDHAM & COMPANY, LLC, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, ABCI SECURITIES COMPANY LIMITED, GF SECURITIES (HONG KONG) BROKERAGE LIMITED, FUTU INC., TIGER BROKERS (NZ) LIMITED, and COGENCY GLOBAL, INC., | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**<br><br><u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

## TABLE OF CONTENTS

I.    NATURE AND SUMMARY OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE ..................................................................................... 4

III.  PARTIES ............................................................................................................... 5

    A.    Plaintiffs ....................................................................................................... 5

    B.    Defendants .................................................................................................... 6

        1.    Corporate Defendants .......................................................................... 6

        2.    Individual Defendants .......................................................................... 6

        3.    Underwriter Defendants ....................................................................... 9

IV.   SUBSTANTIVE ALLEGATIONS ................................................................................ 14

    A.    Company Background ................................................................................... 14

    B.    The Offering................................................................................................ 16

    C.    The Offering Documents Contained  Materially False Statements and
        Omissions.................................................................................................... 17

        1.    The Offering Documents Contained Inaccurate Statements of
            Material Fact and Material Omissions...................................................... 18

        2.    The Offering Documents Falsely Portrayed the Sustainability of
            the Company's Historic Net Revenues Derived from Online
            Platforms........................................................................................... 20

        3.    The Offering Documents Failed to Disclose Material Factors that
            Made the Offering More Speculative and Risky ...................................... 22

    D.    Post-Offering Events.................................................................................... 29

V.    CLASS ACTION ALLEGATIONS ............................................................................... 38

VI.   CAUSES OF ACTION ............................................................................................. 40

    COUNT I For Violation of Section 11 of the Securities Act Against All
    Defendants ........................................................................................................... 40

    COUNT II For Violation of Section 12(a)(2) of the Securities Act Against All
    Defendants ........................................................................................................... 43

COUNT III For Violation of Section 15 of the Securities Act Against All Defendants Except the Underwriter Defendants.................................................... 46

VII.    PRAYER FOR RELIEF ................................................................................. 47

VIII.   JURY DEMAND ........................................................................................... 48

Court-appointed Lead Plaintiffs, Chelsea Fan, Maso Capital Investments Limited, Blackwell Partners LLC – Series A, and Star V Partners LLC, and named plaintiff James Sannito ("Plaintiffs"), individually and on behalf of all other similarly situated persons and entities, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation undertaken by their counsel, which included review and analysis of: (i) regulatory filings made by Missfresh Limited ("Missfresh" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) press releases, transcripts of earnings calls, and other public statements issued by and disseminated by the Company; (v) other publicly available material and data; and (vi) consultation with relevant consulting experts. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE AND SUMMARY OF THE ACTION

1.     The claims asserted herein are solely strict liability and negligence claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to Missfresh's initial public offering of 24,150,000 American depository shares ("ADSs"), including the Underwriter Defendants' (as defined herein) overallotment, for $13.00 per ADS to the investing public on or about June 25, 2021 (the "Offering").

2.     This securities class action is brought on behalf of a Class (as defined herein) of all persons and entities who purchased or otherwise acquired Missfresh ADSs pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the Offering, and who were damaged thereby.

3.     In response to the stock market crash of 1929, Congress enacted the Securities Act which "require[s] companies offering securities to the public"—such as Missfresh—"to make 'full and fair disclosure' of relevant information," *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066 (2018), and imposed essentially strict liability for material misstatements, "even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). The stringent standard of liability under the Securities Act "reflects Congress' sense that underwriters, issuers, and accountants bear a 'moral responsibility to the public [that] is particularly heavy.'" *In re WorldCom, Inc., Sec. Litig.*, 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004).

4.     Under the Securities Act, Plaintiffs need only plead "a material misstatement or omission to establish [a] *prima facie* case." *Huddleston,* 459 U.S. at 687. "Fraud is not an element" and Plaintiffs "need allege no more than negligence." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). "Nor do the heightened pleading standards of the Private Securities Litigation Reform Act [of 1995 (the "PLSRA")] apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156-57 (2d Cir. 2012). Thus, Plaintiffs need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).

5.     This case is emblematic of the congressional intent behind the ironclad investor protections of the Securities Act. Indeed, the straightforward elements of Securities Act claims are easily met here based on the Company's own admissions that the Offering Documents contained materially false and incorrect statements. Specifically, after the Offering, Missfresh issued an accounting restatement reducing its net revenues for the quarter ended March 31, 2021 by ***over 11%***, or RMB156,824,000, from the previously reported net revenue figure of RMB1,530,227,000 set forth in the Offering Documents. Missfresh similarly restated its financial results for the post-

2

Offering quarters ended June 30, 2021 (the same quarter in which the Company conducted the Offering on June 25th) and September 30, 2021.

6.     As disclosed by the Company in connection with the restatement, following the results of a post-Offering audit, Missfresh identified "questionable" transactions in connection with its online sales carried out by the Company in 2021, including ***prior to the Offering***. These "questionable" transactions included transactions with undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, or a lack of supporting logistics information. As a result, Missfresh concluded that certain 2021 revenue was inaccurately recorded in the Company's financial statements, ***including revenue figures set forth in the Offering Documents***.

7.     Prior to the restatement, the Company purported to be an innovator and leader in China's online retail industry, offering over 20,000 SKUs for next-day delivery and over 4,300 grocery SKUs through its Distributed Mini Warehouse ("DMW") model that delivered fresh produce and fast-moving consumer goods on the same day they were ordered. After the restatement, however, Missfresh disclosed that it was forced to shut down both its next-day delivery business and DMW on demand business which accounted for nearly all of the Company's reported revenue prior to and after the Offering. As further disclosed, these significant changes to Missfresh's business, caused by the Company's unsustainable business practices, resulted in a material and adverse impact on the Company's business, financial performance, reputation, and prospects.

8.     The post-Offering audit report also revealed that the Company had identified new material weaknesses in its internal control over financial reporting during 2021. The Company has since dismissed PricewaterhouseCoopers Zhong Tian LLP ("PwC") as its independent accountant

3

and replaced them with Shandong Haoxin Certified Public Accountants Co. Ltd. ("Shandong Haoxin"). Upon review of the actual conditions of Missfresh in 2021, both PwC and Shandong Haoxin have stated that a substantial doubt existed about Missfresh's ability to continue as a going concern.

9.      Accordingly, since the Offering, the value of Missfresh ADSs has collapsed and flatlined, a shocking departure based on the Offering Documents' admittedly false portrayal of a market leading online grocery retailer used to galvanize public investment. As a result of these undisclosed adverse facts that ***existed at the time of the Offering***, the Company's ***ADSs have fallen from the Offering price of $13.00 per ADS to close at $0.39 per ADS on July 12, 2022, the date this action was filed, a decrease of 97%***.

## II.    JURISDICTION AND VENUE

10.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77o.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act, 15 U.S.C. § 77v.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 22(a) of the Securities Act, 15 U.S.C. § 77v(a), as a significant portion of the Defendants' actions, and the subsequent damages took place within this District. In the Offering, Missfresh issued 24,150,000 ADSs, including the Underwriter Defendants' overallotment, and Missfresh ADSs currently trade on the Nasdaq Stock Market (the "NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Missfresh ADSs, some of whom undoubtedly reside in this District.

13.     According to the Offering Documents, the Underwriter Defendants delivered the ADSs issued in the Offering against payment in New York, New York

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and incorrect herein into this District, and Defendants solicited purchasers of Missfresh ADSs in this District.

## III.    PARTIES

### A.    Plaintiffs

15.     Lead Plaintiff Chelsea Fan ("Fan") purchased or otherwise acquired Missfresh ADSs pursuant and traceable to the Offering Documents as set forth in her PSLRA Certification on file with the Court and referenced herein, and has suffered damages as a result of the violations of the federal securities laws alleged herein. In particular, Lead Plaintiff Fan purchased 1,140,219 Missfresh ADSs in the Offering for $13.00 per ADS pursuant and traceable to the Offering Documents.

