UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
JUAN CHEN, Individually and On Behalf of All    :    22-cv-9836 (JSR)
Others Similarly Situated,                               :
                                                          :
                    Plaintiff,                            :
                                                          :
v.                                                        :
                                                          :
                                                          :
MISSFRESH LIMITED, ZHENG XU, JUN            :
WANG, YUAN SUN, ZHAOHUI LI, COLLEEN         :
A. DE VRIES, HANSONG ZHU, J.P. MORGAN       :
SECURITIES LLC, CITIGROUP GLOBAL            :
MARKETS INC., CHINA INTERNATIONAL           :
CAPITAL CORPORATION HONG KONG               :
SECURITIES LIMITED, CHINA RENAISSANCE       :
SECURITIES (HONG KONG) LIMITED,             :
HANSONG ZHU, J.P. MORGAN
HAITONG INTERNATIONAL SECURITIES            :
COMPANY LIMITED, CMB INTERNATIONAL          :
CAPITAL LIMITED, AMTD GLOBAL                :
MARKETS LIMITED, ICBC INTERNATIONAL         :
SECURITIES LIMITED, NEEDHAM &               :
COMPANY, LLC, CHINA MERCHANTS               :
SECURITIES (HK) CO., LIMITED, ABCI          :
SECURITIES COMPANY LIMITED, GF              :
SECURITIES (HONG KONG) BROKERAGE            :
LIMITED, FUTU INC., TIGER BROKERS (NZ)      :
LIMITED, and COGENCY GLOBAL, INC.,          :
                                                          :
                    Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MISSFRESH
LIMITED, COLLEEN A. DEVRIES AND COGENCY GLOBAL, INC.'S
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ..............................................................................................2

I.  BACKGROUND ...................................................................................................2

II.  THE COMPANY'S IPO AND OFFERING DOCUMENTS.................................3

  A.  The Company Disclosed Risks Relating to the Sustainability of Its Business ........3

  B.  The Company Disclosed Risks Relating to Its Internal Controls ...........................5

  C.  Missfresh Disclosed The Ongoing Risk of Employee Misconduct .........................7

III.  AFTER THE IPO, MISSFRESH'S ADS PRICE FALLS FOR
    REASONS UNRELATED TO PLAINTIFFS' ALLEGATIONS......................................8

  A.  Prior to Any Purported "Corrective Disclosure,"
      Missfresh's ADS Price Drops 96% From the IPO Price ........................................8

  B.  Missfresh Discloses an Audit Committee-led Independent Internal Review ..........9

  C.  In July 2022, the Company's ADS Price *Increases*
      Following the Disclosure of the Internal Review's Findings ...............................10

  D.  Missfresh Announces Strategic Business
      Changes Unrelated to the Internal Review ...........................................................12

  E.  In November 2022, Missfresh's ADS Price *Increases*
      After It Releases Its 2021 Annual Report .............................................................13

IV.  THIS ACTION....................................................................................................14

ARGUMENT .................................................................................................................15

I.  PLAINTIFFS FAIL TO ALLEGE A MATERIAL MISREPRESENTATION ................15

  A.  Missfresh Disclosed the Relevant Risks Regarding Internal Controls ..................15

  B.  Missfresh Disclosed the Risks Regarding the Sustainability of Its Business ........19

  C.  Missfresh's Disclosures Were Not Materially Misleading....................................21

II.  NEGATIVE CAUSATION IS APPARENT ON THE FACE OF THE COMPLAINT...24

CONCLUSION...............................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018)............17, 19

*Asay v. Pinduoduo Inc.*,
No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ...................................17

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................3

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)........................25

*In re Britannia Bulk Holdings Inc. Securities Litigation*,
665 F. Supp. 2d 404 (S.D.N.Y. 2009).................................................25

*Coronel v. Quanta Capital Holdings Ltd.*,
No. 07 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...............18

*In re Coty Inc. Securities Litigation*,
No. 14-cv-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)........................21, 23

*Delfonce v. Eltman Law, P.C.*,
No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017),
*aff'd*, 712 F. App'x 17 (2d Cir. 2017)...................................................2

*In re Duke Energy Corp. Securities Litig.*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................22, 23, 24

*Dura Pharmaceuticals Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................25

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ..............................................................8

*Hutchison v. Deutsche Bank Securities Inc.*,
647 F.3d 479 (2d Cir. 2011)..............................................................25

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................15

*In re Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010)..............................................................15

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)............................................................................................18

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)................20

*Peifa Xu v. Gridsum Holding Inc.*,
No. 18 Civ. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020).......................22, 23

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
774 F. Supp. 2d 584 (S.D.N.Y. 2011)..............................................................................25

*Willard v. UP Fintech Holding Ltd.*,
527 F. Supp. 3d 609 (S.D.N.Y. 2021)..............................................................................23

*Yaroni v. Pintec Technology Holdings Ltd.*,
600 F. Supp. 3d 385 (S.D.N.Y. 2022)...........................................15, 16, 17, 18, 19, 22, 23

**STATUTES**

15 U.S.C. § 77k(e) ................................................................................................................25

**REGULATIONS**

17 C.F.R. § 229.105(a).........................................................................................................21

17 C.F.R. § 229.303(A) ....................................................................................................... 21

iii

Defendants Missfresh Limited ("Missfresh" or the "Company"), Colleen A. DeVries and Cogency Global, Inc. ("Defendants") respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Class Action Complaint (ECF No. 34) ("Complaint" or "AC") pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs assert securities claims based on a purported failure to warn of risks that were expressly disclosed and on a restatement that had no impact on the Company's bottom line. This action is a transparent attempt to recover for losses that have nothing to do with the matters alleged in the Complaint. Missfresh is a Chinese technology company that delivers groceries through its innovative neighborhood retail business model. Shortly after its June 2021 initial public offering ("IPO"), as the Chinese technology sector grappled with regulatory uncertainty and an unprecedented drop in consumer spending, Missfresh's American Depositary Share ("ADS") price began to tumble. Indeed, *before* Plaintiffs' first purported "corrective disclosure" was issued, Missfresh's ADS price was already down *96%* from the IPO price.

Attempting to recoup these losses, Plaintiffs now cite unrelated events that occurred *a year after* the IPO to claim Missfresh's Registration Statement and Prospectus (collectively, the "Offering Documents") were false or misleading. Specifically, in July 2022, Missfresh disclosed that an Audit Committee-led independent internal review ("Internal Review") found that certain rogue employees had engaged in questionable transactions in 2021. This led to a restatement of certain financial figures, but not to any change to the Company's gross profit for the affected quarter. Separately, Missfresh also announced in July 2022 that because it was unable to secure funds through a planned strategic partnership, it would be forced to temporarily shut down its Distributed Mini Warehouses ("DMW") business. These new developments did not retroactively

render the Offering Documents materially false or misleading.  As demonstrated below, Plaintiffs fail to state a claim under the Securities Act of 1933 (the "Securities Act").

