# EXHIBIT 1

2023 WL 5152177
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark WINTER, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
v.
STRONGHOLD DIGITAL MINING, INC., Gregory
A. Beard, Ricardo R. A Larroudé, William B. Spence,
B. Riley Securities, Inc., Cowen and Company, LLC,
Tudor, Pickering, Holt & Co. Securities, LLC, D.A.
Davidson & Co., Compass Point Research & Trading,
LLC, and Northland Securities, Inc., Defendants.

No. 22-CV-3088 (RA)
|
Signed August 10, 2023

**Attorneys and Law Firms**

Gregory Bradley Linkh, Glancy Prongay & Murray LLP, New York, NY, for Plaintiff.

Christopher Emmanuel Duffy, Clifford Louis Thau, Marisa Antonelli, Vinson & Elkins LLP, New York, NY, David Adam Hoffman, Petrillo Klein & Boxer LLP, New York, NY, for Defendants Stronghold Digital Mining, Inc., Gregory A. Beard, William B. Spence.

Lucy Nnenna Onyeforo, Faegre Drinker Biddle & Reath LLP, New York, NY, David Adam Hoffman, Petrillo Klein & Boxer LLP, New York, NY, Sandra Dawn Grannum, Faegre Drinker Biddle & Reath LLP, Florham Park, NJ, for Defendant Ricardo R.A. Larroude.

Jeffrey B. Korn, Willkie Farr & Gallagher LLP, New York, NY, for Defendants B. Riley Securities, Inc., Cowen and Company, LLC, Tudor, Pickering, Holt & Co. Securities, LLC, D.A. Davidson & Co., Compass Point Research & Trading, LLC, Northland Securities, Inc.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

**\*1** Plaintiffs Gulzar Ahmed and Allegheny County Employees Retirement System bring this putative federal class action lawsuit against Stronghold Digital Mining, Inc.

("Stronghold," or the "Company"), the underwriters for Stronghold's October 2021 initial public offering ("IPO"), and three of Stronghold's officers and directors. Plaintiffs allege that the registration statement and prospectus filed in connection with Stronghold's IPO contained materially false and misleading information in violation of Section 11, Section 12(a)(2) and Section 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77*o*. Pending before the Court are two motions to dismiss the Amended Class Action Complaint (the "Complaint")—one by Stronghold and its officers, and the other by the Company's underwriters. For the reasons that follow, the motions are granted in part and denied in part.

**FACTUAL BACKGROUND** [1]

Stronghold is a cryptocurrency mining company organized under Delaware law and headquartered in New York. Compl. ¶ 24. At all relevant times, Defendant Gregory Beard was Stronghold's chief executive officer, president and co-chairman of the Company's board of directors; Defendant Ricardo Larroudé was Stronghold's chief financial officer; and Defendant William Spence was co-chairman of the board of directors (collectively, the "Individual Defendants"). *Id.* ¶¶ 25–27. Defendants B. Riley Securities, Inc.; Cowen and Company, LLC; Tudor Pickering Holt & Co. Securities, LLC; D.A. Davidson & Co.; Compass Point Research & Trading, LLC; and Northland Securities, Inc. were underwriters for Stronghold's IPO (collectively, the "Underwriter Defendants"). *Id.* ¶¶ 30–35.

Co-Lead Plaintiff Allegheny County Employees Retirement System ("ACERS") purchased Stronghold stock directly from the Underwriter Defendants on October 20, 2021 during the Company's initial public offering. *Id.* ¶ 23. Co-Lead Plaintiff Gulzar Ahmed purchased Stronghold stock "pursuant and/or traceable" to the Company's Registration Statement and Prospectus which were filed with the SEC in connection with the IPO. *Id.* ¶ 22.

**I. Pre-IPO Events**
Bitcoin is a digital currency that can be created, or "mined" by computers solving complex cryptographic puzzles to guess a correct "hash," which results in the creation of a new Bitcoin. *Id.* ¶¶ 50–52. The greater the computing power of a mining operator, the more likely it is to be the first to provide the correct hash and create a new Bitcoin. *Id.* ¶ 56. Bitcoin is

traded by investors, often at volatile prices, and the rise in its value from 2017 to 2021 "enticed many individuals and entities ... to enter the Bitcoin mining market." *Id.* ¶¶ 54, 55.

**\*2** Stronghold—which describes itself as "a vertically-integrated cryptocurrency mining company"—is one of those entities. *Id.* ¶¶ 24, 55. Like other Bitcoin miners, Stronghold's miners require significant computer processing power to create a single Bitcoin, and thus incur high electricity costs. *Id.* ¶ 57. To "maximize efficiency and to minimize cost," Stronghold owns and operates two coal refuse power generation facilities in Pennsylvania for its fleet of Bitcoin miners, which the Company claims "driv[es] among the lowest costs of crypto asset production in [the] industry" and "helps us to produce Bitcoin at one of the lowest prices among our publicly traded peers." *Id.* ¶¶ 3, 60; Thau Decl. Ex. 5.

