UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
JUAN CHEN ET Al., on behalf of
themselves and all others similarly
situated,

           Plaintiffs,

      -v-

MISSFRESH LIMITED ET AL.,

           Defendants.
```

22-cv-9836(JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

This is a class action alleging violations of Section 11, 12(a) and 15 of the Securities Act of 1933 (the "Securities Act"), based upon purported misrepresentations and omissions in the offering documents of Missfresh Ltd. ("Missfresh"). Missfresh is a Chinese grocery delivery company that held an initial public offering of its American Depository Shares ("ADS") in June 2021.

Plaintiffs' amended complaint identifies three categories of purported misstatements and omissions in the offering documents that they contend are actionable. *First*, plaintiffs challenge certain financial information that was subsequently restated. Specifically, following the IPO, Missfresh publicly acknowledged that the offering documents overstated net revenues and sales through online platforms for the quarter immediately preceding the offering by approximately 10%. *Second*, plaintiffs claim that defendants were obligated to

1

disclose certain internal control deficiencies that allegedly led to the aforementioned accounting restatement, and violated the Securities Act by failing to do so. *Third*, over a year after the IPO, Missfresh was forced to shut down its distributed mini warehouse delivery business and next-day delivery business, which collectively accounted for over 90% of the company's revenue. Plaintiffs allege that the offering documents failed to disclose the fact that Missfresh's business model was fundamentally unsustainable at the time of the offering.

Defendants moved to dismiss the amended complaint in its entirety. *See* Dkt. 42. After full consideration of the parties' written submissions, this Court issued a "bottom-line" order denying defendants' motion with respect to the first set of claims outlined above, but granting defendants' motion in all other respects. This Opinion sets forth the reasons for those rulings.

I.   **Background**

Missfresh is a Chinese technology company that sold groceries in China through its mobile application. Its primary line of business utilized a distributed mini warehouse ("DMW") model that enabled it to deliver groceries from its thousands of small warehouses to customers within an hour of an order being placed. Amended Complaint ("AC") ¶¶ 7, 54 (Dkt. 34). In addition to its DMW business, the company offered a wider variety of products through its next-day delivery business. AC ¶ 55. These two business units collectively accounted for well over 90% of the company's revenue. AC ¶¶ 72, 93.

On June 24, 2021, Missfresh launched its IPO on NASDAQ, issuing 21,000,000 ADS at $13.00 per share. AC ¶ 61. Following the IPO, the company's ADS price began gradually to decline. By April 2022 Missfresh's ADS were trading around $1.00 per share. On April 29, 2022, Missfresh announced that it could not timely file its 2021 annual report. AC ¶ 80. The press release announcing this explained that the audit committee of the company's board of directors was conducting an internal review of "certain matters," including matters "relating to transactions between the company and certain third-party enterprises," and that the annual report could not be filed until this review was complete. AC ¶ 80.

The preliminary results of this internal review were released on July 1, 2022. At that time, the company announced that the review had "identified certain transactions carried out by the Next-Day Delivery [business unit] in 2021 that exhibited characteristics of questionable transactions, such as undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and/or lack of supporting logistics information. As a result, certain revenue associated with these reporting periods in 2021 may have been inaccurately recorded in the Company's financial statements." AC ¶ 82. The internal review further recited that it had not uncover any evidence that the company's executives were aware of, or involved, in the questionable transactions. AC ¶ 82.

The same July 1, 2022, press release disclosed Missfresh's "preliminary assessment of the overall financial impact of the Review

findings on the relevant financial statements." AC ¶ 83. The company disclosed that it would need to restate certain financial results for Q1 through Q3 2021. Declaration of Robert A Fumerton ("Fumerton Decl."), Ex. J (Dkt. 44-10).[1] In particular, the company disclosed that the offering documents had overstated sales through its online platforms by 11.7% for Q1 2021 and overstated the company's overall net revenues for Q1 2021 by 11.4%. *Id.*; AC ¶ 69.

On July 14, 2022, Missfresh announced a "strategic partnership" with Shanxi Donghui Group to obtain, in the words of plaintiffs' amended complaint, "a desperately needed cash infusion" of approximately RMB200 million once certain closing conditions had been satisfied. AC ¶ 84; Fumerton Decl. Ex. L (Dkt. 44-12). However, two weeks later, on July 28, 2022, Missfresh announced that the Shanxi Donghui deal had fallen through and that, as a result, "the Company ha[d] to adopt significant adjustments to its business strategy for sustainability, including a temporary shutdown of its on-demand Distributed Mini Warehouse (DMW) service." AC ¶ 85. The announcement warned that the "DMW business contributed approximately 85% of the Company's total net revenue for the nine months ended September 30, 2021." *Id*. Missfresh declared that it would "make every effort to maintain normal operations in its next-day delivery business, intelligent fresh market business and retail cloud business." *Id*.

---

[1]    The Court may take judicial notice of "statements or documents incorporated into the complaint by reference [and] legally required public disclosure documents filed with the SEC." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

On November 14, 2022, Missfresh finally filed its belated 2021 annual report. AC ¶¶ 90-91. The report repeated the same financial restatements disclosed in the July 1, 2022, press release and expanded upon the material weaknesses in internal controls that had been previously identified, dividing the deficiencies into two categories. AC ¶¶ 91-92. First, it described the company's "failure to design and implement effective controls with a sufficient level of precision to prevent and detect misstatements related to our certain [sic] transactions within the Next-Day Delivery [business unit]," listing various specific deficiencies the review had identified. AC ¶ 92. Second, the annual report repeated the disclosure -- originally made in the offering documents -- of a "lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP." Fumerton Decl. Ex. I, at 141 (Dkt. 44-9). The annual report also disclosed that, since the July 28, 2023 press release, Missfresh had suspended operation of its next-day delivery business as well.