16.     As set forth in its PSLRA Certification on file with the Court and referenced herein, Lead Plaintiff Maso Capital Investments Limited ("Maso") purchased or otherwise acquired Missfresh ADSs pursuant and traceable to the Offering Documents and has suffered damages as a result of the violations of the federal securities laws alleged herein. In particular, Lead Plaintiff Maso purchased 16,500 Missfresh ADSs in the Offering for $13.00 per ADS pursuant and traceable to the Offering Documents.

17.     As set forth in its PSLRA Certification on file with the Court and referenced herein, Lead Plaintiff Blackwell Partners LLC – Series A ("Blackwell") purchased Missfresh ADSs pursuant and traceable to the Offering Documents and has suffered damages as a result of the violations of the federal securities laws alleged herein. In particular, Lead Plaintiff Blackwell

purchased 45,700 Missfresh ADSs in the Offering for $13.00 per ADS pursuant and traceable to the Offering Documents.

18.     As set forth in its PSLRA Certification on file with the Court and referenced herein, Lead Plaintiff Star V Partners LLC ("Star V") purchased Missfresh ADS pursuant and traceable to the Offering Documents and has suffered damages as a result of the violations of the federal securities laws alleged herein. In particular, Lead Plaintiff Star V purchased 17,800 Missfresh ADSs in the Offering for $13.00 per ADS pursuant and traceable to the Offering Documents.

19.     Plaintiff James Sannito ("Sannito") purchased Missfresh ADS pursuant and traceable to the Offering Documents as set forth in his accompanying PSLRA Certification and has suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.     Defendants

#### 1.     Corporate Defendants

20.     Defendant Missfresh is the issuer of the ADSs sold in the Offering pursuant to the Offering Documents. The Company is incorporated in the Cayman Islands and its head office is located at 3rd Floor, Block A, Vanke Times Center, No. 9 Wangjing Street, Chaoyang District, Beijing 100016, the People's Republic of China. Missfresh ADSs trade on the NASDAQ under the ticker symbol "MF."

21.     Defendant Cogency Global Inc. was Missfresh's Authorized U.S. Representative for the Offering. Defendant Cogency Global is based in New York, New York.

#### 2.     Individual Defendants

22.     Defendant Zheng Xu ("Xu") was the Company's founder, Chief Executive Officer, Chairman of the Company's Board of Directors, and a controlling shareholder at all relevant times, including at the time of the Offering, and signed the Registration Statement (as defined herein). As set forth in the Offering Documents, directly prior to the Offering, Defendant Xu owned

75,555,520 Missfresh Class A shares and 21,668,178 Class B shares.[1] Directly following the Offering, Defendant Xu owned 86,383,174 Missfresh Class A shares. As a result of this dual-class share structure, after the Offering Defendant Xu possessed 73.6% of the aggregate voting power of the Company's total issued and outstanding shared capital. Because of this concentration Defendant Xu has been able to determine the outcome of all corporate actions requiring shareholder approval, including the election and removal of directors and control of Missfresh's business direction and policies.

23.    Defendant Jun Wang ("Wang") was the Company's Chief Financial Officer and a director on its Board of Directors at all relevant times, including at the time of the Offering, and signed the Registration Statement. As set forth in the Offering Documents, prior to and directly following the Offering, Defendant Wang owned 14,039,242 Missfresh Class B shares.

24.    Defendant Yuan Sun ("Sun") was the head of the Company's intelligent fresh market business and a director on the Company's Board of Directors at all relevant times, including at the time of the Offering, and signed the Registration Statement. As set forth in the Offering Documents, prior to and directly following the Offering, Defendant Sun owned 8,022,424 Missfresh Class B shares.

25.    Defendant Zhaohui Li ("Li") was a director on the Company's Board of Directors at all relevant times, including at the time of the Offering, and signed the Registration Statement.

26.    Defendant Colleen A. De Vries ("De Vries") was the person acting as the Company's duly authorized representative in the United States at all relevant times, including at

---

[1] Missfresh Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. Class A shares are entitled to twenty votes per share and are convertible into one Class B ordinary share. Class B shares are entitled to one vote and are not convertible into Class A shares.

the time of the Offering, and signed the Registration Statement as an employee of Defendant Cogency Global. As a result, Defendant Cogency Global, as a signer of the Registration Statement, is liable for the securities law violations committed by Defendant De Vries in its capacity as her employer, based on the principals of agency and *respondent superior*, and as a control person under the Securities Act.

27.    Defendant Hansong Zhu ("Zhu") was a director on the Company's Board of Directors and the Company's only independent director at all relevant times, including at the time of the Offering. According to the Company, Defendant Zhu qualified as an "audit committee financial expert."

28.    Defendants Xu, Wang, Sun, Li, De Vries, and Zhu are collectively referred to herein as the "Individual Defendants."

29.    Each of the Individual Defendants (except for Defendant Zhu), many of whom were significant Missfresh shareholders, and Defendant Cogency Global signed or authorized the signing of the Registration Statement.

30.    Each of the Individual Defendants and Defendant Cogency Global participated in the Offering Documents' preparation and in the making of the materially inaccurate and incomplete statements alleged herein.

31.    Each of the Individual Defendants and Defendant Cogency Global reviewed, edited, approved, and disseminated to investors the Offering Documents and Offerings' roadshow presentations, talking points, and scripts. The Individual Defendants also conducted the roadshows along with the Underwriter Defendants to solicit the purchase of Missfresh ADSs in the Offering.

32.    Each of the Individual Defendants and Defendant Cogency Global signed or authorized the signing of the Registration Statement (except for Defendant Zhu), prepared and

disseminated the Offering Documents and Offerings' roadshow materials, participated in the Offering, and solicited the purchase of Missfresh ADSs to serve their financial interests and those of the Company. In addition, Defendant De Vries did so to also serve the financial interest of Defendant Cogency Global.

### 3.    Underwriter Defendants

33.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant J.P. Morgan acted as a as a representative of all of the underwriters in the Offering. Defendant J.P. Morgan was allocated approximately 8,025,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

34.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Citigroup acted as a as a representative of all of the underwriters in the Offering. Defendant Citigroup was allocated approximately 7,253,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

35.    Defendant China International Capital Corporation Hong Kong Securities Limited ("China International Capital") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant China International Capital acted as a representative of all of the underwriters in the Offering. Defendant China International Capital was allocated approximately 3,253,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

36.    Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance Securities") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant China Renaissance Securities acted as a as a representative of all of the underwriters in the Offering. Defendant China Renaissance Securities was allocated approximately 606,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

37.    Defendant Haitong International Securities Company Limited ("Haitong") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Haitong was allocated approximately 24,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

38.    Defendant CMB International Capital Limited ("CMB") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant CMB was allocated approximately 1,253,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

39.    Defendant AMTD Global Markets Limited ("AMTD") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant AMTD was allocated approximately 143,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

40.     Defendant ICBC International Securities Limited ("ICBC") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant ICBC was allocated approximately 41,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

41.     Defendant Needham & Company, LLC ("Needham") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant Needham was allocated approximately 219,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

42.     Defendant China Merchants Securities (HK) Co., Limited ("China Merchants Securities") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant China Merchants Securities was allocated approximately 141,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

43.     Defendant ABCI Securities Company Limited ("ABCI") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant ABCI was allocated approximately 14,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

44.     Defendant GF Securities (Hong Kong) Brokerage Limited ("GF Securities") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents. Defendant

GF Securities was allocated approximately 28,000 ADSs to sell to the investing public in the Offering, excluding the underwriters' overallotment.

45.     Defendant Futu Inc. ("Futu") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents.

46.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") was an underwriter for the Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate and incomplete Offering Documents.