First, Plaintiffs fail to state a material misstatement or omission.  The Offering Documents clearly disclosed the precise risks Plaintiffs claim were omitted, including that Missfresh had inadequate internal controls to timely detect and prevent fraud and that material weaknesses in internal controls could necessitate a restatement of prior financials.  Missfresh also disclosed that its historical performance may not be indicative of its future prospects.  In light of these disclosures, none of the statements challenged in the Complaint was materially misleading to investors.  Nor does the Company's restatement of two line-items following the conclusion of the Internal Review render any statements materially misleading, as it had no impact on the Company's bottom line.

Second, dismissal is also warranted because it is apparent on the face of the Complaint that the alleged misrepresentations did not and could not have caused Plaintiffs' loss.  Missfresh's ADS price fell *96%* prior to any purported "corrective disclosure."  Worse still for Plaintiffs, the Company's ADS price ***increased*** upon the disclosure of the Internal Review findings and the Company's 2021 Annual Report, which announced substantive adjustments to its business.

For these separate and independent reasons, as explained in further detail below, the Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS[1]

### I.    BACKGROUND

Missfresh is a Chinese technology company that sells groceries through its innovative

---

[1]    These facts reflect the well-pled allegations in the Complaint and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law, P.C.*, No. 16
*(cont'd)*

neighborhood retail business model.  Missfresh generates revenue from sales of groceries on the

"Missfresh" mobile application, as well as through Mini Programs, which are services embedded

on third-party social platforms that function almost identically to Missfresh's mobile application.

(AC ¶ 54; Ex. A at 1.[2])  Through the mobile application and Mini Programs, users can place on-

demand DMW orders for over 4,300 grocery products, which, on average, are delivered from

Missfresh's strategically located DMWs within an hour.  (Ex. A at 1.)  As of March 31, 2021, the

Company operated 631 DMWs across 16 cities in China.  (*Id.* at 3; AC ¶ 56.)  It also offered next-

day delivery of a wider range of over 20,000 grocery products to supplement its DMW offerings.

(AC ¶ 55; Ex. A at 133.)  Missfresh commenced its intelligent fresh market business in the second

half of 2020 and its retail cloud business initiative in 2021.  (AC ¶ 59; Ex. A at 1.)

## II.     THE COMPANY'S IPO AND OFFERING DOCUMENTS

### A.     The Company Disclosed Risks Relating to the Sustainability of Its Business

On June 24, 2021, Missfresh launched its IPO on the NASDAQ, issuing 21,000,000 ADSs

at $13.00 per ADS.  (AC ¶ 61.)  The Offering Documents disclosed the Company's business model

and financial statements from FY2018 through Q1 2021, which showed that "gross profit,

calculated as total net revenues minus cost of revenue, increased by 71.3%" from 2018 to 2019,

"and further increased by 128.5%" from 2019 to 2020.  (Ex. A at 86–90, 97.)  Missfresh repeatedly

warned, however, that its historical performance "may not be indicative of [its] future growth or

financial results," and that growth could slow or even become negative in the future:

---

Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2]  Exhibits cited herein are attached to the accompanying Declaration of Robert A. Fumerton, dated January 27, 2023.  Pin cites for all exhibits reference the original pagination at the bottom of the page.  All citations and internal quotations marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

> ***Our limited operating history makes it difficult to evaluate our business and prospects. We cannot guarantee that we will grow as rapidly as before, or at all.***
>
> We commenced operations in 2014, and have a limited operating history. Our historical performance may not be indicative of our future growth or financial results. ***We cannot assure you that we will be able to grow at the same rate as we did in the past, or avoid any decline in the future.  Our growth may slow down or become negative, and revenues may decline for a number of possible reason****s, **some of which are beyond our control, including decreasing consumer spending,*** increasing competition, declining growth of our overall market or industry, the emergence of alternative business models, ***changes in rules, regulations, government policies or general economic conditions***. It is difficult to evaluate our prospects, as we may not have sufficient experience in addressing the risks to which companies operating in rapidly evolving markets may be exposed . . . You should consider our prospects in light of the risks and uncertainties that companies with a limited operating history may encounter.

(*Id.* at 24 (first emphasis in original).)

Similarly, Missfresh warned that it would need to "continue to improve" its "operational and financial systems, policies, procedures and controls" in order to manage growth:

> ***If we are unable to manage growth or execute our strategies effectively, our business and prospects or investors' perceptions of our business and prospects may be materially and adversely affected, and the market price of our . . . ADSs may decline.***
>
> We have experienced rapid growth since we commenced our business in 2014. ***However, there is no assurance that we will be able to maintain our historical growth rates in future periods***. . . . To effectively manage the expected growth of our operations and personnel, ***we will need to continue to improve our transaction processing, technological, operational and financial systems, policies, procedures and controls***. All these endeavors involve risks and will require significant managerial, financial and human resources.  ***We cannot assure you that we will be able to effectively manage our growth or to implement all these systems, procedures and control measures successfully*** or that our new business initiatives will be successful. If we are not able to manage our growth or execute our strategies effectively, our expansion may not be successful and our business and prospects may be materially and adversely affected.  (*Id.* at 20 (first emphasis in original); AC ¶ 74.)

In addition, Missfresh disclosed specific risks relating to uncertainties of the neighborhood retail industry and their potential impact on growth and profitability:

> ***Uncertainties relating to the growth and profitability of the neighborhood retail industry in China in general, and the on-demand DMW retail industry in particular, could adversely affect our revenues and business prospects.***

4

> We generated a majority of our revenues from our on-demand DMW retail business historically. ***The long-term viability and prospects of various online neighborhood retail business models in China remain relatively untested.*** Our future results of operations will depend on numerous factors affecting the development of the online neighborhood retail industry in China, which may be beyond our control. . . .

(*Id.* at 24–25 (first emphasis in original).)

Missfresh also disclosed risks and uncertainties relating to a prolonged downturn in the Chinese economy, including as a result of COVID-19 restrictions:

> ***A severe or prolonged downturn in the Chinese or global economy could materially and adversely affect our business and financial condition.***
>
> COVID-19 had a severe and negative impact on the Chinese and the global economy in 2020. Whether this will lead to a prolonged downturn in the economy is still unknown. If this outbreak persists, commercial activities throughout the world could be curtailed with decreased consumer spending, business disruptions, interrupted supply chains and difficulties in travel. Our business had been adversely affected by the outbreak of COVID-19 in China due to negative impacts to our supply chain and fulfillment operations. The extent to which COVID-19 impacts our results will depend on future developments, which are highly uncertain and cannot be predicted.