On April 2, 2021, Stronghold entered into a purchase agreement with MinerVa Semiconductor Corp. ("MinerVa"), a manufacturer of cryptocurrency miners with operations in China and Canada. *Id.* ¶ 43. Pursuant to the agreement, MinerVa was to supply Stronghold 15,000 cryptocurrency miners with a total terahash equal to 1.5 million terahash. [2] *Id.* The purchase agreement made MinerVa Stronghold's largest supplier of miners at the time of its IPO, with MinerVa supplying "15,000 of the 26,150 miners Stronghold had under purchase agreement at the time of the IPO." *Id.* ¶¶ 43, 72. As a result, Plaintiffs allege, MinerVa's production of Bitcoin miners was "critical ... to Stronghold's business." *Id.* ¶ 72.

### II. Stronghold's IPO and the Offering Materials
Stronghold began preparing for its IPO in 2021. On July 27, 2021, it filed its first registration statement with the SEC, and on October 19, 2021, it filed its final amendment to the Registration Statement to begin its IPO on the NASDAQ market. *Id.* ¶¶ 4, 5. On October 21, 2021, Stronghold filed its Prospectus for the IPO on Form 424B4 with the SEC. *Id.* ¶ 6. In its Registration Statement and Prospectus (together, the "Offering Materials"), it described the delivery schedule and computing power of the miners that MinerVa had agreed to supply:

> On April 2, 2021, the Company entered into a purchase agreement (the "Minerva Purchase Agreement") with Minerva Semiconductor Corp ("Minerva") for the acquisition of 15,000 of their MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash (total terahash). The price per miner is $4,892.50 for an

aggregate purchase price of $73,387,500 to be paid in installments. The first installment equal to 60% of the purchase price, or $44,032,500, was paid on April 2, 2021, and an additional payment of 20% of the purchase price, or $14,677,500, was paid June 2, 2021. The remaining 20% is still owed and is scheduled to be made one month before the shipping date. The seller anticipates shipping no less than 15,000 miners by January 2022. Anticipated delivery quantities and timeframe will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022. The aggregate purchase price does not include shipping costs, which are the responsibility of the Company and shall be determined at which time the miners are ready for shipment.

[...]

With part of the proceeds of this offering, we intend to procure approximately 55,800 additional miners, which we anticipate will bring our total hash rate capacity to over 2,100 PH/s by December 2021 and to over 8,000 PH/s by December 2022.

**\*3** *Id.* ¶¶ 111, 118; Thau Decl. Ex. 5. The Offering Materials also included cautionary statements with respect to the delivery and computing power of the miners:

> We are dependent on third-party brokers and direct suppliers to source some of our miners, and failure to properly manage these relationships, or the failure of these brokers or suppliers to perform as expected, could have a material adverse effect on our business, prospects or operations. [...] China has been experiencing power shortages, and certain of our miner suppliers have been impacted by related intermittent power outages. [...] Such power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all. [...] Any delays, interruption or increased costs could

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

have a material adverse effect on our
business, prospects or operations.

Compl. ¶ 115; Thau Decl. Ex. 5. On October 20, 2021, the
Company's stock began trading on the NASDAQ market at a
price of $19.00 per share. Compl. ¶ 99.

### III. Post-IPO Events

On November 8, 2021, less than three weeks after the IPO,
Stronghold publicly acknowledged that it would be unable
to obtain the MinerVa miners consistent with the delivery
schedule set forth in the Offering Materials. *Id.* ¶ 124. In a
report on Form 8-K filed with the SEC, Stronghold "disclosed
that [it] had yet to receive any miners from MinerVa and that
only 240 miners were on the way," far short of the 2,500
miners it had said in the Offering Materials it anticipated
would arrive by October 31, 2021. *Id.* Several weeks later,
in an earnings call on November 30, 2021, the Company
disclosed that—in contrast to the 5,000 miners it had said
it expected by the end of November—it had only "240
MV7 miners plugged in currently," but explained that "we
do believe that we're going to get all 15,000 miners in
the first quarter of next year." *Id.* ¶ 129, 131. On March
29, 2022, Stronghold announced its fourth quarter earnings,
reporting a loss of $0.52 earnings per share. *Id.* ¶ 136.
In an accompanying press release, Stronghold stated that
"[s]pecific to our contract with MinerVa, deliveries have been
well short of the timelines in the contract and subsequently
communicated to us by MinerVa." *Id.* ¶ 137. As of the
end of the March, it had "only received approximately
3,300 of the total 15,000 miners ordered from MinerVa." *Id.*
Stronghold acknowledged in investor presentation materials
that its losses due to the MinerVa miner delivery delays
were approximately "$30-35mm in estimated revenue missed
through March 2022." *Id.* ¶ 139.