On July 12, 2022, plaintiffs filed this putative shareholder class action against Missfresh, various of its officers and directors, and the underwriters of the IPO, alleging that the offering documents contained material misstatements and omissions in violation of Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77 et seq.). Plaintiffs' amended complaint, filed on December 28, 2022, challenges three sets of statements contained in Missfresh's offering documents.

*First*, the amended complaint alleges that the overstated 2021 Q1 revenue and sales through online platforms specifically set forth in the offering documents were materially false. AC ¶¶ 68-71. The amended complaint also alleges that the statement in the offering documents that the aforementioned financial statements were "prepared and presented in accordance with accounting principles generally accept in the United States of America" were false. AC ¶70.

*Second*, plaintiffs allege that defendants violated the Securities Act by failing to disclose in the offering documents the internal control deficiencies that later led to the restatement. Plaintiffs do not, however, identify any statement in the offering documents expressly touting the effectiveness of Missfresh's internal controls. Rather, plaintiffs identify certain risk disclosures in certain paragraphs of the offering documents that were allegedly misleading because they did not fully disclose the extent of the deficiencies that were subsequently revealed. The relevant paragraphs, with the statements plaintiffs allege were misleading set forth here in boldface, are as follows:

> ***We face risks associated with the misconduct or illegal activities of our employees, suppliers and their employees, and other related personnel.***
>
> We rely on our employees to maintain and operate our business and have implemented a series of code of conduct to guide the activities of our employees. However, we do not have control over the actions of our employees, and any ***misbehavior of our employees could materially and adversely affect our reputation and business***. For example, certain of our ex-employees had been found to have engaged in misconduct involving embezzlements and other fraudulent activities in their roles as operation-level personnel in the past.

Although ***such incidents did not result in any material losses to our company and we have further enhanced our internal compliance programs*** afterwards, we cannot guarantee that our policies and procedures will be effective in preventing similar fraudulent or illegal activities from occurring ***in the future***. In the event we are subject to misconduct and misuse of our platforms for inappropriate or illegal purposes by any of our employees, suppliers and their employees, claims may be brought against us and we ***may incur material financial losses or reputational harms***. In response to allegations of illegal or inappropriate activities conducted through our platforms or as part of business operations, relevant governmental authorities may intervene and hold us liable for non-compliance with applicable laws and regulations and subject us to administrative penalties or other sanctions. In addition, our customers may suffer or allege to have suffered physical, financial or emotional harm caused by such misconducts or illegal activities, and our business and public perception of our brand may be materially and adversely affected as a result.

AC ¶ 76.

***If we fail to remediate our material weakness and implement and maintain an effective system of internal controls over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud.***

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other weaknesses and deficiencies in our internal control over financial reporting. In addition, ***if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. If we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information.*** This could in turn limit our access to capital markets, harm our results of operations, and lead to a decline in the trading price of our ADSs. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to

potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. ***We may also be required to restate our financial statements for prior periods.***

*Id.* ¶ 78.

*Third*, plaintiffs allege that the offering documents falsely portrayed the sustainability of the company. *Id.* ¶¶ 72-75. To support this allegation, the amended complaint first cites to the company's steadily growing sales through online platforms between 2018 to Q1 2021 that were reported in the offering documents. *Id.* ¶ 72-73. The amended complaint then quotes a risk disclosure from the offering documents that, according to plaintiff, "inaccurately described as ***potential*** certain risks" relating to growth that had, in fact already begun to materialize at the time of the offering. *Id.* ¶¶ 74-75. That risk disclosure reads:

> ***If we are unable to manage growth or execute our strategies effectively, our business and prospects or investors' perceptions of our business and prospects may be materially and adversely affected, and the market price of our Class B ordinary shares and/or ADSs may decline.***
>
> We have experienced rapid growth since we commenced our business in 2014. However, there is no assurance that we will be able to maintain our historical growth rates in future periods. Our business, results of operations and financial condition depend in part on our ability to effectively manage our growth or implement our growth strategies. As part of our business strategies, we plan to further improve our fulfillment infrastructure and technology platform and continue to optimize our product offerings. We also intend to continue to invest significant resources in training, managing and motivating our workforce. In addition, as we optimize our product offerings, we will need to work with new suppliers efficiently and establish and maintain mutually beneficial relationships with our existing and new suppliers. We may have limited or no experience for certain new product

offerings, and our expansion into these new product offerings may not achieve broad user acceptance. In addition, these offerings may present new and difficult technological or operational challenges, and we may be subject to claims if our users are not satisfied with the quality of the products or do not have satisfactory experiences in general. To effectively manage the expected growth of our operations and personnel, we will need to continue to improve our transaction processing, technological, operational and financial systems, policies, procedures and controls. All these endeavors involve risks and will require significant managerial, financial and human resources. We cannot assure you that we will be able to effectively manage our growth or to implement all these systems, procedures and control measures successfully or that our new business initiatives will be successful. *If we are not able to manage our growth or execute our strategies effectively, our expansion may not be successful and our business and prospects may be materially and adversely affected.*

    *Our revenue growth may slow or our revenues may decline* for any number of possible reasons, such as decreased consumer spending, increased competition, slowdown in the growth or contraction of the retail or neighborhood retail industry in China, supply chain bottlenecks, emergence of alternative business models, changes in government policies or general economic conditions, and natural disasters or virus outbreaks. *If our growth rate declines, investors' perceptions of our business and business prospects may be adversely affected and the market price of our Class B ordinary shares and/or ADSs could decline.*

AC ¶ 74.