47.     Defendants J.P. Morgan, Citigroup, China International Capital, China Renaissance Securities, Haitong, CMB, AMTD, ICBC, Needham, China Merchants Securities, ABCI, GF Securities, Futu, and Tiger Brokers are collectively referred to herein as the "Underwriter Defendants." Defendant Missfresh, Defendant Cogency Global, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

48.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Missfresh ADSs in the Offering were motivated by their financial interests. Collectively, the Underwriter Defendants received over $19 million in fees and commissions in connection with their sale of Missfresh ADSs in the Offering, or approximately $22 million in fees and commissions upon the full exercise of the Underwriter Defendants' option to purchase and offer additional ADSs through their overallotment.

49.     The Underwriter Defendants determined that in return for their share of the Offering's proceeds, they were willing to merchandise Missfresh ADSs in the Offering. The Underwriter Defendants arranged for the roadshows prior to the Offering during which they and

the Individual Defendants met with investors and presented highly favorable information about the Company, its operations, and its financial condition and prospects.

50.     The Underwriter Defendants also demanded and obtained an agreement from Missfresh that the Company would indemnify and hold the Underwriter Defendants harmless against certain liabilities, including liabilities under the Securities Act, and contribute to payments that the Underwriter Defendants may be required to make for such liabilities. They also made certain that Missfresh had purchased millions of dollars of directors' and officers' liability insurance.

51.     The Underwriter Defendants assisted Missfresh, Defendant Cogency Global, and the Individual Defendants in planning the Offering, and purportedly conducted an adequate and reasonable investigation into the business and operations of Missfresh, an undertaking known as a "due diligence" investigation. The Underwriter Defendants were required to undertake the due diligence investigation in order to engage in the Offering. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Missfresh's operations and financial prospects.

52.     In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to Missfresh's lawyers, management, directors, and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's ADSs would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of these constant contacts and communications between the Underwriter Defendants

Missfresh's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

53.    The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of Missfresh's ADSs pursuant and/or traceable to the Offering and the Offering Documents, including to Plaintiffs and the Class.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

54.    At all relevant times, Missfresh's China-based grocery retail business purportedly generated revenues from sales of groceries on the "Missfresh" mobile application, as well as services run on third-party platforms which function near-identically to the Company's own platform, referred to by the Company as its "Mini Program."

55.    Through its online platforms, Missfresh offers the next-day delivery of over 20,000 SKUs.

56.    Missfresh also sells over 4,300 grocery SKUs through its DMWs. DMWs are neighborhood warehouses with different temperate zones and refrigerated storage capability. According to the Company, its DMWs are strategically located in local neighborhoods, and undertake the functions of warehousing and the last-three-kilometer logistics. As of March 31, 2021, Missfresh operated 631 DMWs across 16 cities.



57.    According to Missfresh, it closely manages its DMWs based on their life cycles and performance standards, including by evaluating performance based on multiple indicators including revenue per square meter and number of orders.



58.    In addition to the DMW, Missfresh also contacts with third-party delivery partners to fulfil orders during peak demand.

59.    The Company also touts itself as the pioneer of the "intelligent fresh market" business model based on its attempts to capitalize on the steady market share of brick-and-mortar stores for fresh produce. According to Missfresh, it launched the intelligent fresh market business in September 2020, seeking to standardize and transform fresh markets into "smart fresh malls" through the introduction of integrated technology solutions which would present further

monetization for the Company through the conversion of offline shoppers into Missfresh users. At the time of the Offering, Missfresh had purportedly entered into contracts to operate 54 fresh markets in 14 cities in China and had started to operate 33 of them in 10 cities in China.

60.    Since its inception, Missfresh purports to have gained significant data insights that help optimize its algorithms. As a result, the Company employs a proprietary end-to-end intelligent system, known as the Retail AI Network ("RAIN"), which includes smart supply chain, smart logistics and smart marketing, among others. RAIN purportedly enhances the automation level and efficiency of the Company's operations through data analytics and AI in areas such as inventory replenishment, procurement, and turnover management, which in turn enhances consumer satisfaction, operational efficiency, and business expansion.

### B.    The Offering

61.    On June 8, 2021, Missfresh filed with the SEC its registration statement on Form F-1, which after an amendment on Form F-1/A dated June 22, 2021, was declared effective by the SEC on June 24, 2021 (the "Registration Statement"). On or about June 25, 2021, Missfresh commenced the Offering pursuant to the Registration Statement. In the Offering, Missfresh, through the Underwriter Defendants, sold 21,000,000 ADSs, or 24,150,000 ADSs including the Underwriter Defendants' overallotment, for $13.00 per ADS, with each ADS representing three of the Company's Class B shares. On June 28, 2021, Missfresh filed with the SEC its final prospectus for the Offering, dated June 24, 2021, on Form 424B4, which forms part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents"). In the Offering, Missfresh raised $273 million, or $313.95 million including the overallotment, from the investing public.

62.    The Offering Documents told investors that the Defendants were "offering to sell" the ADSs to investors, that the information contained in the Offering Documents was "accurate …

16

as of [its] date" and that investors "should rely only on the information contained in th[e]
[P]rospectus."

C.   **The Offering Documents Contained
     Materially False Statements and Omissions**

63.    The Offering Documents were negligently prepared, and as a result, contained
untrue statements of material fact, omitted material facts necessary to make the statements
contained therein not misleading, and failed to make adequate disclosures required under the rules
and regulations governing its preparation.

64.    Sections 11 and 12(a)(2) of the Securities Act create liability against each of the
Defendants for each: (i) misstatement, (ii) omission in contravention of an affirmative legal
disclosure obligation, and (iii) omission of information that is necessary to prevent existing
disclosures from being misleading, in the Offering Documents.

65.    Additionally, pursuant to SEC Regulation C, the Offering Documents were
required to, yet failed to disclose material information necessary to ensure that representations in
the Offering Documents were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a),
states that "[i]n addition to the information expressly required to be included in a registration
statement, there shall be added such further material information, if any, as may be necessary to
make the required statements, in the light of the circumstances under which they are made, not
misleading."

66.    Further, Defendants were required to comply with Part I, Item 5(D) Form 20-F and
Item 303 of Regulation S-K, 17 C.F.R. § 229.303, and failed to do so. Specifically, SEC Regulation
S-K (17 C.F.R. § 229.10) provides that registration statements such as the one filed by Missfresh
on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the
forms to be used for registration under [the Securities] Act." Part I, Item 4(a) of Form F-1 requires

17

registrants to furnish the information required by Part I of Form 20-F. Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K"[2] and requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

67.    Moreover, Defendants also failed to comply with Item 105 (formerly Item 503) of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.[3] The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

### 1.    The Offering Documents Contained Inaccurate Statements of Material Fact and Material Omissions

68.    In the Offering Documents, the Defendants listed "net revenues," including "sales of products through online platforms," as a key component of Missfresh's results of operations. The Offering Documents repeatedly told investors that for the three months ended March 31, 2021,

---

[2] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1. FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows: … d. Trend information – Item 5.D."