(*Id.* at 45 (emphasis in original).)

Finally, Missfresh warned that "[w]e may . . . require additional cash resources due to changed business conditions or other future developments" or "sell additional equity or debt securities," but that "[i]t is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all." (*Id.* at 42.)

**B.    The Company Disclosed Risks Relating to Its Internal Controls**

The Offering Documents also discussed at length the risks and shortcomings associated with the Company's internal controls. As a "newly public company," Missfresh disclosed that, in accordance with SEC rules, it is "not required to provide a report of management on [its] internal control over financial reporting and [its] independent registered public accounting firm is not required to conduct an audit of [its] internal control over financial reporting." (*Id.* at 47.)

5

Moreover, as an "emerging growth company," Missfresh is exempt "from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting." (*Id.* at 111.) These exemptions, as well as its relatively new corporate status, elevated Missfresh's internal controls risks compared to other companies. The Company disclosed these risks as follows:

> ***Neither we nor our independent registered public accounting firm undertook a comprehensive assessment of our internal control*** for purposes of identifying and reporting material weakness and other control deficiencies in our internal control over financial reporting. Had we performed a formal assessment of our internal control over financial reporting or had our independent registered public accounting firm performed an audit of our internal control over financial reporting, additional deficiencies may have been identified.

(*Id.* at 47.)

Missfresh also disclosed that, although its assessment of controls was not complete, it had "identified one material weakness in our internal control over financial reporting," which could lead to material misstatements of financials:

> The material weakness that has been identified relate [sic] to our lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures to address complex U.S. GAAP technical accounting issue; and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC. ***The material weakness, if not remediated timely, may lead to material misstatements in our consolidated financial statements in the future.***

(*Id.*; *see id.* at 110 (similar).)

Although the Company disclosed that it had "taken measures and plan[ned] to continue to take measures to remediate these deficiencies . . . the implementation of these measures may not fully address these deficiencies in [its] internal control over financial reporting, and [it] ***cannot conclude that they have been fully remediated***." (*Id.* at 47; *see id.* at 110–11.) It also warned that "[d]uring the course of documenting and testing [its] internal control procedures, in order to satisfy

6

the requirements of Section 404, [the Company] may identify other weaknesses and deficiencies in [its] internal control." (*Id.* at 47–48.)  With respect to both known and unknown weaknesses in internal controls, Missfresh repeatedly warned that such weaknesses increased the risk that it would be unable to prevent fraud within its business, potentially resulting in delayed filings, restatements of prior financials, and potential de-listing—*i.e.*, the precise risks that materialized after the IPO:

> Our failure to correct these deficiencies or our failure to discover and address any other deficiencies could result in inaccuracies in our financial statements and impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. Moreover, ineffective internal control over financial reporting ***could significantly hinder our ability to prevent fraud*** . . . .
>
> If we fail to achieve and maintain an effective internal control environment, we could suffer ***material misstatements in our financial statements and fail to meet our reporting obligations,*** which would likely cause investors to lose confidence in our reported financial information. This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs. Additionally, ineffective internal control over financial reporting could expose us to ***increased risk of fraud or misuse of corporate assets and subject us to potential delisting*** from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. ***We may also be required to restate our financial statements for prior periods.***

(*Id.*)

### C.    Missfresh Disclosed The Ongoing Risk of Employee Misconduct

In addition to disclosing that weaknesses in internal controls hindered the Company's ability to detect and prevent fraud, the Company also disclosed that it had been, and could again in the future be, subject to risks associated with employee misconduct and fraudulent activity:

> ***We face risks associated with the misconduct or illegal activities of our employees, suppliers and their employees, and other related personnel.***  We rely on our employees to maintain and operate our business and have implemented a series of code of conduct to guide the activities of our employees.  However, we do not have control over the actions of our employees, and any misbehavior of our employees could materially and adversely affect our reputation and business.

(*Id.* at 32–33 (emphasis in original).)

The Company also disclosed specific recent examples of fraudulent activities carried out by former employees, and warned that it could not assure investors that it would be able to prevent or timely detect similar misconduct in the future, which could further harm the Company:

> For example, ***certain of our ex-employees had been found to have engaged in misconduct involving embezzlements and other fraudulent activities*** in their roles as operation-level personnel in the past. Although such incidents did not result in any material losses to our company and we have further enhanced our internal compliance programs afterwards, ***we cannot guarantee that our policies and procedures will be effective in preventing similar fraudulent or illegal activities from occurring in the future.*** In the event we are subject to misconduct and misuse of our platforms for inappropriate or illegal purposes by any of our employees, suppliers and their employees, claims may be brought against us and we may incur material financial losses or reputational harms.

(*Id.* at 33.)

## III.    AFTER THE IPO, MISSFRESH'S ADS PRICE FALLS FOR REASONS UNRELATED TO PLAINTIFFS' ALLEGATIONS

### A.    Prior to Any Purported "Corrective Disclosure," Missfresh's ADS Price Drops 96% From the IPO Price

Immediately following the IPO and long before any alleged corrective disclosure, the Company's ADS price fell well below its IPO price of $13.00. On the first day of trading, its ADS price closed at $9.66, down 25.7% from its IPO price. (Ex. B, Historical ADS Prices, at 1.)[3] Over the next several months, for reasons unrelated to any allegation in the Complaint, Missfresh's ADS price fell further. For example, after market close on August 26, 2021, Missfresh released its Q2 2021 Earnings Results, which showed a net loss of $222 million—***more than triple*** its loss from Q2 2020. (Ex. C, Q2 2021 Earnings Results, at 3.) The next day, its ADS price closed at $4.66, down 64.2% from its IPO price. (Ex. B at 2.) Similarly, after market close on November 11, 2021,

---

[3]    Exhibit B shows Missfresh's ADS prices before the Company's reverse stock split on October 17, 2022. "[A] district court may take judicial notice of well-publicized stock prices[.]" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

Missfresh released its Q3 2021 Earnings Results, which reported a net loss of $151.1 million, a 58% increase from Q3 2020.  (Ex. D, Q3 2021 Earnings Results, at 3.)  The next day, its ADS price closed at $4.60, down 64.6% from its IPO price.  (Ex. B at 3.)