Stronghold also disclosed in the March 29, 2022 press
release that it had failed to achieve the total hash rate
it projected in the Offering Materials, in part because of
MinerVa's failure to deliver the miners. *Id.* ¶ 144. In addition,
"the performance of MinerVa's miners has been below
expectations, with hash rates ranging from 50% to 70% of
the expected capacity, compared to 90%+ for a standard
performing machine." *Id.* ¶¶ 137, 146. According to Plaintiffs,
that acknowledgment indicated that the hash rate Stronghold
had expected "internally was only 90% of the 100 TH/s figure
the Company had announced in its Offering Materials, or 90

TH/s of the announced 100 TH/s." *Id.* ¶ 84. On March 30,
2022, the Company's stock price fell "as much as $3.28 per
share, or 35%," on a trading volume ten times that of March
28, 2022. *Id.* ¶ 147.

**\*4** The Complaint alleges several reasons that MinerVa
was unable to deliver miners consistent with the schedule
in the Offering Materials. First, power cuts and outages in
September and October 2021 caused factory closures across
China and at the MinerVa assembly facility, "prevent[ing]
the assembly and shipping of MinerVa MV7 miners to
Stronghold," and "rendering it impossible to meet the delivery
schedule represented in the Offering Materials." *Id.* ¶¶ 68,
69. Second, at the time of the IPO, MinerVa "had not yet ...
sourced adequate component parts for any significant number
of miners." *Id.* ¶ 77. On October 21, 2021, a China-based chip
manufacturer, AGM Group Holdings Inc., announced that it
"agreed to supply MinerVa Semiconductor Corp. ('MinerVa')
with 25,000 units of its 100 TH/S MinerVa MV7 ASIC to
build the MinerVa family of crypto miners," which, according
to Plaintiffs, "indicat[es] MinerVa did not have the necessary
parts to even construct the miners Stronghold had ordered."
*Id.* In addition, Stronghold had not yet fully paid for the
MinerVa miners as of the October 21, 2021 Prospectus filing,
even though payment was due "one month before the shipping
date." *Id.* ¶ 78. According to Plaintiffs, it was therefore
"knowable" that MinerVa would be unable to deliver the first
shipment of 2,500 miners by October 31, 2021, ten days later.
*Id.*

According to Plaintiffs, MinerVa's failure to deliver the
required number of miners—and the alleged deficiencies of
the miners it did deliver—rendered several statements in
the Offering Materials materially false and misleading. First,
Plaintiffs allege that the Company's statement in the Offering
Materials describing the delivery schedule of the miners—
that "[a]nticipated delivery quantities and timeframe will be
no less than 2,500 miners by October 31, 2021, no less than
5,000 miners by November 30, 2021, no less than 5,000 by
December 31, 2021, and the remaining 2,500 by January
2022"—was false, because MinerVa was ultimately "unable
to achieve the miner delivery quantities and deadlines stated
in the Offering Materials." *Id.* ¶ 114. Second, Plaintiffs allege
that the statements in the Offering Materials regarding the
MinerVa miners' anticipated hash rate—that "[t]he Company
entered into a purchase agreement [with MinerVa] for the
acquisition of 15,000 [miners] with a total terahash to be
delivered equal to 1.5 million terahash (total terahash)" and
that "we anticipate will bring our total hash rate capacity to

over 2,100 PH/s by December 2021"—were false because Stronghold could "not meet its total hash rate forecasts in the Offering Material," and because the individual miners failed to achieve the individual hash rates that Stronghold projected in the Offering Materials. *Id.* ¶¶ 119, 122.

## PROCEDURAL BACKGROUND

Plaintiff Mark Winter initiated this action on April 14, 2022. On June 13, 2022, Edward Young, ACERS, Gulzar Ahmed, and Greg Stuart filed motions for appointment as lead counsel and approval of selection of lead counsel in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 77z-1(a). On August 4, 2022, the Court held a hearing on the motions for appointment of lead plaintiff, and on the same day, appointed Ahmed and ACERS as Co-Lead Plaintiffs.

On October 18, 2022, Plaintiffs filed the instant Complaint on behalf of all those who purchased or acquired Stronghold stock in connection with the October 2021 IPO, alleging violations of Section 11 of the Securities Act against all Defendants; Section 12(a)(2) violations against Stronghold and the Underwriter Defendants; and Section 15 violations against the Individual Defendants. On December 19, 2022, Defendants Stronghold, Beard, and Spence moved to dismiss, and Defendant Larroudé moved to join their motion (the "Stronghold Defendants"). On the same day, the Underwriter Defendants filed a separate motion to dismiss.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [her] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (cleaned

up). In answering this question, the Court must "accept[ ] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35 (citation omitted).