On January 27, 2023, defendants moved to dismiss the amended complaint in its entirety, arguing that plaintiffs had failed to state a Section 11 claim and that, absent such a claim, plaintiffs' sections 12(a)(2) and 15 claims fail as well. As noted, after full briefing, the Court issued its "bottom-line" order on September 12, 2023, denying defendants' motion in part and granting it in part.

## II.   <u>Legal Standard</u>

To state a claim pursuant to Section 11 of the Securities Act, a plaintiff need only allege that "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (internal quotation marks omitted). The liability of an issuer under Section 11 for material misstatements is "virtually absolute," and attaches without regard to scienter. *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Defendants concede that plaintiffs' complaint does not sound in fraud and, accordingly, Federal Rule of Civil Procedure Rule 9(b)'s heightened pleading standard does not apply. *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) ("We will not, however, apply the heightened pleading standard of Rule 9(b) where the complaint sounds in negligence, rather than fraud.").[2] Therefore, the Court must "review the complaint['s] sufficiency under the notice-pleading standard, which requires [p]laintiffs to assert enough facts

---

[2]   The Private Securities Litigation Reform Act's heightened pleading standard is similarly inapplicable to claims brought under Section 11 of the Securities Act. *See* 15 U.S.C. § 78u-4(b)(1); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

to state a claim to relief that is plausible on its face." *Hutchison*, 647 F.3d at 484.

## III.  **Discussion**

### A.  **Accounting Restatement**

The first and most straightforward of plaintiffs' claims concerns the accounting restatement for the company's Q1 2021 financial results. Plaintiffs allege that the offering documents contained material misstatements because -- as the company subsequently acknowledged -- they overstated the company's net revenues for Q1 2021 by 11.4% and overstated the company's sales through online platforms for Q1 2021 by 11.7%.

Despite the conceded inaccuracy of the offering documents' reported financial information, defendants offer three arguments as to why these misstatements are not actionable: (1) the overstatement of revenue was not material because it was offset by misstated costs of equal amount, such that the misstatement had no impact on bottom-line profits; (2) the offering documents disclosed that Missfresh's internal controls might be deficient such that an accounting restatement could be required; and (3) plaintiffs have failed to allege loss causation because the company's stock price had already declined precipitately after the IPO for unrelated reasons. As explained below, none of these arguments warrants dismissal at this stage.

### 1.  Profit-Neutrality

Defendants begin by pointing out that, while the aforementioned line items may have been incorrect, the same accounting restatement

that exposed these misstatements also adjusted other line items such that the restatement had no adverse effect on the company's gross profits for the period. Defendants argue that, because the overstatements did not impact the company's bottom line, it is immaterial as a matter of law.

A fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [invest]." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quotation omitted). This standard is satisfied where an "omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Determination of "whether a misstatement or omission is material is an inherently fact-specific inquiry." *Hutchison*, 647 F.3d at 485 (internal quotation omitted). Therefore, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

In evaluating the materiality of accounting misstatements, the Second Circuit has "cited with approval" SEC Staff Accounting Bulletin No. 99 ("SAB No. 99"), which lays out a framework by which any such misstatements are assessed for both their quantitative and qualitative materiality. *Hutchison*, 647 F.3d at 485. Quantitatively, SAB No. 99

sets forth presumption that accounting misstatements of below 5% are not material, although it cautions this will by no means always be the case. Qualitatively, it directs a whole host of other factors should be considered to place an accounting misstatement in its complete context.

Applying these principles here, the Court finds the accounting misstatements were sufficiently material to survive a motion to dismiss.

The overstatement of Q1 2021 online sales and net revenue by 11.7% and 11.4%, respectively, far surpass the 5% quantitative materiality threshold established by SAB No. 99. The materiality is still more pronounced when one considers its impact specifically on Missfresh's next-day delivery business. The press release disclosing the restatement and the 2021 annual report describing it in more detail suggest that the issues leading to the restatement were concentrated in the next-day delivery business. *See* AC ¶¶ 82, 93. Missfresh does not report the breakdown of its online sales between its next-day delivery and DMW delivery business units. However, other disclosures indicate the next day delivery business accounted for approximately 14% of the company's net revenue prior to the restatement.[3] Thus, an accurate statement could have wiped out as much as 80% of the next day delivery business unit's overall revenues for this quarter.

---

[3]    *See* AC ¶¶ 72 (suggesting sales from online products accounted for 97.9% of net revenues in 2020), 85 (disclosing DWN business contributed approximately 85% of net revenue).

Moreover, from a qualitative perspective, the misstatements did not affect some peripheral line items, but impacted the company's core businesses, which is "the exact type of information that would be important to a reasonable investor." *Sec. & Exch. Comm'n v. MiMedx Grp., Inc.*, 2022 WL 902784, at *9 (S.D.N.Y. Mar. 28, 2022). Indeed, sales through online platforms represented well over 90% of the company's total revenue. *See Hutchinson*, 647 F.3d at 486 (identifying, as a qualitative factor, "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability" (quoting SAB No. 99)).