[3] Item 105 was amended in October 2020, to expand the scope of required disclosure from "the most significant factors" to "material factors." The purpose of the revision was to "focus registrants on disclosing the risks to which reasonable investors would ***attach importance in making investment or voting decisions***." *See Modernization of Regulation S-K Items 101, 103, and 105,* 85 F.R. 63726-01, 63743-45 (Oct. 8, 2020).

the Company had sales of products through online platforms of RMB1,492,780,000 and total net revenues of RMB1,530,227,000. For example, the Offering Documents contained the following financial statements:

| | For the Year Ended December 31, | | | | For the Three Months Ended March 31, | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | | **2020** | **2021** | |
| | **RMB** | **RMB** | **RMB** | **US$** | **RMB** | **RMB** | **US$** |
| | *(in thousands, except for share and per share data)* | | | | | | |
| **Selected Consolidated Statements of Operations and Comprehensive Loss Data:** | | | | | | | |
| **Net revenues** | | | | | | | |
| Sales of products through online platforms | 3,202,738 | 5,777,413 | 5,999,675 | 915,730 | 1,668,295 | 1,492,780 | 227,843 |
| Other revenues | 343,961 | 223,983 | 130,762 | 19,958 | 21,520 | 37,447 | 5,716 |
| **Total net revenues** | **3,546,699** | **6,001,396** | **6,130,437** | **935,688** | **1,689,815** | **1,530,227** | **233,559** |

69.     The statements referenced above in ¶68, *inter alia*, that for the three months ended March 31, 2021, the Company had sales of products through online platforms of RMB1,492,780,000 and total net revenues of RMB1,530,227,000, were each false and inaccurate statements of material fact when made because as the Company would admit, after the Offering through its restatement, the Defendants overstated sales of products through online platforms and total net revenues by over 11%:

| Financial Statement Category | As Disclosed in the Offering Documents (False) | Adjustment in the Restatement | As Restated (Actual) | Error as a Percent of Actual Results |
|---|---|---|---|---|
| Sales of products through online platforms | **RMB1,492,780,000** | (RMB156,824,000) | **RMB1,335,956,000** | **11.7%** |
| Other revenues | RMB37,447,000 | - | RMB37,447,000 | |
| Total net revenues | **RMB1,530,227,000** | (RMB156,824,000) | **RMB1,373,403,000** | **11.4%** |

70. The Offering Documents also told investors that the Company's financial statements, including the "net revenues" and "sales of products through online platforms" referenced above in ¶68, were "***prepared and presented in accordance with accounting principles generally accept in the United States of America***" ("GAAP").

71. The statements referenced above in ¶¶68, 70, *inter alia*, that the Company's financial statements were prepared and presented in accordance with GAAP, were each false and inaccurate statements of material fact when made because as the Company would admit, after the Offering through its restatement, the Defendants overstated sales of products through online platforms and total net revenues by over 11% and:

    (a)    under GAAP, a "restatement" is required for material accounting errors that exist at the time the financial statements were prepared;

    (b)    by issuing the restatement, Missfresh acknowledged that the Offering Documents' financial statements for 2021 were materially inaccurate, did not comply with GAAP, and were therefore materially false and misleading when issued; and

    (c)    by issuing the restatement, Missfresh admitted that the false and inaccurate statements were not judgmental mistakes in estimation because GAAP makes a distinction between a change in estimate and the correction of historical facts by not requiring restatements for changes in estimates.

### 2.    The Offering Documents Falsely Portrayed the Sustainability of the Company's Historic Net Revenues Derived from Online Platforms

72. The Offering Documents also told investors that the Company's net revenues were primarily generated through online on-demand and next-day sales. The Company's "other revenues" were derived through membership fees and vending machine sales. As shown in following financial statements taken from the Offering Documents, for the years 2018, 2019, and

2020, the sales of products through online platforms were responsible for approximately 90.3%, 96.3%, and 97.9%, respectively of Missfresh's annual net revenues for the year ended December 31. The Company's lopsided revenue generation continued leading up to the Offering as well, with the Offering Documents reporting that sales of products through online platforms accounted for approximately 97.6% of the Company's revenues for its first quarter 2021. The Offering Documents stated as follows:

| | For the Year Ended December 31, | | | | | | | For the Three Months Ended March 31, | | | | | |
| | 2018 | | 2019 | | 2020 | | | | 2020 | | 2021 | | | |
| | RMB | % | RMB | % | RMB | US$ | % | | RMB | % | RMB | US$ | % |
| | | | | | (in thousands, except for percentage data) | | | | | | | | |
| Sales of products through online platforms | 3,202,738 | 90.3 | 5,777,413 | 96.3 | 5,999,675 | 915,730 | 97.9 | | 1,668,295 | 98.7 | 1,492,780 | 227,843 | 97.6 |
| Other revenues | 343,961 | 9.7 | 223,983 | 3.7 | 130,762 | 19,958 | 2.1 | | 21,520 | 1.3 | 37,447 | 5,716 | 2.4 |
| Total net revenues | 3,546,699 | 100.0 | 6,001,396 | 100.0 | 6,130,437 | 935,688 | 100.0 | | 1,689,815 | 100.0 | 1,530,227 | 233,559 | 100.0 |

73.    The statements referenced above in ¶72 concerning, *inter alia*, the Company's sources of net revenues, were each false and inaccurate statements of material fact when made because they failed to disclose the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the Offering:

(a)    the Company's revenue derived from sales of products through online platforms in the first quarter of 2021 were incorrectly reported and inflated by over 11% because of unsustainable business practices including, questionable transactions, undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and a lack of supporting logistics information;

(b)    this undisclosed trend of unsustainable business practices and the materialized risks it presented began at the latest in the first quarter of 2021 and continued for the rest of 2021;

21

(c)     at the same time, Missfresh had inadequate internal control over financial reporting to prevent and detect misstatements of its sales of products through online platforms, in particular the Company's next-day delivery business;

(d)     as a result of the Company's unsustainable business practices, Missfresh needed to and, after the Offering, did terminate next-day sales through its online platforms;

(e)     to address the then existing unsustainability of its business, Missfresh also needed to and, after the Offering, did "adopt significant adjustments to our business strategy for sustainability," which included shutting down its on-demand online sales through the DMW retail business, effectively eliminating all of the online sales the Company had touted as its cornerstone and growing revenue generator; and

(f)     accordingly, the Offering Documents overstated the Company's financial results, falsely portrayed the Company's business and financial prospects, and failed to disclose that the Company would be unable to continue as a going concern shortly after the Offering.

### 3.     The Offering Documents Failed to Disclose Material Factors that Made the Offering More Speculative and Risky

74.    The Offering Documents inaccurately described as ***potential*** certain risks with "effectively manag[ing the Company's] growth or execute [its] strategies effectively," which "***may***" materially and adversely affect the Company's business and prospects so that the Company's "revenue growth ***may*** slow or [its] revenues ***may*** decline." The Offering Documents stated, in pertinent part, that:

> ***If we are unable to manage growth or execute our strategies effectively, our business and prospects or investors' perceptions of our business and prospects may be materially and adversely affected, and the market price of our Class B ordinary shares and/or ADSs may decline.***
>
> We have experienced rapid growth since we commenced our business in 2014. However, there is no assurance that we will be

able to maintain our historical growth rates in future periods. Our business, results of operations and financial condition depend in part on our ability to effectively manage our growth or implement our growth strategies. As part of our business strategies, we plan to further improve our fulfillment infrastructure and technology platform and continue to optimize our product offerings. We also intend to continue to invest significant resources in training, managing and motivating our workforce. In addition, as we optimize our product offerings, we will need to work with new suppliers efficiently and establish and maintain mutually beneficial relationships with our existing and new suppliers. We may have limited or no experience for certain new product offerings, and our expansion into these new product offerings may not achieve broad user acceptance. In addition, these offerings may present new and difficult technological or operational challenges, and we may be subject to claims if our users are not satisfied with the quality of the products or do not have satisfactory experiences in general. To effectively manage the expected growth of our operations and personnel, we will need to continue to improve our transaction processing, technological, operational and financial systems, policies, procedures and controls. All these endeavors involve risks and will require significant managerial, financial and human resources. We cannot assure you that we will be able to effectively manage our growth or to implement all these systems, procedures and control measures successfully or that our new business initiatives will be successful. ***If we are not able to manage our growth or execute our strategies effectively, our expansion may not be successful and our business and prospects may be materially and adversely affected.***

***Our revenue growth may slow or our revenues may decline*** for any number of possible reasons, such as decreased consumer spending, increased competition, slowdown in the growth or contraction of the retail or neighborhood retail industry in China, supply chain bottlenecks, emergence of alternative business models, changes in government policies or general economic conditions, and natural disasters or virus outbreaks. ***If our growth rate declines, investors' perceptions of our business and business prospects may be adversely affected and the market price of our Class B ordinary shares and/or ADSs could decline.***