Plaintiffs' sources confirm that the rapid decline in Missfresh's ADS price was unrelated to any allegation in the Complaint.  The *South China Morning Post* article Plaintiffs cite (AC ¶ 86) noted that "[s]ocial retail spending, a general measure of *consumer spending, contracted in China in the first half of 2022*"—*i.e.*, before Missfresh announced the findings of the Internal Review or partnership with Shanxi Donghui—and Missfresh "has also seen its operations, which rely on extremely efficient *logistics, severely disrupted by quarantine requirements, mini lockdowns and other policies designed to control the spread of Covid-19*."  (Ex. E, South China Morning Post article, July 29, 2022.)  The Reuters article cited in the Complaint (AC ¶ 87) also attributed Missfresh's "troubles" to "slowing growth" in China's technology sector "amid *COVID-19 lockdowns* and *tightening regulatory oversight*."  (Ex. F, Reuters article, Aug. 9, 2022.)  Indeed, as Shanghai grappled with a strict city-wide lockdown that lasted more than two months and ended on June 1, 2022, Missfresh's ADSs consistently traded under $1.00, and did so for the remainder of 2022, (Ex. B at 6), as China's zero-COVID policy continued to impact consumer spending.  (*See* Ex. G, Bloomberg article, Sept. 1, 2022.)

On April 29, 2022, *before* Plaintiffs' first purported corrective disclosure was filed, Missfresh's ADS price closed at $0.52—*a 96% decrease* from its IPO price.  (Ex. B at 5.)

### B.    Missfresh Discloses an Audit Committee-led Independent Internal Review

On April 29, 2022, after market close, Missfresh filed a Notification of Late Filing on Form 12b-25, which informed investors that the Company could not timely file its 2021 Annual Report because "[t]he independent Audit Committee of the Company's board of directors, with the

9

assistance of professional advisors, [was] in the process of conducting an internal review of certain matters, including those relating to transactions between the Company and certain third-party enterprises." (AC ¶ 80; Ex. H, Apr. 29, 2022 Notice of Late Filing, at 1.) On May 2, 2022 (the next trading day), Missfresh's ADS price opened at $0.55, three cents *higher* than the closing price on the last day of market open, and ultimately closed at $0.45. (Ex. B at 5.)

On May 24, 2022, after market close, Missfresh disclosed that it had received a notification that it was not in compliance with NASDAQ's requirements for continued listing because it did not timely file its Annual Report due to the Internal Review. (AC ¶ 81; Ex. K, May 24, 2022 Press Release, at 1.) The Company disclosed that the notification "has no immediate effect on the listing of the Company's American depositary shares on Nasdaq," and "the Company has 60 calendar days from the date of the Notification Letter to submit a plan to regain compliance with Nasdaq Listing Rules." (AC ¶ 81.) It further stated that "[t]he Company continues to work diligently to complete the 2021 Form 20-F and intends to file it with the SEC as soon as reasonably practicable." (*Id.*) The next day, Missfresh's ADS price closed at $0.19, the same as the prior day's closing.

### C.      In July 2022, the Company's ADS Price *Increases* Following the Disclosure of the Internal Review's Findings

Two months later, on July 1, 2022, after market close, Missfresh announced the substantial completion of the Internal Review "of certain transactions carried out by the Next-Day Delivery Business Unit of the Company ('Next-Day Delivery BU') with third-party suppliers and customers in 2021." (Ex. J, July 1, 2022 Press Release, at 1; AC ¶ 82.) The Internal Review, which involved analyses of transactions, documents, and electronic data, as well as interviews of "management-level executives and relevant employees," was conducted by "the Audit Committee, with the assistance of third-party professional advisors[,] including a leading international law firm and

forensic accounting experts from a Big-Four accounting firm that is not the Company's auditor."

(AC ¶ 82.)  The Company disclosed a summary of the Internal Review's findings as follows:

> The Review is now substantially complete.  The Review identified certain transactions carried out by the Next-Day Delivery BU in 2021 that exhibited characteristics of questionable transactions, such as undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and/or lack of supporting logistics information. As a result, certain revenue associated with these reporting periods in 2021 may have been inaccurately recorded in the Company's financial statements.
>
> Based on the Review's investigative steps as described above, the individual employees in the Next-Day Delivery BU responsible for carrying out the questionable transactions have been identified. All of them had given notices of resignation to the Company before the conclusion of the Review. *The Review did not uncover any evidence indicating that Company management-level executives, including the CEO and Co-CFOs, were involved in or aware of any misconduct relating to the questionable transactions at the time of their occurrence.*

(*Id.*)

The Company also disclosed remedial measures undertaken as a result of its findings,

including its plans to continue to enhance its internal controls:

> To enhance the Company's internal controls in light of the aforementioned findings, the Company, under the supervision of the Audit Committee, has begun and will continue implementing a remediation plan. The remedial measures include, among other things: (i) disciplinary actions against individual employees found to be responsible or knowingly took part in the questionable transactions identified; and (ii) enhancement of the Company's internal controls and risk management policies and procedures for the Next-Day Delivery BU, including follow-on employee trainings. Given the Review findings and in an abundance of caution, the Company has also terminated its relationships with suppliers and customers involved in the high-risk questionable transactions identified.

(*Id.*)

The July 1 Press Release also included a "preliminary assessment of the overall financial impact" on previously reported financial statements.  Missfresh restated its financial results for Q1 through Q3 2021 (the "Restatement").  (Ex. J at 2; AC ¶ 83.)  As shown below, the Restatement disclosed that net revenues from sales of products through online platforms were

11

adjusted downward for all three quarters, but that total cost and operating expenses were adjusted upward by the same amount.  In other words, the Restatement had no impact on the Company's bottom line:

| (All amounts in thousands, except for share, per share data or otherwise noted) | As Previously Announced For the three months ended | | | Adjustments For the three months ended | | | As Adjusted For the three months ended | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2021 | June 30, 2021 | September 30, 2021 | March 31, 2021 | June 30, 2021 | September 30, 2021 | March 31, 2021 | June 30, 2021 | September 30, 2021 |
| | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB |
| Net revenues | | | | | | | | | |
| Sales of products through online platforms | 1,492,780 | 1,854,120 | 2,078,226 | (156,824) | (256,482) | (263,873) | 1,335,956 | 1,597,638 | 1,814,353 |
| Other revenues | 37,447 | 40,360 | 43,706 | - | - | - | 37,447 | 40,360 | 43,706 |
| Total net revenues | 1,530,227 | 1,894,480 | 2,121,932 | (156,824) | (256,482) | (263,873) | 1,373,403 | 1,637,998 | 1,858,059 |
| Cost of revenues | (1,341,249) | (1,752,626) | (1,861,290) | 161,696 | 265,495 | 272,358 | (1,179,553) | (1,487,131) | (1,588,932) |
| Fulfillment expenses | (440,224) | (540,990) | (637,869) | - | - | - | (440,224) | (540,990) | (637,869) |
| Sales and marketing expenses | (167,615) | (304,700) | (256,208) | (4,872) | (9,013) | (8,485) | (172,487) | (313,713) | (264,693) |
| General and administrative expenses | (86,853) | (396,012) | (192,176) | - | - | - | (86,853) | (396,012) | (192,176) |
| Technology and content | (94,794) | (393,829) | (145,121) | - | - | - | (94,794) | (393,829) | (145,121) |
| Total cost and operating expenses | (2,130,735) | (3,388,157) | (3,092,664) | 156,824 | 256,482 | 263,873 | (1,973,911) | (3,131,675) | (2,828,791) |