**\*5** Sections 11, 12(a)(2) and 15 of the Securities Act impose liability on issuers, officers and other participants in a registered securities offering for material misrepresentations or omissions in registration statements or prospectuses. Section 11 applies to registration statements filed with the SEC and provides redress against a security's issuer, underwriter, and certain other statutorily enumerated parties. *See* 15 U.S.C. § 77k(a). To state a claim under Section 11, a plaintiff "must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' " *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

Section 12(a)(2) imposes liability for misstatements or omissions in a prospectus. *See* U.S.C. § 77*l*(a)(2). In order to plead a prima facie case under Section 12, a plaintiff must allege that (1) the defendant is a "statutory seller," *see* *Pinter v. Dahl*, 486 U.S. 622, 643–47 & n. 21 (1988); that "(2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading,' " *In re Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77*l*(a)(2)). "Claims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section 12(a)." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011) (internal citation omitted).

Section 15 makes individuals or entities liable that "control[ ] any person liable" under Sections 11 or 12. 15 U.S.C. § 77*o*(a). As a result, "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *In re Morgan Stanley*, 592 F.3d at 358.

Both Sections 11 and 12(a)(2) provide affirmative defenses based on what a defendant knew or reasonably believed at the time a registration statement or prospectus was issued. Section 11 provides a so-called "due diligence" defense that expressly exempts from liability persons—"other than the issuer" of the security—where they demonstrate that they had

> after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading [...]."

15 U.S.C. § 77k(b)(3). There is no such defense available for issuers in Section 11 claims. *See id.;Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983) (explaining that "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements" while "[o]ther defendants bear the burden of demonstrating due diligence"). Section 12(a)(2), for its part, provides a "reasonable care defense," imposing liability upon securities sellers for "untrue statement[s] of a material fact" or omissions in a prospectus only where they

> shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission [...]

*Id.* § 77*l*(a)(2).

Section 11 thus imposes strict liability on issuers of securities, and negligence liability on the issuers' officers, directors and experts, while Section 12 imposes negligence liability on all sellers. *See e.g.,In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659–60 (S.D.N.Y. 2004) (explaining that "Section 11 provides an affirmative defense of 'due diligence,' which is available to defendants

other than the issuer of the security" and "Section 12(a)(2) provides an affirmative defense of reasonable care"). As discussed in greater detail below, scienter is not a pleading requirement in Section 11 and Section 12 claims, *In re Morgan Stanley,* 592 F.3d at 359, and plaintiffs are not required to allege that defendants knew of any material omitted facts or misstatements, *see, e.g.,In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 441 n.15.

**DISCUSSION**

**\*6** In their motions to dismiss, Defendants make three principal arguments. First, they argue that the Complaint does not allege any actionable misleading statements or omissions; second, that the allegations in the Complaint negate loss causation; and third, that Plaintiff Ahmed lacks standing pursuant to Section 12(a)(2). The Court addresses each of those arguments in turn.

**I. Material Misstatements in the Offering Materials**

Plaintiffs' claims are based on two categories of alleged misleading statements or omissions in the Offering Materials. The first is about the number of Bitcoin miners that Stronghold expected MinerVa to deliver. The Offering Materials state that

> [a]nticipated delivery quantities and timeframe [of the MinerVa miners] will be no less than 2,500 miners by October 31, 2021, no less than 5,000 miners by November 30, 2021, no less than 5,000 by December 31, 2021, and the remaining 2,500 by January 2022.

Compl. ¶ 111; Thau Decl. Ex. 4, 5. As Stronghold later acknowledged, MinerVa failed to deliver anywhere close to the number of miners stated in the Offering Materials. Indeed, the Company received only 240 miners by the end of November 2021 and 3,300 miners by March 2022, far short of the 15,000 miners Stronghold told investors that MinerVa would deliver, and well behind schedule.

As an initial matter, Defendants argue that plaintiffs in Section 11 and Section 12(a)(2) cases must allege that defendants knew, or should have known, of the falsity of any statements

or omissions at the time they were made in order to state a claim under the Securities Act. Stronghold Mot. at 9–10, 11, 15. According to Defendants, dismissal is warranted here because the Complaint does not allege that Stronghold "knew (or should have known)" that MinerVa would not deliver the required number of Bitcoin miners. *Id.* at 11. The Court disagrees.