Missfresh's own offering documents identified these as important metrics. Under the heading "Key Components of Results of Operations," the first item listed by the offering documents is net revenues. Fumerton Decl. Ex. A, at 93. This heading then breaks down "net revenues" into two categories: "(i) sales of products through online platforms, and (ii) other revenues," underscoring the importance of sales through online platforms. *Id.* Further, net revenue is the first item the company discussed in reporting on its results immediately prior to the IPO. *See id.* at 98.

While the misstated revenue concerned only a single quarter, this was the quarter immediately preceding the IPO, and so it is reasonable to infer that it was important to investors. It is plausible that promptly disclosed evidence of a slide in the company's performance right before it went public, even a relatively small one, could have

14

signaled a negative trend in the company's growth prospects and had a disproportionate effect on the IPO's success.

The fact that the misstated revenue was offset by a corresponding misstatement of costs does not change this conclusion. SAB No. 99 directly rejects just such an argument, making clear that, "if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses." SAB No. 99, at *5. This makes sense, because investors do not simply rely on a company's bottom-line profits when making investment decisions. And yet, if defendants' argument were adopted, a company could intentionally misstate its revenue figures with impunity so long as it offered compensating fictitious expenses, a result that cannot be correct.

Defendants cite to *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385 (S.D.N.Y. 2022) to support their argument that the lack of a profit impact is dispositive. That case does not stand for the proposition that a profit-neutral restatement is always immaterial. Rather, the court there found that the plaintiff had offered nothing more than a "conclusory statement" to establish that the "equal increase in both revenue and costs of revenue" was material. *Id.* at 401-02, 404. Here, by contrast, plaintiffs have offered a plausible explanation for why the particular misstated line-item was material.

   2.   Risk Disclosures

Defendants next argue that the accounting misstatements could not have been material because "the Offering Documents warned of this precise risk, including that existing material weaknesses in internal controls could 'significantly hinder [its] ability to prevent fraud,' or result in the identification of 'other weaknesses and deficiencies in [its] internal control' that could require it to 'restate [its] financial statements for prior periods.'" MTD at 22.

To the extent defendants rely on the "bespeaks caution" doctrine, this argument clearly fails. The bespeaks caution doctrine only applies to forward-looking statements, not historical financial results such as these. *See P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). This is true notwithstanding defendants attempt to frame the possibility of a prospective accounting restatement as a "risk." The bespeaks caution doctrine asks whether the statement was forward looking, and the historical financial results that were reported plainly were not.

Even though the bespeaks caution doctrine does not apply, the warnings about Missfresh's inadequate internal controls may still be relevant to the distinct issue of materiality. By warning the reported financial results may be incorrect, one might argue that any subsequent restatement of those results would be less material to a reasonable investor. As explained *infra* Part III.B.-C, such an argument is plausible with respect to plaintiffs' two other sets of claims, which

are predicated upon half-truths and omissions. But this argument plainly fails with respect to the accounting misstatements.

The problem with applying such an argument here is that Missfresh had an affirmative duty to accurately report its financial results. Defendants cannot avoid that affirmative duty by warning that the information they were providing may be inaccurate. The securities laws would be rendered toothless if such warnings could absolve an offeror of liability. While an offeror need not disclose any and all information that an investor may find to be material, where an affirmative duty exists to report specific information, investors have a right to presume that information is truthfully reported, whatever warnings the offeror may have included about its ability to comply with the securities laws.

This is true notwithstanding the fact that "Missfresh is exempt from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting." MTD at 6. Even prior to Section 404, a company was responsible for accurately reporting its financial results. Section 404 was adopted to enhance those protections by requiring, among other things, additional disclosures about the steps a company was taking to ensure the financial results were accurate. But the mere fact a company has been exempted from Section 404 in no way exempts it from the baseline requirement of avoiding false statements or accurately reporting financial information.

3.    <u>Negative Causation</u>

Defendants finally argue that plaintiffs have failed to state a claim because "[p]laintiffs' alleged losses were not caused by any misstatement or omission." Defs.' Reply at 9. Defendants point out that Missfresh's stock price had already dropped by 96% from its IPO price as of April 29, 2022, before any alleged misrepresentation was revealed to the market, and that after the disclosure of the restatement in July 2022 Missfresh's share price increased. MTD at 25.

But proof of loss causation is not an element of a Securities Act claim under Section 11. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."). While defendants attempt to derive their argument from certain language contained in the affirmative defense provision of Section 11(e) of the Securities Act,[4] "the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013). This is because "to make out a successful defense a party must prove not the mere

---

[4]    That Section provide that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable." 15 U.S.C. § 77k(e).

possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss *was* caused by that other factor." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015). This typically requires expert testimony disaggregating the various causes of stock price movements. *See id.*; *Adair v. Kaye Kotts Assocs., Inc.*, 1998 WL 142353, at *7 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, J.) ("It should be noted that in the cases where defendants have successfully established an 11(e) defense on summary judgment, they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results.").

Furthermore, defendants have not carried their burden of showing a complete absence of price impact caused by the alleged misstatements. In particular, plaintiffs identify two price declines that they contends undermine defendants' argument. First, after Missfresh disclosed on April 29, 2022, that it would not be filing its annual report on time, its share price fell by 13.50%. Second, on May 24, 2022, when Missfresh announced it had received a non-compliance notice from NASDAQ, and explained that its internal review was ongoing, its share price fell by 10.5%.