75.    The statements referenced in ¶74 were each inaccurate statements of material fact

because while noting, *inter alia*, only the potential for slowing revenue growth or revenue declines,

the Offering Documents failed to disclose the following significant, ***then-existing*** material adverse facts, trends, and uncertainties that Missfresh was already facing at the time of the IPO:

(a)  the Company's revenue growth had already slowed and declined as disclosed in the post-Offering restatement;

(b)  the Company's revenue derived from sales of products through online platforms in the first quarter of 2021 were incorrectly reported and inflated by over 11% because of unsustainable business practices including, questionable transactions, undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and a lack of supporting logistics information;

(c)  this undisclosed trend of unsustainable business practices and the materialized risks it presented began at the latest in the first quarter of 2021 and continued for the rest of 2021;

(d)  at the same time, Missfresh had inadequate internal control over financial reporting to prevent and detect misstatements of its sales of products through online platforms, in particular the Company's next-day delivery business;

(e)  as a result of the Company's unsustainable business practices, Missfresh needed to and, after the Offering, did terminate next-day sales through its online platforms;

(f)  to address the then existing unsustainability of its business, Missfresh also needed to and, after the Offering, did "adopt significant adjustments to our business strategy for sustainability," which included shutting down its on-demand online sales through the DMW retail business, effectively eliminating all of the online sales the Company had touted as its cornerstone and growing revenue generator; and

(g)     accordingly, the Offering Documents overstated the Company's financial results, falsely portrayed the Company's business and financial prospects, and failed to disclose that the Company would be unable to continue as a going concern shortly after the Offering.

76.     The Offering Documents also inaccurately described as ***potential*** certain risks "associated with the misconduct or illegal activities of [its] employees, suppliers and their employees, and other related personnel," including hypothetical "material financial losses or reputational harms" as a result of said misconduct, which ***may*** result in "material financial losses." The Offering Documents stated, in pertinent part, that:

> ***We face risks associated with the misconduct or illegal activities of our employees, suppliers and their employees, and other related personnel.***
>
> We rely on our employees to maintain and operate our business and have implemented a series of code of conduct to guide the activities of our employees. However, we do not have control over the actions of our employees, and any ***misbehavior of our employees could materially and adversely affect our reputation and business***. For example, certain of our ex-employees had been found to have engaged in misconduct involving embezzlements and other fraudulent activities in their roles as operation-level personnel in the past. Although ***such incidents did not result in any material losses to our company and we have further enhanced our internal compliance programs*** afterwards, we cannot guarantee that our policies and procedures will be effective in preventing similar fraudulent or illegal activities from occurring ***in the future***. In the event we are subject to misconduct and misuse of our platforms for inappropriate or illegal purposes by any of our employees, suppliers and their employees, claims may be brought against us and we ***may incur material financial losses or reputational harms***. In response to allegations of illegal or inappropriate activities conducted through our platforms or as part of business operations, relevant governmental authorities may intervene and hold us liable for non-compliance with applicable laws and regulations and subject us to administrative penalties or other sanctions. In addition, our customers may suffer or allege to have suffered physical, financial or emotional harm caused by such misconducts or illegal activities, and our business and public perception of our brand may be materially and adversely affected as a result.

77.     The statements referenced above in ¶76 are inaccurate statements of material fact because while noting, *inter alia*, only the potential misconduct or illegal activities by the Company's employees, suppliers, and others and the material financial losses which may result, the Offering Documents failed to disclose the following significant, ***then-existing*** material adverse facts, trends, and uncertainties that Missfresh was already facing at the time of the IPO:

(a)     the Company's revenue derived from sales of products through online platforms in the first quarter of 2021 were incorrectly reported and inflated by over 11% because of unsustainable business practices including, questionable transactions, undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and a lack of supporting logistics information;

(b)     this undisclosed trend of unsustainable business practices and the materialized risks it presented began at the latest in the first quarter of 2021 and continued for the rest of 2021;

(c)     at the same time, Missfresh had inadequate internal control over financial reporting to prevent and detect misstatements of its sales of products through online platforms, in particular the Company's next-day delivery business;

(d)     as a result of the Company's unsustainable business practices, Missfresh needed to and, after the Offering, did terminate next-day sales through its online platforms;

(e)     to address the then existing unsustainability of its business, Missfresh also needed to and, after the Offering, did "adopt significant adjustments to our business strategy for sustainability," which included shutting down its on-demand online sales through the DMW retail business, effectively eliminating all of the online sales the Company had touted as its cornerstone and growing revenue generator; and

26

(f)     accordingly, the Offering Documents overstated the Company's financial results, falsely portrayed the Company's business and financial prospects, and failed to disclose that the Company would be unable to continue as a going concern shortly after the Offering.

78.    The Offering Documents also stated that the Company "**may** identify other weaknesses and deficiencies in [its] internal control over financial reporting," through which Missfresh "**could** suffer material misstatements in [its] financial statements and fail to meet [its] reporting obligations, which **would likely** cause investors to lose confidence in [its] reported financial information" or "**may**" cause the Company to "restate [its] financial statements for prior periods." The Offering Documents stated, in pertinent part, as follows:

> *If we fail to remediate our material weakness and implement and maintain an effective system of internal controls over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud.*
>
> * * *
>
> During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other weaknesses and deficiencies in our internal control over financial reporting. In addition, *if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. If we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information.* This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. *We may also be required to restate our financial statements for prior periods.*

27

79.     The statements referenced above in ¶78 are inaccurate statements of material fact because while noting *inter alia*, only potential material weaknesses in internal controls and the possibility of needing to restate prior financial statements, the Offering Documents failed to disclose the following significant, ***then-existing*** material adverse facts, trends, and uncertainties that Missfresh was already facing at the time of the IPO:

(a)     the Company's revenue derived from sales of products through online platforms in the first quarter of 2021 were incorrectly reported and inflated by over 11% because of unsustainable business practices including, questionable transactions, undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and a lack of supporting logistics information;

(b)     as a result, the Company was required to restate its financial statements after the Offering for this period preceding the Offering;

(c)     the Company's financial statements were incorrectly reported in the Offering Documents, in part, due to a then-existing material weakness in internal controls over financial reporting related to the Company's failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to transactions on its online sales platforms;

(d)     the Company lacked sufficient competent personnel to effectively and timely monitoring and perform risk assessment procedures;

(e)     the Company lacked formalized policies and procedures over the acceptance and on-going monitoring of third-party suppliers, had inadequate review and approval of third-party suppliers, and lacked effective acceptance procedures, such as background and qualification checks on the third-party suppliers;

(f)    the Company had ineffective controls related to the shipping and delivery of products and the determination whether revenue recognized relates to valid sales orders;

(g)    the Company had inadequate review and approval of the products sold and their related sales prices;

(h)    the Company lacked effective monitoring activities performed by internal audit and business unit personnel;

(i)    the Company lacked sufficient segregation of duties related to certain risk monitoring and whistleblower activities;

(j)    as a result, in part, of these material weaknesses in internal controls, the Company would be forced to terminate next-day sales through its online platforms and eventually its on-demand online sales through the DMW retail business due to unsustainable business practices; and

(k)    accordingly, the Offering Documents overstated the Company's financial results, falsely portrayed the Company's business and financial prospects, and failed to disclose that the Company would be unable to continue as a going concern shortly after the Offering.

**D.    Post-Offering Events**

80.    On April 29, 2022, Missfresh filed with the SEC a notification of late filing on Form 12b-25, indicating that it would be unable to timely file its 2021 annual report on SEC Form 20-F. According to the Company, it was unable to meet its filing deadlines because "[t]he independent Audit Committee of the Company's board of directors, with the assistance of professional advisors, [was] in the process of conducting an internal review of certain matters, including those relating to transactions between the Company and certain third-party enterprises."