On July 5, 2022 (the next trading day), Missfresh's ADS price closed at $0.31, a three cent (10.7%) increase from the July 1 closing price of $0.28.  (Ex. B at 6.)  Missfresh's ADS price continued to increase throughout that week, ultimately closing at $0.41 on Friday, July 8, 2022. (*Id.*)

### D.    Missfresh Announces Strategic Business Changes Unrelated to the Internal Review

On July 14, 2022, prior to market close, Missfresh announced a strategic partnership with Shanxi Donghui Group ("Shanxi Donghui"), through which Shanxi Donghui would subscribe for Missfresh's Class B shares in a U.S. dollar amount equivalent to RMB200 million (approximately $29.5 million), subject to the satisfaction of certain closing conditions:

> Through the strategic partnership, Missfresh and Shanxi Donghui will exchange resources and best practices relating to agriculture operations and sales and marketing to strategically cooperate on a range of initiatives around the agriculture supply chain including agricultural branding, contract farming and supply chain management.

> Pursuant to the Agreement, Shanxi Donghui or its designated affiliate will subscribe for 298,507,463 Class B ordinary shares of the Company in the amount of the US$ equivalence of RMB200 million, subject to the satisfaction of the closing condition that Shanxi Donghui or its designated affiliate completes all necessary registrations and obtains all required governmental approvals in China for its overseas direct investment in the Company in the twelve months following the signing date of the Agreement.

(AC ¶ 84; Ex. L, July 14, 2022 Press Release.)  The July 14 Press Release made no mention of the Company's Internal Review of its Next Day Delivery business.

Two weeks later, on July 28, 2022, after market close, the Company announced that "the transaction has not been closed and the Company has not received any funding from Shanxi Donghui." (Ex. M, July 28, 2022 Press Release.)  The Company disclosed that it would be required to temporarily shut down its on-demand DMW business and undertake "staff optimization:"

> As a result, the Company has to adopt significant adjustments to its business strategy for sustainability, including a temporary shutdown of its on-demand Distributed Mini Warehouse (DMW) service and staff optimization. It is expected that these significant adjustments will have a material and adverse impact on the Company's financial performance. The on-demand DMW business contributed approximately 85% of the Company's total net revenue for the nine months ended September 30, 2021. The Company will decide if and when it will re-open the on-demand DMW business depending on the development of its financings and business operations. The Company will make every effort to maintain normal operations in its next-day delivery business, intelligent fresh market business and retail cloud business.

(*Id.*)

Upon this news, the Company's ADS price dropped from $0.14 on July 28, 2022 to $0.12 on July 29, 2022.  Like the July 14 Press Release, the July 28 Press Release made no mention of Missfresh's Internal Review of its Next Day Delivery business.[4]

### E.     In November 2022, Missfresh's ADS Price *Increases* After It Releases Its 2021 Annual Report

On November 14, 2022, prior to market open, Missfresh filed its 2021 Annual Report on Form 20-F.   (Ex. I, 2021 Annual Report.)  Tracking its prior disclosure on July 1, 2022, the 2021

---

[4]   Separately, on September 9, 2022, after market close, Missfresh disclosed the resignation of four directors and officers for personal reasons. (AC ¶ 88; Ex. N, Sept. 9, 2022 Press Release.) Missfresh's ADS price remained the same ($0.12) on September 12, 2022, the next trading day after the announcement.  On September 30, 2022, the Company announced the dismissal of PwC as its independent registered public accounting firm, to be replaced by Shandong Haoxin Certified Public Accountants Co., Ltd.  (AC ¶ 89; Ex. O, Sept. 30, 2022 Press Release.)  The Company's ADS price increased from $0.09 on September 30, 2022 to $0.10 on October 3, 2022.  Plaintiffs do not allege that either of these announcements caused their loss.

Annual Report recited the Internal Review's findings that were announced five months earlier, as well as the related restated financials, which again had no impact on the Company's bottom line:

**Unaudited**

| | As Previously Announced | | | Adjustments | | | As Adjusted | | |
|---|---|---|---|---|---|---|---|---|---|
| | For the three months ended | | | For the three months ended | | | For the three months ended | | |
| | March 31, | June 30, | September 30, | March 31, | June 30, | September 30, | March 31, | June 30, | September 30, |
| (All amounts in thousands, except for share, per share data or otherwise noted) | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 |
| | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB | RMB |
| **Net revenues** | | | | | | | | | |
| Sales of products through online platforms | 1,492,780 | 1,854,120 | 2,078,226 | (156,824) | (256,482) | (263,873) | 1,335,956 | 1,597,638 | 1,814,353 |
| Other revenues | 37,447 | 40,360 | 43,706 | — | — | — | 37,447 | 40,360 | 43,706 |
| **Total net revenues** | 1,530,227 | 1,894,480 | 2,121,932 | (156,824) | (256,482) | (263,873) | 1,373,403 | 1,637,998 | 1,858,059 |
| Cost of revenues | (1,341,249) | (1,752,626) | (1,861,290) | 161,696 | 265,495 | 272,358 | (1,179,553) | (1,487,131) | (1,588,932) |
| Fulfillment expenses | (440,224) | (540,990) | (637,869) | — | — | — | (440,224) | (540,990) | (637,869) |
| Sales and marketing expenses | (167,615) | (304,700) | (256,208) | (4,872) | (9,013) | (8,485) | (172,487) | (313,713) | (264,693) |
| General and administrative expenses | (86,853) | (396,012) | (192,176) | — | — | — | (86,853) | (396,012) | (192,176) |
| Technology and content | (94,794) | (393,829) | (145,121) | — | — | — | (94,794) | (393,829) | (145,121) |
| **Total cost and operating expenses** | (2,130,735) | (3,388,157) | (3,092,664) | 156,824 | 256,482 | 263,873 | (1,973,911) | (3,131,675) | (2,828,791) |

(*Id.* at 117.)

The 2021 Annual Report also disclosed that the Company had identified a new material weakness in its internal control over financial reporting as of December 31, 2021 and the Company had therefore "temporarily terminated the operation of the Next-Day Delivery BU." (AC ¶ 92; Ex. I, 2021 Annual Report, at 140, 141.) Separately, the 2021 Annual Report repeated Missfresh's earlier July 28, 2022 disclosure that Shanxi Donghui had yet to provide any funding, which necessitated significant adjustments to the Company's business strategy, including the temporary shutdown of its on-demand DMW retail business and staff optimization. (AC ¶ 93; Ex. I, 2021 Annual Report, at 32.) The Company further disclosed that these adjustments "have resulted in a material and adverse impact on [its] business, financial performance, reputation and prospect." (*Id.*) That day, Missfresh's ADS price closed at $0.06, a slight increase from the prior trading day's closing of $0.05.