The Second Circuit has clearly established that plaintiffs bringing claims under Sections 11 and 12(a)(2) of the Securities Act are not required to allege scienter. *SeeCity of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (explaining that in Sections 11 and 12(a)(2) claims, plaintiffs "need not allege scienter, reliance, or causation"); *In re Morgan Stanley*, 592 F.3d at 359 ("[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act ... plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."). The Circuit has also made clear that Section 11's due diligence and Section 12(a)(2)'s reasonable care requirements regarding a defendant's knowledge are affirmative defenses, not pleading requirements that plaintiffs must overcome on a motion to dismiss. *SeeFed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) (explaining that Section 12's reasonable care defense is an affirmative defense); *Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 475 (S.D.N.Y. 2002) (noting, in Section 11 claims, that "[s]ince the due-diligence defense" is "not [an] element[ ] of the plaintiffs' case, there is no requirement that the plaintiffs anticipate the invocation of [the] defense[ ] in their complaint"). As such, Sections 11 and 12(a)(2) "place[ ] a 'relatively minimal burden' on a plaintiff," which is met "[s]o long as plaintiffs plausibly allege that [the defendant] omitted material information that it was required to disclose or made material misstatements in its offering documents." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716, 718 (2d Cir. 2011); *accord.Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

**\*7** Consistent with those principles and the text of the Securities Act, numerous district courts in this Circuit have explained that plaintiffs are not required to allege that defendants in Section 11 and Section 12 claims knew, or should have known, of any material omitted facts or misstatements at the pleading stage. *In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 652 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013) (citing *Litwin*, 634 F.3d at 715–16 and *In re Morgan Stanley*, 592 F.3d at 360) ("Section 11 does not

require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made."); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 441 n.15 ("[K]nowledge is not an element of a plaintiff's *prima facie* case for claims brought pursuant to sections 11 and 12(a)(2)"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 343 (S.D.N.Y. 2003) ("Because there is no scienter requirement in Section 11, Plaintiffs need not plead that the Defendants had knowledge of the alleged omission."); *Degulis v. LXR Biotech., Inc.*, No. 95-CV-4204 (RWS), 1997 WL 20832, at \*3 (S.D.N.Y. Jan. 21, 1997) ("[T]o make out a *prima facie* case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's *prima facie* case."); *see alsoHutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 273–75 (D. Conn. 2009), *aff'd on other grounds sub nom.Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011) (collecting cases and concluding that, under Sections 11 and 12, "plaintiffs need not plead that the defendants knew or should have known" of omissions "in order to state a claim for failure to disclose").

In support of their assertion that a complaint must allege a defendant "knew, or should have known" of the falsity of their statements, Defendants rely on cases which note that the misstatements or omitted facts must have been "knowable" at the time the statements were made. *SeeIn re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021) ("Plaintiffs alleging actionable omissions under Section 11 must 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.' "); *Holbrook v. Trivago N.V.*, No. 17-CV-8348 (NRB), 2019 WL 948809, at \*11 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom.Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) (stating that Plaintiffs must plead facts to demonstrate that the omitted facts "were known or knowable"); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (same). But whether a fact was "knowable" at the time of a securities offering is not the same as whether a defendant "knew," or "should have known" of that fact. Indeed, the cases Defendants cite turn on whether plaintiffs alleged that a defendant *could have known* of an alleged misstatement or omission—i.e., whether the relevant event had already transpired at the time of the offering—not, as Defendants argue, on what the defendant knew or should have known.

For example, Defendants rely on *Wandel v. Gao*, where a court in this District dismissed Section 11 and 12(a)(2) claims

alleging that the defendants failed to disclose "what they knew about COVID-19" and its risks at the time of their IPO. 590 F. Supp. 3d 630 (S.D.N.Y. 2022). Although, as Defendants correctly point out, the court in *Wandel* stated that "the duty to disclose" under Sections 11 and 12(a)(2) "arises only when the issuer knew—or should have known—of the omitted fact at the time the statements were made," its reasoning rested on its conclusion that "the risk of COVID-19 was neither known nor knowable" at the time of the defendants' IPO on January 17, 2020, which predated the widespread outbreak of COVID-19. 590 F. Supp. 3d at 640–41. Because it was "only with hindsight" that the plaintiffs could allege that the defendants "failed to discuss the possibility that a few dozen cases of respiratory illness would explode into a ruinous pandemic," the court held that the defendants could not be held liable for failing to disclose those risks. *Id.* at 641–42. The other cases Defendants rely on similarly do not support the pleading requirement they propose. In *In re HEXO Corp.*, another judge in this District dismissed a Section 11 claim where, nine months after the IPO, a defendant company's key customer failed to meet a purchase commitment described in the offering materials, and the plaintiffs did not "allege[ ] facts detailing defendants' contemporaneous knowledge of future insufficient demand or even how the defendants could have told the future." 524 F. Supp. 3d at 297, 301–02. In *Scott v. General Motors Co.*, yet another judge dismissed a Section 11 claim where it concluded that plaintiffs alleged "no facts that, if true, would demonstrate that the Registration Statement contained a material misstatement or omission *at the time it became effective*," and where the allegations in the complaint "reflect[ed] public knowledge" of the alleged material omission. 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) (emphasis added). And in *Zirkin v. Quanta Capital Holdings Ltd.*, the court dismissed a Section 11 claim where the plaintiff challenged the defendant's loss estimates relating to Hurricane Katrina but the complaint alleged "no factual allegations contradicting the veracity of the $68.5 million loss estimate at the time that estimate was released," and instead relied on a revised estimate released two months after defendant's offering materials. No. 07-CV-851, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009). As those cases make plain, courts considering Section 11 and 12(a)(2) claims at the motion to dismiss stage inquire into the "truth of a statement made in the registration statement" as "judged by the facts as they existed when the registration statement became effective." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004).