Defendants argue these disclosures did not explicitly correct all or most of the misstatements on which plaintiffs rely. But what information was effectively revealed to the market by these disclosures is largely a question of fact. *See In re Facebook, Inc. IPO Sec. &*

*Derivative Litig.*, 986 F. Supp. 2d at 523. Nor is it dispositive that the stock price rose after certain subsequent disclosures. *See Adair,*1998 WL 142353, at *6 ("The presence or absence of price movement immediately after disclosure is not per se dispositive under Section 11(e). This is particularly true where it is undisputed that the stock price did in fact decline at some point after the disclosure of the Company's financial results." (internal citation omitted)). It is possible that, after the April 29 and May 24 disclosures, the markets assumed the worst and, after the full truth was revealed, the failure of the stock price to completely recover represents a loss resulting from the fraud. While defendants may well be correct that a substantial portion of the decline in Missfresh's stock price is not recoverable as damages, to obtain dismissal of the action on this basis it is defendants' burden to prove that the alleged misrepresentation had no price impact at all. The Court finds this defense cannot be resolved on a motion to dismiss.

**B.   Omitted Weakness in Internal Controls**

Plaintiffs' second set of claims challenge defendants' failure to disclose the internal control weaknesses that led to the accounting restatement discussed above. As with the accounting misstatements, defendants argue they cannot be liable because the offering documents "warned of the precise risks" that later materialized. MTD at 15-17 (citing *Yaroni v. Pintec Tech. Holdings Ltd.,* 600 F. Supp. 3d 385, 395 (S.D.N.Y. 2022) ("[W]hen a registration statement warns of the exact risk that later materialized, a [S]ection 11 claim will not lie as a

matter of law.")). But it is simply incorrect to characterize these internal control deficiencies as a "risk" when, according to plaintiff, they were a fact in existence at the time of the offering. This is not to say the company's disclosures about deficient internal controls are irrelevant -- as explained below, the Court believes they are in certain respects dispositive as to certain of plaintiffs' claims -- but rather that the bespeaks caution doctrine is not the proper framework to evaluate their significance. *See Stolz Fam. P'ship L.P.*, 355 F.3d at 96-97.

Defendants are also incorrect that they are entitled to dismissal because plaintiffs fail to allege that defendants "knew or had reason to know at the time of the IPO of the employee misconduct and internal control weaknesses." MTD at 18. It is well settled that a plaintiff is not required to allege scienter to state a Section 11 claim. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010) ("[P]laintiffs are not required under sections 11 and 12(a)(2) of the Securities Act to allege that defendants acted with scienter or intentionally omitted information from the Offering Documents."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (similar). While there are some district court opinions that suggest a defendant must have at least "kn[own] or had reason to believe" that a challenged statement was untrue, *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *13 (S.D.N.Y. Jan. 26, 2009), properly understood these cases do not establish a requirement that a Securities Act plaintiff plead any form of knowledge. Rather,

as Judge Abrams recently explained, these cases "turn[ed] on whether plaintiffs alleged that a defendant *could have known* of an alleged misstatement or omission -- i.e., whether the relevant event had already transpired at the time of the offering." *Winter v. Stronghold Digital Mining, Inc.*, 2023 WL 5152177, at *7 (S.D.N.Y. Aug. 10, 2023) (collecting cases). These cases do not help defendants here, because there is no question that the internal control deficiencies existed at the time of the offering and could have been discovered (as they subsequently were by the company's internal review).[5]

At the same time, plaintiffs are incorrect insofar as they appear to assume that the mere existence of the internal control deficiencies is sufficient to establish liability. *See* Opp. at 14-15. The federal securities laws "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013) ("[M]ateriality alone does not demand disclosure . . . ." (citation omitted)); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . . simply because it may be relevant or of interest to a reasonable investor."). Rather, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the

---

[5]    To the extent *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 398 (S.D.N.Y. 2022) required the plaintiff to allege defendants "knew or should have known" the omitted information, the Court respectfully disagrees with that decision.

omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993).

Thus, the question before the Court is whether Missfresh had a duty to disclose the internal control deficiencies. If such a duty existed, it would not matter that defendants were unaware of the deficiencies or warned that they might exist. If, on the other hand, there was no such duty to disclose, there can be no liability, however material the information may seem with the benefit of hindsight.

Such a duty to disclose under the securities laws may arise in one of two ways. *See Morgan Stanley*, 592 F.3d at 361-63; 15 U.S.C. § 77k(a) (imposing liability for "omit[ing] to state a material fact required to be stated [in a registration statement] or necessary to make the statements therein not misleading"). First, an offeror may be affirmatively required to disclose specific information, such as the financial results discussed above. Second, even where there is no express obligation to provide a particular piece of information, an offeror may nevertheless be required to do so where disclosure of the omitted fact is "necessary to make [another] statement[] not misleading." *Matrixx Initiatives*, 563 U.S. at 36; *see also* 17 C.F.R. § 230.408.

Missfresh was under no express obligation to make disclosures about the company's internal controls. The offering documents explained that, as a "newly public company," in accordance with SEC rules Missfresh was "not required to provide a report of management on [its] internal control over financial reporting and [its]

23

independent registered public accounting firm is not required to conduct an audit of [its] internal control over financial reporting." Fumerton Decl. Ex. A, at 47. The offering documents further explained that, as an "emerging growth company," Missfresh is exempt "from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting." *Id.* at 111.[6] Plaintiffs do not suggest that any of these disclosures are incorrect.