> *Missfresh Limited (the "Company") will not be able to file its Annual Report on Form 20-F for the fiscal year ended December 31, 2021 (the "Form 20-F") by the prescribed filing deadline of*

> ***April 30, 2022. The independent Audit Committee of the
> Company's board of directors, with the assistance of professional
> advisors, is in the process of conducting an internal review of
> certain matters, including those relating to transactions between
> the Company and certain third-party enterprises***. The Audit
> Committee is working with its advisors to complete the review in a
> timely manner. The Company will not be in a position to file its
> Form 20-F until the Audit Committee completes its review and the
> Company assesses the results of the review.

81.     On May 24, 2022, Missfresh issued a press release which was filed with the SEC

on Form 6-K disclosing that it had received a notification it was not compliance with NASDAQ

requirements due to its failure to timely file its annual report. In the release, the Company disclosed

that it has been "unable to complete the audit of the financial statements of the Company for the

fiscal year ended December 31, 2021 and the preparation for the 2021 Form 20-F due to an internal

review conducted by the independent audit committee of the Company's board of directors, with

the assistance of professional advisors."

> Missfresh Limited (NASDAQ: MF) ("Missfresh" or the
> "Company"), an innovator and leader in China's neighborhood
> retail industry, today announced that it received a notification letter
> dated May 19, 2022 (the "Notification Letter") from the Listing
> Qualifications Department of The Nasdaq Stock Market Inc.
> ("Nasdaq"), indicating that the Company is not in compliance with
> the requirements for continued listing set forth in Nasdaq Listing
> Rule 5250(c)(1) since the Company did not timely file its annual
> report on Form 20-F for the fiscal year ended December 31, 2021
> (the "2021 Form 20-F") with the Securities and Exchange
> Commission (the "SEC").
>
> The Notification Letter has no immediate effect on the listing of the
> Company's American depositary shares on Nasdaq. Pursuant to the
> Nasdaq Listing Rules, the Company has 60 calendar days from the
> date of the Notification Letter to submit a plan to regain compliance
> with Nasdaq Listing Rules (the "Compliance Plan"). If Nasdaq
> accepts the Compliance Plan, it may grant the Company an
> extension until November 14, 2022 to regain compliance. The
> Company expects either to file its 2021 Form 20-F or submit the
> Compliance Plan within the prescribed 60-day period.

> ***The Company was not able to file the 2021 Form 20-F by the
> prescribed deadline as extended pursuant to Rule 12b-25(b)(2)(ii)
> under the Securities Exchange Act of 1934, primarily because the
> Company is unable to complete the audit of the financial
> statements of the Company for the fiscal year ended December 31,
> 2021 and the preparation for the 2021 Form 20-F due to an
> internal review conducted by the independent audit committee of
> the Company's board of directors, with the assistance of
> professional advisors, as previously disclosed in the Company's
> Notification of Late Filing on Form 12b-25 filed with the SEC on
> April 29, 2022.*** The Company continues to work diligently to
> complete the 2021 Form 20-F and intends to file it with the SEC as
> soon as reasonably practicable. This announcement is made in
> compliance with Nasdaq Listing Rule 5810(b), which requires
> prompt disclosure of receipt of a deficiency notification.

82.    On July 1, 2022 Missfresh issued a press release which was filed with the SEC on

Form 6-F announcing the completion of the audit into the Company's financials. In the release,

Missfresh announced that its "[r]eview identified certain transactions carried out by the Next-Day

Delivery BU in 2021 that exhibited characteristics of questionable transactions, such as

undisclosed relationships between suppliers and customers, different customers or suppliers

sharing the same contact information, and/or lack of supporting logistics information. As a result,

certain revenue associated with these reporting periods in 2021 may have been inaccurately

recorded in the Company's financial statements." The release also indicated that all responsible

employees had resigned from Missfresh prior to the completion of the audit.

### The Independent Review

> As previously disclosed by the Company in its Notification of Late
> Filing (Form 12b-25) on April 29, 2022, the Audit Committee, with
> the assistance of third-party professional advisors—including a
> leading international law firm and forensic accounting experts from
> a Big-Four accounting firm that is not the Company's auditor—
> conducted an independent internal review of certain transactions
> carried out by the Next-Day Delivery Business Unit of the Company
> ("Next-Day Delivery BU") with third-party suppliers and customers
> in 2021(the "Review"). The Review involved analyzing and sample-
> testing certain transactions carried out by the Next-Day Delivery BU
> in 2021; reviewing select documents, including electronic data

collected from certain Company management-level executives and relevant employees in the Next-Day Delivery BU in 2021; and interviewing Company management-level executives and relevant employees who were available and willing to participate in such interviews.

### Summary of Findings

The Review is now substantially complete. ***The Review identified certain transactions carried out by the Next-Day Delivery BU in 2021 that exhibited characteristics of questionable transactions, such as undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and/or lack of supporting logistics information. As a result, certain revenue associated with these reporting periods in 2021 may have been inaccurately recorded in the Company's financial statements***.

Based on the Review's investigative steps as described above, the individual employees in the Next-Day Delivery BU responsible for carrying out the questionable transactions have been identified. All of them had given notices of resignation to the Company before the conclusion of the Review. The Review did not uncover any evidence indicating that Company management-level executives, including the CEO and Co-CFOs, were involved in or aware of any misconduct relating to the questionable transactions at the time of their occurrence.

### Remedial Measures in Response to Review

To enhance the Company's internal controls in light of the aforementioned findings, the Company, under the supervision of the Audit Committee, has begun and will continue implementing a remediation plan. The remedial measures include, among other things: (i) disciplinary actions against individual employees found to be responsible or knowingly took part in the questionable transactions identified; and (ii) enhancement of the Company's internal controls and risk management policies and procedures for the Next-Day Delivery BU, including follow-on employee trainings. Given the Review findings and in an abundance of caution, the Company has also terminated its relationships with suppliers and customers involved in the high-risk questionable transactions identified.

83.    Also in the July 1, 2022 press release, Missfresh provided the results of its "preliminary assessment of the overall financial impact" on its previously reported financial

statements, including financial results for the quarter ended March 31, 2021 which were included in the Offering Documents. This included a reduction in previously reported net revenues for the quarter ended March 31, 2021 by over 11%, or RMB156,824,000, from the previously reported net revenue figure of RMB1,530,227,000 as set forth in the Offering Documents. Missfresh similarly restated its financial results for the post-Offering quarters ended June 30, 2021 (the same quarter in which the Company conducted the Offering) and September 30, 2021.

### *Follow-up Financial Impact Assessment*

The Company has conducted a preliminary assessment of the overall financial impact of the Review findings on the relevant financial statements, as shown in the table below. While the Company does not expect any further adjustments to be needed, the Company's management is committed to full and transparent disclosure and will provide timely updates if needed, as its financial impact assessment continues.

| (All amounts in thousands, except for share, per share data or otherwise noted) | As Previously Announced For the three months ended | | | Adjustments For the three months ended | | | As Adjusted For the three months ended | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2021 | June 30, 2021 | September 30, 2021 | March 31, 2021 | June 30, 2021 | September 30, 2021 | March 31, 2021 | June 30, 2021 | September 30, 2021 |
| | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB |
| **Net revenues** | | | | | | | | | |
| Sales of products through online platforms | 1,492,780 | 1,854,120 | 2,078,226 | (156,824) | (256,482) | (263,873) | 1,335,956 | 1,597,638 | 1,814,353 |
| Other income | 37,447 | 40,360 | 43,706 | - | - | - | 37,447 | 40,360 | 43,706 |
| **Total net revenues** | 1,530,227 | 1,894,480 | 2,121,932 | (156,824) | (256,482) | (263,873) | 1,373,403 | 1,637,998 | 1,858,059 |

84.    On July 14, 2022, shortly following the Company's restatement and revelation of false transactions in its online business, Missfresh issued a press release which was filed with the SEC on Form 6-K announcing a desperately needed cash infusion through a RMB200 million equity investment from a strategic partnership with multinational conglomerate Shanxi Donghui Group ("Shanxi Donghui"), through which Shanxi Donghui would subscribe for 298,507,463 Missfresh Class B shares.