## IV. THIS ACTION

On July 12, 2022, shortly after the issuance of the July 1 Press Release, a purported shareholder initiated this Action. (ECF No. 1.) On December 28, 2022, Lead Plaintiffs filed this Complaint, alleging that the Offering Documents contained material misstatements or omissions

in violation of Sections 11, 12(a)(2), and 15 of the Securities Act.  (ECF No. 34.)  For the reasons explained below, the Complaint should be dismissed in its entirety with prejudice.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO ALLEGE A MATERIAL MISREPRESENTATION

To state a claim under Section 11 or Section 12(a)(2), the Complaint must allege Defendants made "an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).  Plaintiffs challenge six statements in the Offering Documents, and argue Defendants failed to disclose weaknesses in internal controls and misrepresented the sustainability of Missfresh's business.  As explained below, none constitute a material misrepresentation or actionable omission.

### A.    Missfresh Disclosed the Relevant Risks Regarding Internal Controls

Plaintiffs allege that Defendants failed to disclose that "Missfresh had inadequate internal control over financial reporting to prevent and detect misstatements of its sales of products through online platforms," as later revealed by the independent Audit Committee-led Internal Review of its Next Day Delivery business.  (AC ¶¶ 73–79.)  However, "[e]ven at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *see also Yaroni v. Pintec Tech. Holdings Ltd.,* 600 F. Supp. 3d 385, 395 (S.D.N.Y. 2022) ("[W]hen a registration statement warns of the exact risk that later materialized, a [S]ection 11 claim will not lie as a matter of law.").  Here, Missfresh's fulsome and accurate disclosures foreclose Plaintiffs' claim of a material omission.

Contrary to Plaintiffs' claim that Missfresh failed to disclose shortcomings in its internal controls, the Offering Documents contained extensive disclosures on this very topic.  For example,

15

Missfresh warned that although it "ha[d] not completed an assessment of the effectiveness of [its] internal control and procedures over financial reporting" (Ex. A at 110), it had already uncovered a material weakness in its internal controls:

> The material weakness identified relates to *lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP to design and implement formal period-end financial reporting policies and procedures to address complex U.S. GAAP technical accounting issue*; and to prepare and review the Group's consolidated financial statements and related disclosures in accordance with U.S. GAAP and financial reporting requirements set forth by the SEC.

(*Id.* at 47).

Missfresh also candidly warned that it could not "*conclude that [this material weakness] ha[s] been fully remediated*," and that the weakness "*could result in inaccuracies in [its] financial statements*[,] impair [its] ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis" and "*significantly hinder [its] ability to prevent fraud*." (*Id.*)  It also warned that it "*may identify other weaknesses* and deficiencies in [its] internal control over financial reporting," which could "expose [it] to *increased risk of fraud or misuse of corporate assets and subject us to potential delisting*," and even require Missfresh to "*restate [its] financial statements for prior periods*." (*Id.* at 47–48.)  Investors were warned of the precise risks that Plaintiffs contend Missfresh omitted, including that it lacked adequate controls (AC ¶¶ 73, 75, 77), "sufficient competent personnel to effectively and timely monitor[] and perform risk assessment procedures," and "formalized policies and procedures" to detect fraud, and that it could be "required to restate its financial statements." (*Id.* ¶ 79.)

In *Yaroni*, plaintiff alleged a similar Securities Act claim based on defendants' alleged failure to disclose certain as-yet-undiscovered internal control weaknesses, which later caused the company to restate its prior financials after its IPO. *See Yaroni*, 600 F. Supp. 3d. at 393-94.  Judge Furman dismissed plaintiff's claim, holding that defendants' "extensive and reasonably specific"

disclosures—which are nearly *identical* to the disclosures in Missfresh's Offering Documents— "warn[ed] of the exact risk that later materialized." *Id.* at 396-97. In *Yaroni*, as here, the company warned investors about its failure to "complete[] an assessment of the effectiveness of [its] internal control[s]," *id.* at 398, and the lack of "sufficient financial reporting and accounting personnel with appropriate knowledge of GAAP and SEC reporting requirements," *id.* at 397, and further warned that "it might identify additional material weaknesses in the future" and "be required to restate [its] financial statements from prior periods." *Id.* Because Missfresh made the *exact same disclosures* regarding its internal controls, *Yaroni*'s holding applies with equal force to this case.

Moreover, with respect to fraudulent activities in particular, Missfresh disclosed specific instances of "embezzlements and other fraudulent activities" previously perpetrated by rogue employees and warned that it "***cannot guarantee that [its] policies and procedures will be effective in preventing similar fraudulent or illegal activities from occurring in the future***." (Ex. A at 32–33.) Investors were thus warned of the precise risks later uncovered through the Internal Review. *See Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (summary order) ("[A] reasonable investor, based on the specificity of the contemporaneous examples of anti-counterfeiting failures and risks, would have understood that [such] anti-counterfeiting measures were not, at the time of the offering, successfully 'prevent[ing] substantial violations of [] Chinese regulations' and international laws."); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180, 184-86 (E.D.N.Y. 2017) (dismissing Securities Act and Exchange Act claims where "defendants openly acknowledged that [they] faced compliance challenges" and "warned investors of the significant risk"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

Unable to deny Missfresh's fulsome and accurate disclosures, Plaintiffs contend that these same risk disclosures were nonetheless misleading because they "described as *potential* certain

17

risks" but failed to disclose "*then-existing* material adverse facts, trends and uncertainties that Missfresh was already facing at the time of the IPO."  (AC ¶¶ 76–79 (emphasis in original).) However, "[t]he relevant inquiry under the Securities Act is . . . whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue."  *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07 CIV. 1405(RPP), 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009).  Here, the Complaint contains no allegations whatsoever suggesting that Defendants knew or had reason to know at the time of the IPO of the employee misconduct and internal control weaknesses later uncovered through the Internal Review.  *See Yaroni*, 600 F. Supp. 3d at 398-99 (dismissing claims where "Plaintiff allege[d] no facts suggesting that [company] knew or should have known about the internal control weaknesses at the time of the IPO").  Nor does it plausibly allege that Missfresh should have known of these material weaknesses prior to engaging qualified personnel familiar with U.S. GAAP and SEC reporting requirements to complete a thorough assessment of its internal controls over financial reporting.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them").  Plaintiffs do not even challenge the Company's disclosure that "[t]he Review *did not uncover any evidence indicating that Company management-level executives . . . were involved in or aware of any misconduct* relating to the questionable transactions at the time of their occurrence."  (AC ¶ 82.)  Because "Plaintiff[s] do[] not plausibly allege that, at the time of the IPO, [Missfresh] knew that those risks had materialized," they fail to allege a misstatement or omission.  *Yaroni*, 600 F. Supp. 3d at 398-99.