**\*8** In sum, Plaintiffs are not required to allege that Defendants "knew" or "should have known" that a breach of the MinerVa purchase agreement was imminent. Because "knowledge is not an element" of a plaintiff's prima facie case for Section 11 and Section 12 claims, "Defendants' 'knowledge' argument is more appropriately made on a motion for summary judgment, in the context of invoking the various 'due diligence' or 'reasonable care' affirmative defenses provided for by sections 11 and 12(a)(2)." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 441 n.15. Instead, to withstand the motions to dismiss, Plaintiffs must plausibly allege that Stronghold's statement that it "anticipated" the delivery of miners described in the Offering Materials was materially false or misleading at the time of the IPO. *See, e.g.,In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d at 205.

Plaintiffs have done so here. Several facts alleged in the Complaint animate this conclusion. First, Stronghold stated in the Offering Materials that the outstanding payment for the MinerVa miners was due "one month before the shipping date," but Stronghold had not yet made that payment as of October 21, 2021, just ten days before 2,500 MinerVa miners were supposed to be delivered. Compl. ¶ 78. The Complaint thus plausibly alleges that, contrary to Stronghold's assertions in the Offering Materials, it could not have "anticipated" receiving "2,500 miners by October 31, 2021" given that it had not yet paid for them. *Id.* ¶ 80.

Second, from September 2021 through at least October 2021, power cuts and outages resulted in factory closures across China, including at the facility where MinerVa assembled the MV7 miners. *Id.* ¶¶ 68, 69. Plaintiffs allege that those power outages, which occurred "prior to and at the time of the IPO," "prevented the assembly and shipping of MinerVa MV7 miners to Stronghold" and "render[ed] it impossible to meet the delivery schedule represented in the Offering Materials." *Id.* ¶ 69. Third, according to the Complaint, MinerVa did not have the necessary parts to construct the miners Stronghold had ordered. Plaintiffs allege that on October 21, 2021, the date of the Prospectus filing, the China-based company AGM Group Holdings Inc. announced that it "agreed to supply [MinerVa] with 25,000 units of its 100 TH/s MinerVa MV7 ASIC to build the MinerVa family of crypto miners," thus raising a plausible inference that MinerVa was unable to construct and deliver the miners Stronghold ordered at the time of the IPO. *Id.* ¶ 77.

Plaintiffs also allege that, according to one confidential witness ("CW"), CW-1, Stronghold Vice President of Operations Charlie Talcott stated during a visit to Stronghold's Panther Creek facility "in mid-to-late October 2021" that "although MinerVa had sold Stronghold a large quantity of miners, in fact MinerVa did not have that many miners at all, and could not provide the miners on the timeframe represented or needed by Stronghold." *Id.* ¶ 75. In addition, according to CW-2, "miner deliveries and deployments were behind schedule at the Panther Creek Data Center, and Stronghold did not have the miners it planned to have as of the IPO." *Id.* ¶ 71. [3]

 **\*9**  Defendants invoke the "bespeaks caution" doctrine, arguing that the alleged misrepresentations in the Offering Materials are immaterial in light of the cautionary language in the IPO materials. Stronghold Mot. at 20-21. Under that doctrine, courts analyze such cautionary language along with the "allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002). The doctrine does not apply, however, where a risk disclosed by Defendants has already transpired at the time the statements at issue were made. *See Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (citation omitted) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

Here, Stronghold warned in the Offering Materials that "power outages and production relocations could result in cancellations or delays and may negatively impact our ability to receive mining equipment on a timely basis or at all." Thau Decl. Ex. 4, 5. But given Plaintiffs' allegations that those risks had already occurred, the warnings are unavailing: the Complaint alleges that Stronghold had not yet paid for the final shipment of miners and that the power outages were so severe that the miner shipment schedule was not possible at the time of the IPO. As such, "[b]ecause Defendants' statements were hypothetical" and the warned-of risks were not, the cautionary statements "are not curative." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379, 409 (S.D.N.Y. 2020) (rejecting defendants' warnings as insufficient where disclosed risks "had already materialized as of the IPO").