Even absent an express disclosure obligation, defendants may have been obligated to disclose the internal control deficiencies if doing so was necessary to render another statement in the offering documents not misleading. "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Morgan Stanley*, 592 F.3d at 366 (internal quotation marks omitted). While it is often suggested that "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014), the mere reference to a topic does not require "disclos[ure] [of] the entire corpus of [the company's] knowledge" relating to it. *Morgan Stanley*, 592 F.3d at 366. The test

---

[6]    *See also* 17 C.F.R. § 229.308, Instruction No. 1 (noting that a registrant is not required to include management's annual report on internal controls or an auditor attestation to the company's internal controls until "until it either had been required to file an annual report pursuant to section 13(a) or 15(d) of the Exchange Act (15 U.S.C. 78m or 78o(d)) for the prior fiscal year or had filed an annual report with the Commission for the prior fiscal year").

remains whether, upon "examination of defendants' representations, taken together and in context," the affirmative statements that were made are misleading. *Id.* (internal quotation marks omitted).

A trio of Second Circuit cases explore under what circumstances a company's description of compliance efforts --such as those at issue here -- can give rise to a duty to disclose ongoing compliance failures. In *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) -- relied on by plaintiffs -- a Chinese solar panel production company warned about the risks of compliance with local environmental laws and described the measures the company had taken to remedy potential deficiencies. *Id.* at 250. The plaintiffs alleged the statements were misleading because the company failed to disclose then-ongoing failures to comply with environmental regulations. The Second Circuit agreed, concluding that the plaintiffs had stated a claim under the Securities Act because the "description of pollution-preventing equipment and 24-hour monitoring teams [in the company's offering documents] gave comfort to investors that reasonably effective steps were being taken to comply" with the law, thereby requiring disclosure of ongoing compliance deficiencies. *Id.* at 251.

Subsequent Second Circuit decisions, however, have limited and clarified *Jinkosolar*'s holding. In *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), the Second Circuit held that generic statements about having "policies and procedures" and allocating "significant resources" towards regulatory compliance were not rendered misleading by undisclosed compliance deficiencies when the statements were

"framed by acknowledgements of the complexity and numerosity of applicable regulations." *Id.* at 64. The *Cigna* court distinguished *Jinkosolar* on the ground that, read in context, Cigna's statements "suggest[ed] caution (rather than confidence) regarding the extent of Cigna's compliance." *Id.*[7]

Expanding on the holding in *Cigna*, the Second Circuit in *Asay v. Pinduoduo Inc.*, 2021 WL 3871269 (2d Cir. Aug. 31, 2021), concluded that statements about attempts to comply with Chinese anti-counterfeiting laws were not rendered misleading when accompanied by disclosures about past findings of non-compliance with those very same laws, as well as warnings that the company's "measures may not always be successful." *Id.* at *3. The panel explained that "[u]nlike in *Jinkosolar*, a reasonable investor, based on the specificity of the contemporaneous examples of anti-counterfeiting failures and risks, would have understood that Pinduoduo's anti-counterfeiting measures were not, at the time of the offering, successfully prevent[ing] substantial violations of [] Chinese regulations and international laws." *Id.* (internal quotation marks omitted).

---

[7]     *Cigna* addressed claims arising under the Securities Exchange Act of 1934 (the "Exchange Act"), rather than the Securities Act. However, the decision remains applicable because it rested its decision entirely on the existence (or non-existence) of a duty to disclose the omitted information, which is analyzed the same under both statutes. *See id.* at 63-64; *In re Teva Sec. Litig.*, 2023 WL 3186407, at *22 (D. Conn. May 1, 2023) (noting that the "legal standard for misstatements or omissions of material facts" is the same under the Securities Act and Exchange Act).

Plaintiffs have failed to plausibly allege that the offering documents were rendered misleading by the non-disclosure of the additional internal control deficiencies that were eventually identified. Unlike in *Jinkosolar*, nothing in the offering documents was calculated to inspire confidence in the effectiveness of Missfresh's internal controls. Rather, the only statements plaintiffs claim are misleading are risk disclosures warning of the <u>weakness</u> in the company's internal controls.

As in *Pinduoduo*, the risk disclosures in question flagged specific historical deficiencies the company had identified. They explained that the company had identified "one material weakness in [Missfresh's] internal control over financial reporting," which "relate[d] to [Misfressh's] lack of sufficient competent financial reporting and accounting personnel with appropriate understanding of U.S. GAAP." Fumerton Decl. Ex. A, at 47. The offering documents also warned of the "risks associated with the misconduct or illegal activities of our employees, suppliers and their employees, and other related personnel," identifying examples of past employee misconduct that had occurred. AC ¶ 76.