85.    On July 28, 2022, Missfresh issued a press release which was filed with the SEC on Form 6-K announcing that due, in part, to Shanxi Donghui's failure to inject the previously agreed-upon capital that Missfresh desperately needed, the Company was forced to make

additional significant changes in its business strategy, which included shutting down its

unsustainable on-demand online sales. The release further announced that Missfresh had no

definite timeline when or if it would restart in on-demand sales and "expected that these significant

adjustments will have a material and adverse impact on the Company's financial performance."

> Missfresh Limited ("Missfresh" or the "Company") (NASDAQ: MF), an innovator and leader in China's neighborhood retail industry, today announced that it has adopted significant adjustments to its business strategy.
>
> As announced on July 14, 2022, the Company entered into a strategic investment agreement with Shanxi Donghui Group ("Shanxi Donghui"), pursuant to which Shanxi Donghui agrees to make an RMB200 million equity investment in Missfresh. As of today, the transaction has not been closed and the Company has not received any funding from Shanxi Donghui.
>
> ***As a result, the Company has to adopt significant adjustments to its business strategy for sustainability, including a temporary shutdown of its on-demand Distributed Mini Warehouse (DMW) service and staff optimization. It is expected that these significant adjustments will have a material and adverse impact on the Company's financial performance. The on-demand DMW business contributed approximately 85% of the Company's total net revenue for the nine months ended September 30, 2021. The Company will decide if and when it will re-open the on-demand DMW business depending on the development of its financings and business operations.*** The Company will make every effort to maintain normal operations in its next-day delivery business, intelligent fresh market business and retail cloud business.

86.     A July 29, 2022 article from the *South China Morning Post* shed more color on

Missfresh's July 28, 2022 release. Specifically, the article stated that Missfresh had announced it

was dismissing most of its employees and leaving hundreds of suppliers unpaid. According to an

online meeting record shared with the *South China Morning Post*, Missfresh employees were told

to stay at home on July 28, 2022 and later told that they were terminated effective immediately,

with no clear date when June and July salaries would be paid. The article further reported that

Missfresh announced it had run out of money as the previously announced funding of RMB200 million from Shanxi Donghui had failed to materialize.

87.    On August 9, 2022, *Reuters* reported that a Beijing consumer rights group had demanded Missfresh work on plans to refund its customers and address the mounting complaints against the Company. The government-backed Beijing Consumer Association said in a statement on its website that a large number of Missfresh customers had complained about the Company's "abnormal operations."

88.    On September 9, 2022 Missfresh issued a press release announcing the surprise resignations of a slew of its directors and officers, including Defendants Wang, Sun, and Zhu:

> Missfresh Limited ("Missfresh" or the "Company") (NASDAQ: MF), an innovator in China's neighborhood retail industry, today announced the following changes in the Company's board composition and management team:
>
> Mr. Hansong Zhu resigned from his positions as an independent director of the Company, the chairperson of the audit committee of the Company, the chairperson of the compensation committee of the Company and a member of the nominating and corporate governance committee of the Company;
>
> Ms. Yuan Sun resigned from her position as a director of the Company;
>
> Mr. Jun Wang resigned from his positions as a director and the co-chief financial officer of the Company; and
>
> Ms. Xi (Catherine) Chen resigned from her position as the co-chief financial officer of the Company.

89.    On September 30, 2022 Missfresh issued a press release which was filed on SEC form 6-K announcing that that Company had dismissed PwC as its independent registered public accounting firm, to be replaced by Shandong Haoxin.

90.     On November 14, 2022 Missfresh released its long overdue 2021 annual report on SEC Form 20-F (the "2021 Annual Report"). The 2021 Annual Report reiterated the restatement of Missfresh's financial results, including the financial results set forth in the Offering Documents.

91.     The 2021 Annual Report disclosed that during the course of auditing of Missfresh's financial statements for the year ended December 31, 2021, PwC had advised Missfresh that PwC believed that a going concern explanatory paragraph was required for 2021 Annual Report. Similarly, Shandong Haoxin also stated that based on the financial conditions in 2021, "substantial doubt exist[ed] about the Company's ability to continue as a going concern."

92.     The 2021 Annual Report also for the first time revealed that Missfresh had identified a new weakness in its internal controls over financial reporting as of December 31, 2021, related to the Company's "failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to … certain transactions within the Next-Day Delivery BU." According to the 2021 Annual Report, this material weakness stemmed from a confluence of failures by the Company. As a result, Missfresh's next-day delivery business remained "temporarily terminated."

> ***One of the two material weaknesses that have been identified in our internal control over financial reporting as of December 31, 2021 relates to our failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our certain transactions within the Next-Day Delivery BU.*** Specifically, the material weakness is a combination of control deficiencies, including:
>
> (i)     lack of sufficient competent personnel to effectively and timely monitoring and perform risk assessment procedures in the Next-Day Delivery BU sales related business due to changes in its business model;
>
> (ii)    lack of formalized policies and procedures over the acceptance and on-going monitoring of third-party suppliers in the Next-Day Delivery BU sales related business, and inadequate review and approval of third-party suppliers and lack of effective

acceptance procedures, such as background and qualification checks on the third-party suppliers;

(iii)    ineffective controls related to the shipping and delivery of products ordered in the Next-Day Delivery BU sales related business and the determination whether revenue recognized relates to valid sales order;

(iv)    inadequate review and approval of products sold and the related sales price in the Next-Day Delivery BU sales related business;

(v)    lack of effective monitoring activities performed by internal audit and business unit personnel over certain activities conducted in the Next-Day Delivery BU sales related business; and

(vi)    lack of sufficient segregation of duties related to certain risk monitoring and whistleblower activities.

*As of the date of this annual report, we have temporarily terminated the operation of the Next-Day Delivery BU*. For our existing businesses, we will conduct a comprehensive review of related policies and procedures, improve relevant processes for monitoring and reporting risks, and enhance the supervision for ensuring the separation of duties to decrease related fraud risks.

93.    The 2021 Annual Report also disclosed that the RMB200 million investment from Shanxi Donghui had yet to manifest, and that Missfresh's forced business adjustments, including the indefinite closure of the Company's unsustainable on-demand DMW business.

On July 14, 2022, we entered into a strategic investment agreement, or the Shanxi Donghui Agreement, with Shanxi Donghui Group, pursuant to which Shanxi Donghui Group or its designated affiliate shall subscribe for 298,507,463 Class B ordinary shares of the Company in the amount of the US$ equivalence of RMB200 million, subject to the satisfaction of the closing condition that Shanxi Donghui Group or its designated affiliate completes all necessary registrations and obtains all required governmental approvals in China for its overseas direct investment in the Company in the twelve months following the signing date of the Shanxi Donghui Agreement. Upon the closing, Shanxi Donghui Group will have the right to designate two directors for nomination and election to our board of directors. *Shanxi Donghui Group did not provide any funding to us as we expected, and as a result, on July 28, 2022, we had to adopt significant adjustments to our*

*business strategy for sustainability, including a temporary shutdown of our on-demand DMW retail business and staff optimization. The on-demand DMW retail business contributed approximately 90% of our total net revenue for the year ended December 31, 2021, and therefore these significant adjustments to our business strategy have resulted in a material and adverse impact on our business, financial performance, reputation and prospect*. As of December 31, 2021, the aggregate amount of our inventory, property, equipment, right of use assets (net of corresponding lease liabilities) and intangible assets were RMB466.2 million (US$73.2 million), which may suffer significant losses due to these adjustments to our business strategy. As of the date of this annual report, we are not able to accurately estimate such losses. As of the date of this annual report, this transaction contemplated under the Shanxi Donghui Agreement has not been closed.

94.     Finally, the 2021 Annual Report disclosed that Missfresh was facing hundreds of lawsuits from its suppliers and current and former employees. Specifically, the 2021 Annual Report disclosed that Missfresh and its subsidiaries had been "named as defendants in approximately 616 lawsuits in China brought primarily by [its] previous suppliers and in approximately 765 labor disputes brought by [its] employees or former employees for approximately RMB812.7 million in aggregate."