Plaintiffs also conveniently omit several key statements from Missfresh's risk disclosure regarding internal controls, including that it had not "completed an assessment of the effectiveness

of [its] internal controls," lacked "sufficient competent financial reporting and accounting personnel," and that it "may identify other  material weaknesses" that could "expose [it] to increased risk of fraud or misuse of corporate assets and subject [it] to potential delisting" or require Missfresh to "restate [its] financial statements for prior periods."  (*Compare id.* ¶ 78 *with* Ex. A at 47–48, 110.)  But it is axiomatic that Plaintiffs' claims "must be interpreted in the context of the Prospectus as a whole."  *Altayyar*, 242 F. Supp. 3d at 176.  Plaintiffs' contention that Missfresh failed to disclose that it "lacked sufficient competent personnel to effectively and timely monitor[] and perform risk assessment procedures," "lacked formalized policies and procedures," and "had ineffective controls" that could, and ultimately did, result in a restatement of its Q1 2021 financials cannot be squared with the disclosures above.  (AC ¶ 79.)  "In context, the challenged statements are not misleading, and it is only by ignoring the Prospectus's clear limiting language that [Plaintiffs] can say that they are."  *Altayyar*, 242 F. Supp. 3d at 176.

## B.    Missfresh Disclosed the Risks Regarding the Sustainability of Its Business

Plaintiffs also claim that Missfresh falsely portrayed the sustainability of its business, including its historic net revenues, and failed to warn that it may need to adjust its business strategy.  (*See* AC ¶¶ 72–79.)  These claims fail because the Company once again warned of the precise risks that later materialized.  *See Yaroni*, 600 F. Supp. 3d at 395-96.

Plaintiffs claim that the Offering Documents failed to warn that Missfresh would need to "terminate next-day sales through its online platforms" as a result of internal control weaknesses uncovered through the Internal Review.  (AC ¶¶ 72–79.)  As shown above, the Complaint alleges no facts whatsoever suggesting that Defendants knew or had reason to know of these internal control weaknesses or employee misconduct at the time of the IPO.  (*Supra* § I.A.)  Nonetheless, the Offering Documents warned that "[t]o effectively manage the expected growth . . . *[Missfresh]*

19

*will need to continue to improve [its] . . . operational and financial systems, policies, procedures and controls*," which "involve risks and will require significant managerial, financial and human resources." (Ex. A at 20.)  Missfresh further warned that it might not be able "to implement all these. . . control measures successfully" and, as a result, its "business and prospects may be materially and adversely affected." (*Id.*)  Thus, investors were again warned of the precise risks that later materialized, including that Missfresh was later required in July 2022—*one year after the IPO*—to "enhanc[e] . . . the Company's internal controls and risk management policies and procedures for the Next-Day Delivery BU" to address the Internal Review's findings (AC ¶ 82), and that by November 2022, Missfresh "temporarily terminated the operation of the Next-Day Delivery BU" (*id.* ¶ 92).

Moreover, far from "falsely portray[ing] the Company's business and financial prospects," (*id.* ¶¶ 73–79), the Offering Documents warned that Missfresh could not assure investors that it "will be able to grow at the same rate as [it] did in the past, or avoid any decline in the future," particularly in light of its "limited operating history," "[u]ncertainties relating to the growth and profitability of the neighborhood retail industry in China in general, and the on-demand DMW retail industry in particular," industry sensitivity to "macroeconomic changes," and the potential "severe and negative impact" of COVID-19 on China's economy. (Ex. A at 20, 24–25, 45.)

With respect to the temporary shutdown of its DMW business, Plaintiffs once again fail to allege any facts to show that Defendants knew or should have known that macroeconomic conditions, including the rapid decline of consumer spending in China as a result of COVID-19 lockdowns and regulatory tightening, (Exs. F–G), would require Missfresh to seek additional financing, let alone that its efforts to secure such financing through Shanxi Donghui would be unsuccessful. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673

20

(S.D.N.Y. 2008) ("Plaintiff asks the Court to assume that Defendants *must* have known because something did in fact occur later; this is simply inadequate pleading.") (emphasis in original), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  Nonetheless, although Missfresh had no duty to predict these events that occurred ***more than a year after its IPO***, it did warn, as shown above, that such macroeconomic conditions were an uncertainty that could have a material and adverse effect on its business (Ex. A at 20, 24–25, 45), and that it "***may . . . require additional cash resources due to changed business conditions or other future developments***" or need to "sell additional equity or debt securities," and that "***[i]t is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all***."  (*Id.* at 20, 42.)  Once again, investors were expressly warned of the risks that later materialized, including the need to adopt strategic changes due to lack of funding.[5]

### C.    Missfresh's Disclosures Were Not Materially Misleading

Dismissal is also warranted because Plaintiffs fail to allege that any of the six statements challenged in the Complaint were materially misleading.  First, the three risk disclosures described in the Complaint were not misleading for the reasons stated above (AC ¶¶ 74–79), namely, Missfresh disclosed the precise risks that were allegedly omitted, and, to the extent Plaintiffs contend such disclosures failed to warn of additional risks or uncertainties that materialized ***more***

---

[5]    Because, as shown above (*supra* §§ I.A–B), Defendants disclosed the "material events and uncertainties known to management that [were] reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," 17 C.F.R. § 229.303(a), and discussed "material factors that make an investment in [Missfresh] speculative or risky," 17 C.F.R. § 229.105(a), Plaintiffs fail to plead a violation of Items 303 or 105 of Regulation S-K (*see* AC ¶¶ 66–67).  Moreover, "[k]nowledge of a trend is an essential element triggering disclosure under Item 303."  *In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016).  Plaintiffs' Item 303 claim thus fails for the additional reason that the Complaint fails to allege that management knew, at the time of the IPO, about the "questionable transactions" in its Next Day Delivery business, or about any plans to partner with Shanxi Donghui.  (*Supra* §§ I.A–B.)

***than a year after the IPO***, the Complaint alleges no facts whatsoever indicating that such risks or uncertainties were known to the Company at the time of the IPO.  (*Supra* §§ I.A–B.)