To the extent that Defendants argue that any misstatements about the expected delivery dates of the miners were immaterial, materiality is a "mixed question of law and fact," that "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley,* 592 F.3d at 360 (citation omitted). As the Second Circuit has recognized, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted). The Stronghold Defendants' assertion that "[a]t most, [the] allegations" that Stronghold had not made its final payment until after the IPO "show that Stronghold knew of a potential *immaterial* delay in MinerVa's first shipment," Stronghold Mot. at 12 (emphasis in original), is thus inapposite: absent fact discovery, the Court cannot determine that any delay in the shipments of miners would have been immaterial to investors given their alleged importance to Stronghold's operations.

In sum, given the power outages at MinerVa's facilities and MinerVa's belated acquisition of necessary parts for the miners, as well as that Stronghold had not yet made its final payment for the miners at the time of the IPO, Plaintiffs have plausibly alleged Stronghold could not have "anticipated" receiving the miners according to the timeline in the Offering Materials. [4] Compl. ¶ 116. Insofar as the non-issuer Defendants intend to argue that they exercised "due diligence" or "reasonable care" pursuant to Sections 11 and 12, respectively, to determine whether MinerVa could deliver miners consistent with the delivery schedule, they may assert a due diligence defense under Section 11 or a reasonable care defense under Section 12(a)(2) on summary judgment or at trial. They will, however, "bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)." *In re Morgan Stanley,* 592 F.3d at 359 n.7; *see Fed. Hous. Fin. Agency v. UBS Americas, Inc.,* 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013) (explaining that in Section 11 claims, "due diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6)").

 **\*10**  Accordingly, because Plaintiffs have identified at least one actionable misstatement or omission in the Offering Materials, the Complaint survives the motion to dismiss.

## II. Loss Causation

Defendants next argue that Plaintiffs' claims must be dismissed because the facts alleged in the Complaint make clear that their theory of "loss causation"—i.e., the causal connection between the alleged misrepresentation or omission and Plaintiffs' loss—is not viable. Stronghold Mot. at 23–24. The Court is not persuaded.

"[U]nlike securities fraud claims pursuant to section 10(b)" of the Securities Act, "plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege ... loss causation." *In re Morgan Stanley*, 592 F.3d at 359. The absence of loss causation—known as "negative causation"—is instead an "affirmative defense" that defendants bear the burden of proving, "reflecting Congress's 'desire to allocate the risk of uncertainty to the defendants.' " *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)). That burden is a heavy one, and is generally established by a defendant on a motion for summary judgment or at trial. *See, e.g.*, *Levine*, 508 F.Supp.2d at 272–73. Where courts have found dismissal appropriate on a negative causation defense at the motion to dismiss phase, it is in the "perhaps unusual" case where "negative causation is apparent on the face of the Complaint." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009).

This is not that unusual case. The Complaint alleges that the day after Stronghold announced on March 29, 2023 that it had only received 3,300 out of the 15,000 miners originally ordered, the price of its stock declined 35%, and that the trading volume on that day was "almost ten times the trading volume" on March 28, 2023. Compl. ¶ 147. Plaintiffs thus raise a plausible inference that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); [5] *see* *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444–45 (explaining that plaintiff bringing Section 11 claim "ha[d] not pleaded himself 'out of court,' " where he alleged that defendants' disclosure of legal action caused company's stock to drop 23.5%).

Defendants argue that the March 29, 2022 disclosures "cannot have caused Plaintiffs' loss" because the shipment delays had already been disclosed in a November 30, 2021 earnings call. Stronghold Mot. at 23. But on the same earnings call, and in a press release the same day, Defendants also stated that Stronghold "remain[ed] on track" to the achieve its hash rate capacity and that it was "still the case" that it expected to receive 15,000 MinerVa miners by early 2022. Compl. ¶¶ 127, 129. As a result, the severity of Stronghold's delivery problems was not revealed until March 2022. Defendants also argue that the decline in Stronghold's stock price can be attributed to the decline in Bitcoin's value in the months preceding the March 29, 2022 disclosure. Stronghold Mot. at 24. But at this stage, the Court cannot determine from the Complaint what portion of the decline in Stronghold's stock was due to factors unrelated to the alleged misstatements in the Offering Materials. Even if it is likely that a significant portion of Plaintiffs' losses were the result of the decline in Bitcoin's value and not the alleged misstatements, "[t]he Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (internal citation omitted) (denying motion to dismiss Section 10 claim). In sum, "[g]iven the burden on Defendants to establish an affirmative defense such as negative causation," dismissal on that basis "is more properly considered on a motion for summary judgment." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444.