While the company disclosed that they had "taken measures and plan[ned] to continue to take measures to remediate these deficiencies," the disclosures contained a litany of warnings that made clear the measures might not be effective. Fumerton Decl. Ex. A, at 47. The offering documents explained that "the implementation of these measures may not fully address these deficiencies in

[Missfresh's] internal control over financial reporting, and [Missfresh] cannot conclude that they have been fully remediated." *Id*. And Missfresh warned that "[n]either [it] nor [its] independent registered public accounting firm undertook a comprehensive assessment of [its] internal controls" and it was possible that such an audit would have identified "additional deficiencies." *Id.*

Plaintiffs argue these disclosures are too generic and the single material weakness identified in the offering documents -- concerning inadequate accounting personnel -- "bears no resemblance" to the issues that were subsequently identified. Opp. at 15-16. Plaintiffs attempt to distinguish *Pinduoduo* on this basis, arguing the additional internal control deficiencies were "completely unrelated [to the] weakness concerning the shortage of financial staff." Opp. at 17 n.15. If the company had only disclosed the single internal control deficiency about financial staff, this criticism might have some force. But the company went well beyond that, making clear that it had not conducted a comprehensive assessment and it very well might identify additional issues in the future. Plaintiffs also ignore the additional disclosure of past instances of fraud by employees, *see* AC ¶ 76, which bears a striking resemblance to the subsequently identified material weakness, *see* AC ¶ 82.

More fundamentally, the question is not whether the offering documents effectively disclosed the internal control deficiencies that were later identified -- they plainly did not, at least not specifically. Rather, in determining whether defendants had a duty to

disclose these deficiencies, the correct question is whether the offering documents misleadingly suggested that the subsequently-identified deficiencies <u>did not exist</u>. As in *Cigna and Pinduoduo*, when the offering documents are read as a whole, they unmistakably "suggest[ed] caution (rather than confidence)" about the efficacy of the company's internal controls. *Pinduoduo*, 2021 WL 3871269, at *3 (quoting *Cigna*, 918 F.3d at 64). There was nothing misleading about Missfresh disclosing one weakness in its internal controls, while also candidly acknowledging that it had not conducted a comprehensive assessment of those controls. Accordingly, plaintiffs have failed to allege that defendants violated a duty to disclose.

Limiting defendants' liability in these circumstances also makes sense from a policy perspective. Missfresh was under no affirmative obligation to make disclosures about its internal controls, but nevertheless elected to make certain voluntary disclosures about deficiencies it had identified to date. It did not do so in a misleading manner -— for example, by suggesting it had identified all of the deficiencies that existed -- but instead made clear the limits of its own knowledge and warned of the possibility that other deficiencies might exist. In such circumstances, it would be perverse to penalize Missfresh for offering more information to investors than was expressly required.

### C.  **Unsustainability of Missfresh's Online Delivery Business**

Plaintiffs' final set of claims concern the sustainability of Missfresh's online delivery business as a whole. Plaintiffs argue that

"the Offering Documents failed to disclose that the Company's net revenues from sales through online platforms were unsustainable with respect to both next-day sales and sales through DMWs." Opp. at 17. Plaintiffs argue both that Missfresh's business was unsustainable from the outset and that, even if the business was not inevitably unsustainable, defendants violated Item 105 by failing to adequately disclose the risk that it might be. As explained below, neither of plaintiffs' arguments succeeds.

     1. <u>Unsustainability at Time of Offering</u>

On July 28, 2022, Missfresh announced that it had been forced to "adopt significant adjustments to its business strategy for sustainability, including a temporary shutdown of its" DMW business. AC ¶ 85. And in November 2022 Missfresh announced it had also temporarily suspended its next-day delivery business. AC ¶ 93. Notwithstanding that these events occurred over a year after the IPO, plaintiffs attempt to attribute them to "unsustainable" business practices that should have been disclosed in the offering documents but were not. This argument fails, because plaintiffs have not plausibly allege that the facts underlying Missfresh's ultimate collapse were in existence at the time of the offering.

As a threshold matter, plaintiffs are quite vague about exactly what "unsustainable business practices" they believes should have been disclosed but were not. As best the Court can determine, the only "unsustainable business practices" described in any detail in the amended complaint are the deficiencies relating to the company's

internal controls disclosed in July 2021: "questionable transactions, undisclosed relationships between suppliers and customers, different customers or suppliers sharing the same contact information, and a lack of supporting logistics information." AC ¶ 73(a); *see* AC ¶¶ 73-79.

These internal control deficiencies clearly cannot explain the collapse of the DMW business, because by plaintiffs' own admission these internal control deficiencies related to the company's next-day delivery business, not its DMW business. *See* Opp. at 5-6, 10. Plaintiffs offer no explanation of what, if any, other unsustainable business practices might have caused the suspension of the DMW business. Rather, the amended complaint suggests that the DMW business was suspended because the company lacked the liquidity needed to continue operations after the expected investment from Shanxi Donghui fell through. *See* AC ¶¶ 85-86, 92-93. This alternate explanation is both entirely plausible and in no way fraudulent.

Nor does the amended complaint plausibly allege that the next-day delivery business was terminated as a result of the internal control deficiencies. The complaint's sole basis for this allegation is a passage from the company's 2021 annual report. *See* AC ¶ 92. After describing the internal control deficiencies that the company had identified, the report states, "As of the date of this annual report, we have temporarily terminated the operation of the Next-Day Delivery BU." AC ¶ 92. But the report nowhere states that the <u>reason</u> for the termination of the next-day delivery business was the internal control

deficiencies. *See* Fumerton Decl. Ex. I. Rather, elsewhere in the annual report, the company expressly attributes the closure of the next-day delivery business units to the same liquidity constraints that had previously lead to the closure of the DMW business. *See id* at F-56.[8]

More fundamentally, the amended complaint fails to explain why these internal control deficiencies would have forced the company to shutter the next-day delivery business. Indeed, the investigation into these issues was "substantially complete" as of July 1, 2022, when the issues were first announced to the public, and yet Missfresh continued to operate its next-day delivery business until November 2022, when it released its 2021 Annual Report. AC ¶¶ 82, 93. The July 28, 2022, press release announcing the temporary suspension of the DMW business indicated that Missfresh would "make every effort to maintain normal operations in its next-day delivery business." AC ¶ 85. If the internal control deficiencies were in fact the cause of the next-day delivery businesses closure, it is difficult to see why the company waited months after learning of the deficiencies to suspend its operations.