95.     As of the commencement of this action, Missfresh ADSs have fallen from the Offering price of $13.00 per ADS to close at $0.39 per ADS on July 12, 2022, the date this action was filed, a decrease of 97%.

## V.    CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of all persons and entities who purchased or otherwise acquired publicly traded Missfresh ADSs pursuant and/or traceable to the Offering Documents, and were damaged thereby (the "Class"). Excluded from the Class are: (i) the Defendants and immediate family members of Individual Defendants; (ii) the officers, directors, and affiliates of Missfresh, the Underwriter

Defendants, and Cogency Global, at all relevant times, including Missfresh's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Missfresh ADSs through any such plan(s); (iii) any entity in which any Defendant has or had a controlling interest; and (iv) the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

97.    The members of the Class are so numerous that joinder of all members is impracticable. Following the Offering, Missfresh ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class as the Company offered over 24 million ADSs in the Offering. Record owners and other members of the Class may be identified from records maintained by Missfresh or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

98.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include, *inter alia*:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Documents contained inaccurate statements of material fact or omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

99.    Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act set forth herein.

100.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in securities class action litigation. Plaintiffs have no interests that conflict with those of the Class.

101.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT I
### For Violation of Section 11 of the Securities Act
### Against All Defendants

102.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

103.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and the Class against Defendant Missfresh, Defendant Cogency Global, each of the Individual Defendants, and each of the Underwriter Defendants.

104.    This cause of action does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Missfresh and negligence as to the remaining Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statement of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

105.     The Registration Statement issued in connection with the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

106.     Missfresh is the registrant and issuer of the ADSs offered pursuant to the Registration Statement. As such, Missfresh is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misstatements and omissions of material fact necessary to make the statements therein not false and misleading, Missfresh is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

107.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

108.     The Individual Defendants each signed the Registration Statement and/or was a director of Missfresh at the time of the Offering. Each of the Individual Defendants caused the issuance of the Registration Statement. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

109.    Defendant Cogency Global was Missfresh's Authorized U.S. Representative for the Offer. Defendant Cogency Global employed and directed Defendant De Vries who signed the Registration Statement. Therefore, Cogency Global is responsible for Defendant De Vries's violations of the Securities Act under principles of agency and *respondeat superior*. As such, Defendant Cogency Global is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

110.    The Underwriter Defendants served as the underwriters for the Offering and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. The Underwriter Defendants, as underwriters of the ADSs offered in the Offering pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, the Underwriter Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Class.

111.    None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue

statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

112.    Each of the Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misstated and failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

113.    Plaintiffs and the Class acquired Missfresh ADSs pursuant to, or traceable to, the defective Registration Statement.

114.    Plaintiffs and the Class have sustained damages. The value of Missfresh ADSs have declined substantially subsequent to and due to violations by the Defendants.

115.    At the time that Plaintiffs and other members of the Class purchased Missfresh ADSs, they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

116.    Less than one year has elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time this action was commenced.

**COUNT II**
**For Violation of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

117.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

118.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of Plaintiffs and the Class, against Defendant Missfresh, Defendant Cogency Global, each of the Individual Defendants, and each of the Underwriter Defendants.

119.    This cause of action does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Missfresh and negligence as to the remaining Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statement of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

120.    Each of the Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's ADSs pursuant to the defective Prospectus. The actions of solicitation by the Defendants included participating in the preparation of the false and misleading Prospectus, roadshows, and marketing of Missfresh ADSs to investors, such as Plaintiffs and other members of the Class. In the absence of the Defendants efforts to publicize the Offering and solicit ADSs purchasers, the Offering could not have occurred. Moreover, Defendant Cogency Global, which employed and directed Defendant De Vries, is responsible for Defendant De Vries's violations of the Securities Act under principles of agency and *respondeat superior*.

121.    The Prospectus contained untrue statements of material fact, omitted to state other material facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

122.    Each of Defendants owed to the purchasers of Missfresh ADSs, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements made therein not misleading and no omission of material fact required by the rules and regulations governing the Prospectus's preparation. By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained material misstatements of fact, omitted material facts necessary to make the statements therein not misleading, and omitted material facts required to be stated therein. As such, each of these Defendants are liable under Section 12(a)(2) of the Securities Act to Plaintiffs and the Class.

123.    Plaintiffs and other members of the Class did not know, nor in the exercise of reasonable diligence could Plaintiffs or other members of the Class have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff or other members of the Class purchased Missfresh ADSs.

124.    By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Missfresh ADSs pursuant to the Prospectus sustained substantial damages. Accordingly, Plaintiffs and the other members of the Class who hold the ADSs issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their ADSs with interest thereon or damages as allowed by law or in equity. Class members who have sold their Missfresh ADSs seek damages to the extent permitted by law.

**COUNT III**
**For Violation of Section 15 of the Securities Act**
**Against All Defendants Except the Underwriter Defendants**

125.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

126.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the Class, against Defendant Missfresh, Defendant Cogency Global, and each of the Individual Defendants.

127.    This cause of action does not sound in fraud. Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is based solely on strict liability as to Missfresh and negligence as to the remaining Defendants. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statement of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

128.    As alleged herein, each of the Defendants named in the cause of action committed primary violation of the Securities Act or are directly responsible and primarily liable for such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) of the Securities Act or having responsibility for such conduct.

129.    Defendant Missfresh controlled all of the Individual Defendants and Defendant Cogency Global, which Defendant Missfresh employed as its Authorized U.S. Representative in connection with the Offering. Cogency Global, through Defendant De Vries, executed the Registration Statement on behalf of Defendant Missfresh at its direction, and committed primary violations of the Securities Act as a result. Alternatively, because Defendant De Vries possessed

and exercised the authority to sign the Registration Statement and bind the Company accordingly, she had control over the Company in connection with the Offering.

130.    The Individual Defendants, other than Defendant De Vries, each were control persons of Missfresh by virtue of their positions as directors and/or senior officers and/or major shareholders of the Company. The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors and/or officers and/or major shareholders of Missfresh. Alternatively, the Company controlled each of the Individual Defendants given the influence and control the Company possessed and exerted over each of the Individual Defendants.

131.    Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the Offering. Because of their positions of control and authority as senior officers and/or directors, major shareholders of the Company, and/or signers of the Registration Statement, each of the Individual Defendants, as well Defendant Cogency Global, were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed by rule or regulation to prevent the statements made therein from being misleading.

132.    As control persons, each of the Defendants named in the cause of action are liable jointly and severally with and to the same extent as the primary violators of Sections 11 and 12(a)(2) of the Securities Act whom they controlled.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action maintainable under Fed. R. Civ. P. 23, certifying Plaintiffs as class representatives, and appointing Labaton Sucharow LLP and The Rosen Law Firm, P.A. as class counsel pursuant to Rule 23(g);

B.      Awarding Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Plaintiffs' consulting and testifying expert witnesses; and

D.      Granting such other and further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: December 28, 2022                    **LABATON SUCHAROW LLP**

                                            _____*/s/ Alfred L. Fatale III*_____
                                            Alfred L. Fatale III
                                            David J. Schwartz
                                            Charles Wood
                                            140 Broadway
                                            New York, NY 10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            afatale@labaton.com
                                            dschwartz@labaton.com
                                            cwood@labaton.com

                                            **THE ROSEN LAW FIRM, P.A.**

                                            _____*/s/ Phillip Kim*_____
                                            Phillip Kim
                                            Laurence M. Rosen
                                            Jing Chen
                                            275 Madison Ave., 40th Floor
                                            New York, NY 10016
                                            Telephone: (212) 686-1060

Facsimile: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com

*Lead Counsel for Plaintiffs and the*
*Proposed Class*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0482
Email: brian@schallfirm.com

*Additional Counsel*