Second, Plaintiff argues that Missfresh's financial statements for one quarter—Q1 2021— were misleading because the Company later restated its net revenues for sales of products through online platforms after the conclusion of its Internal Review of the Next Day Delivery business. (AC ¶¶ 68–69.)  Once again, the Offering Documents warned of this precise risk, including that existing material weaknesses in internal controls could "significantly hinder [its] ability to prevent fraud," or result in the identification of "other weaknesses and deficiencies in [its] internal control" that could require it to "***restate [its] financial statements for prior periods***."  (Ex. A at 47–48.)

Moreover, Plaintiffs fail to allege why these changes were material.  A fact is material only if "there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *In re Duke Energy Corp. Sec. Litig*., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (Rakoff, J.), *aff'd*, 113 F. App'x 427 (2d Cir. 2004).  In assessing the materiality of a change in financials, courts must look to the change "in the context of the company's total operations," not "based on the change in the line item alone."  *Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020).  "[C]onclusory statement[s] that 'the changes in financial results were material to investors' [are] not sufficient" to state a Securities Act claim, even where a company issues a restatement.  *Yaroni*, 600 F. Supp. 3d at 402-03.

Plaintiffs fail to allege facts showing the changes to Missfresh's Q1 2021 financial statements "would have been material to an investor," because "gross profit remained the same before and after the restatement."  *Id.* at 401-02.  As Missfresh disclosed in its July 1 Press Release and its 2021 Annual Report, Q1 2021 net revenue was overstated by RMB156,924,000, but costs

of revenues were understated by the same amount.  (Ex. J, July 1 Press Release, at 2; Ex. I, 2021 Annual Report, at 117.)  In other words, the Restatement did not affect Missfresh's bottom line for that period.  *See Yaroni*, 600 F. Supp. 3d at 401-02, 404 (dismissing Securities Act claims where restatement resulted in no change to gross profit); *see also Duke Energy*, 282 F. Supp. 2d at 160-61 ($217 million in round-trip trades, which represented 0.3% of revenue, were "immaterial . . . as a matter of law").  Plaintiffs allege no other reason why the adjustments to the Q1 2021 financial figures alone were material.  Indeed, after Missfresh issued the Restatement, its ADS price actually increased from $0.28 to $0.31 (Ex. B), confirming that the changes did not "significantly alter[] the total mix of information made available" to investors.  *Peifa Xu*, 2020 WL 1508748, at *9.

Third, Plaintiffs contend that Missfresh's historical financial statements, which showed that "net revenues were primarily generated through online on-demand and next-day sales" and that such sales accounted for an increasingly higher percentage of net revenues from 2018 through Q1 2021, "falsely portrayed the Company's business and financial prospects."  (AC ¶¶ 72–73.)  As an initial matter, to the extent Plaintiffs argue that the financial statements from 2018 to 2020 were misleading, this claim fails because "it is well established that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 617 n.3 (S.D.N.Y. 2021).  Plaintiffs do not allege that Missfresh's financial statements for 2018 through 2020 were false.  Nor do they explain why the misstated figures pertaining to *one quarter*—Q1 2021—would have provided a misleading picture of Missfresh's sustainability or financial prospects.  As shown above, the Restatement of Q1 2021 figures resulted in no change to Missfresh's bottom line.  In any event, "Plaintiffs cannot base a [Securities Act] claim on implicit promises read into Defendants' historical factual statements." *Coty*, 2016 WL 1271065, at *9.  Plaintiffs' other allegations that the financial statements were

misleading because they omitted risks relating to the Company's internal controls, employee misconduct, and the potential need to adjust business strategies (AC ¶ 73), fail for the reasons explained above, namely, such risks were either clearly disclosed, or were not known or knowable at the time of the IPO (*supra* §§ I.A–B).

Fourth, and finally, Plaintiffs fail to allege facts showing the financial statements reported in the Offering Documents were not "prepared and presented in accordance with" U.S. GAAP. (*See* AC ¶¶ 70–71.) The eventual Restatement was not the result of any U.S. GAAP violation or accounting error. Rather, the Internal Review found that certain rogue employees engaged in "questionable transactions," including involving "undisclosed relationships between suppliers and customers," which indicates that the employees actively hid their misdeeds from the Company. (Ex. I at 4.) Plaintiffs do not allege that the Company's accountants misapplied any U.S. GAAP rules to the information they had at the time the Offering Documents were prepared. The mere fact that the Company later corrected certain financial data based on new information does not show the Offering Documents were not prepared and presented in accordance with U.S. GAAP. *See Duke Energy*, 282 F. Supp. 2d at 160 (dismissing securities claims where plaintiffs failed to "specify any respect in which defendants' . . . accounting practices . . . were improper").[6]

## II.   NEGATIVE CAUSATION IS APPARENT ON THE FACE OF THE COMPLAINT

Dismissal is also warranted because the Plaintiffs' loss is not attributable to the purported "corrective disclosures" on which they rely. The securities laws do not "provide investors with

---

[6]   Similarly, because Plaintiffs fail to allege that the challenged statements were misleading under the circumstances under which they were made, they fail to state a violation of Rule 408 of Regulation C. (AC ¶ 65.)

broad insurance against market losses"; rather, they "protect [investors] against those economic losses that misrepresentations actually cause." *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 345 (2005). The Securities Act provides an affirmative defense that bars recovery for losses not attributable to the alleged misrepresentation. *See* 15 U.S.C. § 77k(e), 77/(b). Even at the pleading stage, dismissal is warranted if "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue." *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig*., 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).

By April 29, 2022—before any alleged misrepresentation was revealed to the market—Missfresh's ADS price had already dropped **96%** from its $13.00 IPO price to $0.52. (Ex. B at 5.) "[A] price decline before disclosure may not be charged to [Defendants]" under Sections 11 or 12(a)(2). *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009). Worse for Plaintiffs, Missfresh's ADS price ***increased*** following the disclosure of the Internal Review findings in July 2022, and again after the release of its 2021 Annual Report in November 2022, which disclosed strategic adjustments to its business. *See Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (granting motion to dismiss where disclosures did not result in a price drop; noting "nothing bars a court from dismissing claims based on an affirmative defense"). Thus, it is apparent on the face of the Complaint that the alleged misrepresentations did not cause and could not have caused any of Plaintiffs' alleged loss.[7]

### CONCLUSION

For the foregoing separate and independent reasons, Defendants respectfully request that the Amended Class Action Complaint be dismissed in its entirety with prejudice.

---

[7] Because Plaintiffs fail to allege a primary violation, their Section 15 claim "necessarily fails." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

Dated: New York, New York
       January 27, 2023

               Respectfully submitted,


               */s/ Robert A. Fumerton*

Scott D. Musoff
  (scott.musoff@skadden.com)
Robert A. Fumerton
  (robert.fumerton@skadden.com)
Michael C. Griffin
  (michael.griffin@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

*Attorneys for Defendants Missfresh Limited,*
*Cogency Global, Inc., and Colleen A. DeVries*