## III. Plaintiff Ahmed's Section 12 Claims

**\*11** Finally, Defendants argue that Plaintiff Ahmed lacks standing to bring Section 12 claims. The Court agrees.

Section 12(a)(2) makes a defendant liable "to the person purchasing such security from him." 15 U.S.C. § 77*l*(a). As such, standing to assert a Section 12(a)(2) claim is limited to persons who purchased securities directly from the defendant in a public offering and does not extend to purchasers in a secondary market. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015). Here, the Complaint does not allege that Plaintiff Ahmed purchased Stronghold shares in the IPO. Instead, it alleges that he purchased shares "pursuant and/or traceable to the Offering Materials." Compl. ¶ 22. Numerous courts have held that alleging a purchase of shares "pursuant" to a prospectus is insufficient to confer standing under Section 12(a)(2). *See, e.g.*, *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005).

Indeed, in their briefs in opposition to Defendants' motions to dismiss, Plaintiffs do not contest, or even address,

Defendants' argument that Plaintiff Ahmed does not have standing, thus "conced[ing] the point by silence." *In re UBS AG Sec. Litig.*, No. 07-CV-11225 RJS, 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *seeRamirez v. Temin & Co., Inc.*, No. 20-CV-6258 (ER), 2021 WL 4392303, at *9 n.2 (S.D.N.Y. Sept. 24, 2021) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument."). Accordingly, Plaintiff Ahmed's Section 12(a)(2) claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motions are denied, except with respect to Plaintiff Ahmed's claims under Section 12(a)(2), which are dismissed. No later than 30 days from this order, the parties shall file a letter proposing next steps in this action.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 5152177

## Footnotes

1       The facts in this section and throughout are taken from the Complaint, statements or documents incorporated into the Complaint by reference, as well as legally required public disclosure documents filed with the Securities and Exchange Commission. *SeeATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court assumes all alleged facts to be true for the purposes of this motion. *SeeStadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

2       According to the Complaint, "modern Bitcoin mining machines can each generate trillions of hashes per second." Compl. ¶ 66 n.31. The hash rate of an individual miner "is often represented in TeraHashes per second," or "TH/s," and "one TeraHash [is] equivalent to 1 trillion hashes." *Id.*

3       The Stronghold Defendants argue that any information about the delays was "unknowable" at the time of the IPO because the allegations in the Complaint about its communications with MinerVa regarding the deliveries "entirely post-date the IPO." Stronghold Reply at 4. But the allegations in the Complaint suggest that MinerVa and Stronghold were in contact at the time of the IPO. For example, Plaintiffs allege that according to CW-1, the Individual Defendants held regular conference calls with MinerVa on Zoom and Microsoft Teams, and although CW-1 began participating in those calls "around the end of 2021," he "was aware that regular calls had been occurring for some time prior thereto." *Id.* ¶ 73. Those calls included discussions about MinerVa's shipping delays and the "quality problems with the miners it was producing."*Id.* On the March 29, 2022 earnings call, Defendant Beard stated that Stronghold was "in near constant contact" with MinerVa and that "we probably talk to [MinerVa co-founder] Mar[c] Ma on an either daily basis by phone or by text," and that he had "been with us on site in Pennsylvania for probably ten days in the past of the past 30 [sic]." *Id.* ¶ 141. In any event, even if Stronghold and MinerVa were not regularly communicating at the time of the IPO, the lack of contact between the companies does not necessarily demonstrate that the conditions that led to the shipment delays were "unknowable" at the time, and more properly constitutes one of the affirmative defenses available under Sections 11 and 12.

4       Although the Court does not now assess the ultimate viability of Plaintiffs' claims regarding the anticipated delivery of miners, it does note that it is skeptical that Plaintiffs will prevail, at the very least, on their claims under Section 11 and Section 12 with respect to the second category of alleged misstatements, namely that "the Company entered into a purchase agreement with a seller [MinerVa] for the acquisition of 15,000 of their

MV7 ASIC SHA256 model cryptocurrency miner equipment (miners) with a total terahash to be delivered equal to 1.5 million terahash." *Id.* ¶ 111; Thau Decl. Ex. 5. According to Plaintiffs, these statements are false because they "impl[y]" that each of the 15,000 MinerVa miners would average 100 TH/s per miner to reach 1.5 million terahash, and that the miners that were delivered ultimately failed to achieve that computing power. *Id.* ¶¶ 121, 122. But the Offering Materials do not state that each miner would operate at 100 TH/s; rather, they state that, pursuant to the purchase agreement, MinerVa had agreed to deliver 1.5 million total terahash. *Id.* ¶ 111; Thau Decl. Ex. 5. Even if the Offering Materials had guaranteed a particular hash rate of 100 TH/s per miner, Stronghold's subsequent disclosure that the "expected capacity" is "90%+ for a standard performing machine," *id.* ¶¶ 137, 146, does not render that claim false: rather, that disclosure suggests that Stronghold did, in fact, expect MinerVa miners to operate in a range around 100 TH/s.

5       While *Lentell* addresses loss causation in the context of a Section 10 claim, courts have applied the reasoning of *Lentell* to analyze loss causation in Section 11 claims. *See* *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011); *see also* *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011).

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---