In short, plaintiffs have failed to plausibly allege that Missfresh's business was fundamentally unsustainable at the time of

---

[8]     When read in context, the language quoted in paragraph 92 of the amended complaint is not meant to suggest any causal connection between the termination and the deficiencies. Rather, the reason the termination is referenced in the discussion of internal controls is to explain why the company is not adopting remedial measures in the next-day delivery business (i.e. because it no longer existed), as evidenced by the next sentence in the paragraph, which explained the remedial measures that are being taken in the company's lines of business that are still in operation. *See* AC ¶ 92.

the offering, and so defendants cannot be held liable for failing to disclose that fact.[9]

### 2.  Risk Business Model Would Be Unsustainable

Plaintiffs argue that defendants violated Item 105 by failing to disclose the risk that the company's business practices might prove unsustainable. *See* Opp. at 19. Item 105 required that the offering documents disclose "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. This argument, too, fails, because Missfresh's risk disclosures were more than adequate.

The offering documents contain voluminous (if generalized) disclosures about Missfresh's future growth prospects.[10] These general

---

[9]     In a footnote, plaintiffs argue that the non-disclosure of the company's unsustainable business model violated Item 303, which requires the registrant to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). This argument fails for the same reason: plaintiffs have failed to plausibly allege the unsustainability of the business existed at the time of the offering. This argument also fails because a violation of Item 303 requires that plaintiffs allege that management had knowledge of the trend in question, something plaintiffs have wholly failed to do. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) ("Knowledge of a trend is an essential element triggering disclosure under Item 303.").

[10]     *See, e.g.*, Fumerton Decl. Ex. A, at 24 (Missfresh's "limited operating history makes it difficult to evaluate our business and prospects. We cannot guarantee that we will grow as rapidly as before, or at all."); *id.* at 20 ("If [Missfresh is] unable to manage growth or execute [its] strategies effectively, [its] business and prospects or investors' perceptions of [its] business and prospects may be materially and adversely affected, and the market price of [its] . . . ADSs may decline.").

disclosures were supplemented by more specific ones relating to the neighborhood retail industry and the impact of COVID-19 upon it.[11] The offering documents specifically disclosed the liquidity risk faced by the company, and the possibility that it would be unable to obtain the financing needed to address such problems.[12] Finally, as noted *supra* Section III.B, the company disclosed the internal control deficiencies it had identified to date, the possibility it would identify more, and

---

[11]   *See id.* at 24-25 ("Uncertainties relating to the growth and profitability of the neighborhood retail industry in China in general, and the on-demand DMW retail industry in particular, could adversely affect our revenues and business prospects. We generated a majority of our revenues from our on-demand DMW retail business historically. The long-term viability and prospects of various online neighborhood retail business models in China remain relatively untested."); *id* at 45 ("If [the COVID-19] outbreak persists, commercial activities throughout the world could be curtailed with decreased consumer spending, business disruptions, interrupted supply chains and difficulties in travel. Our business had been adversely affected by the outbreak of COVID-19 in China due to negative impacts to our supply chain and fulfillment operations. The extent to which COVID-19 impacts our results will depend on future developments, which are highly uncertain and cannot be predicted.").

[12] *See id. at 21* ("We have a history of net losses and negative cash flows, which may continue in the future. . . . If we are unable to generate adequate revenue growth and manage our costs and expenses, we may not be able to achieve profitability or positive cash flow on a consistent basis, which may impact our business growth and adversely affect our financial condition and results of operations."); *id.* at 42 ("It is possible that we will continue to have negative cash flow in the future. . . . [Missfresh may] require additional cash resources due to changed business conditions or other future developments. . . . we may seek to obtain a credit facility or sell additional equity or debt securities. . . . It is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all.").

the negative impact those deficiencies could have on the company. *See id.* at 47.

Plaintiffs claim that these "boilerplate and generalized risk factors" are insufficiently specific, Opp. at 20-21, but as near as the Court can determine, these risk factors addressed every single potential cause of the company's subsequent shutdown identified in the amended complaint. Plaintiffs claim that these disclosures failed to warn that the company's online sales platforms would inevitably need to be shut down, Opp. at 21, but plaintiffs have simply failed to allege that the subsequent shut down of these platforms was a forgone conclusion at the time of the offering. At bottom, plaintiffs' argument is nothing more than a claim of fraud-by-hindsight. *See In re TVIX Secs. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) ("Plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight because Section 11 claims cannot be based on a backward-looking assessment of the registration statement."). Plaintiffs have failed to allege a violation of Item 105.

## IV.  Conclusion

For the reasons set forth herein, the Court, by order dated September 12, 2023, granted in part and denied in part defendants' motion to dismiss.

New York, NY
November  6, 2023

_____
JED S. RAKOFF, U.S.D.J.