**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN CHEN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil Action No. 1:22-cv-09836-JSR |
| vs. | |
| MISSFRESH LIMITED, ZHENG XU, JUN WANG, YUAN SUN, ZHAOHUI LI, COLLEEN A. DE VRIES, HANSONG ZHU, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, AMTD GLOBAL MARKETS LIMITED, ICBC INTERNATIONAL SECURITIES LIMITED, NEEDHAM & COMPANY, LLC, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, ABCI SECURITIES COMPANY LIMITED, GF SECURITIES (HONG KONG) BROKERAGE LIMITED, FUTU INC., TIGER BROKERS (NZ) LIMITED, and COGENCY GLOBAL, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF PROPOSED**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 3

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE,
AND WARRANTS FINAL APPROVAL .......................................................... 3

A.    The Law Favors and Encourages Settlement of Class Action Litigation ........... 3

B.    The Standards for Final Approval ...................................................................... 4

    1.    Plaintiffs and Co-Lead Counsel Have Adequately Represented the
Settlement Class ......................................................................................... 6

    2.    The Settlement Was Reached After Robust Arm's-Length Negotiations ............. 8

    3.    The Relief Provided by the Settlement Is Adequate ............................... 9

        (a)    The Costs, Risks, and Likely Duration of the Litigation Support
Approval of the Settlement ......................................................... 9

        (b)    Risks Related to Proving Liability: Material Falsity ................................ 11

        (c)    Risks Related to Damages: Negative Causation Defense ......................... 13

        (d)    The Risks of Achieving and Maintaining Class Certification ................. 15

        (e)    Obstacles to Enforcing a U.S. Judgment .................................................. 15

        (f)    The Effective Process for Distributing Relief to the Settlement
Class .................................................................................................. 16

        (g)    The Requested Attorneys' Fees and Expenses Are Reasonable ............. 17

        (h)    The Relief Provided in the Settlement Is Adequate Taking Into
Account all Agreements Related to the Settlement .................................. 18

    4.    Application of the Remaining *Grinnell* Factors Supports Approval ................... 18

        (a)    The Ability of Defendants to Withstand a Greater Judgment .................. 18

        (b)    The Reaction of the Settlement Class to Date ........................................ 19

        (c)    The Stage of the Proceedings and the Amount of Information
Available to Counsel Support Approval of the Settlement ...................... 20

(d)    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement ........................................ 21

II.    THE PROPOSED PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT TREATS CLASS MEMBERS EQUITABLY AND SHOULD BE APPROVED BY THE COURT ........................................................................... 22

III.    THE COURT SHOULD FINALLY CERTIFY THE SETTLEMENT CLASS ............. 23

IV.    NOTICE SATISFIED RULE 23 AND DUE PROCESS ................................................... 24

CONCLUSION ................................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3D Sys. Sec. Litig.*,
    No. 21-1920, 2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) .........................................................22

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................................................20

*Anixter v. Home-Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) ...............................................................................................13

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012) .........................................................................9, 19, 22

*In re Citigroup Inc. Sec. Litig.*,
    No. 09-7359, 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ....................................................4

*City of Detroit v. Grinnell Corp.* 495 F.2d 448, 463 (2d Cir. 1974),
    *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) .........................................................................................5, 10, 21, 22

*City of Providence v. Aeropostale Inc. et al.*,
    No. 05-1695, 2014 WL 1883494 (S.D.N.Y. May 9, 2014),
    *aff'd, Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015) ...................................................7

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ......................................................................................................8

*Ebbert v. Nassau Cnty.*,
    No. 05-5445, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ...........................................15, 16

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    No. MDL 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd sub*
    *nom. In re Facebook, Inc.*, 674 F. App'x. 37 (2d Cir. 2016) ....................................................9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............................................21, 22

*In re Giant Interactive Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ...........................................................................................23

*In re Gilat Satellite Networks*, Ltd.,
    No. 02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ...............................................9, 10

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ..................................................................21, 22

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ..........................................................10, 22

*In re Lyft Inc. Sec. Litig.*,
    No. 19-2690, 2023 WL 5068504 (N.D. Cal. Aug. 7, 2023) .................................8

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..............................25

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    65 F.3d 1044 (2d Cir. 1995)..............................................................................13

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) .................................................................................5

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)..............................................................................21

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)...........21, 22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) .......................................................................5, 9

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ..........................................................................6

*In re PPDAI Grp. Inc. Sec. Litig.*,
    No. 18-6716, 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) .............................5, 6

*Puddu v. 6D Global Tech., Inc.*,
    No. 15-8061, 2021 WL 1910656 (S.D.N.Y. May 12, 2021) ..............................20

*Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*,
    No. 11-5801, 2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012) .............................10

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .........................................................................13

*Rodriguez v. CPI Aerostructures, Inc.*,
    No. 20-982, 2023 WL 2184496 (E.D.N.Y. Feb. 16, 2023) ...............................24

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003).........................................................12, 13

*Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*,
   No. 01-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ................................................21

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...........................................................................11, 14

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 15-1695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..................................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...........................................................................................3, 4, 24

*In re Warner Chilcott Ltd. Sec. Litig.*,
   No. 06-11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) ..............................................19

**Statutes**

15 U.S.C § 77k(e) ....................................................................................................................13, 14

**Rules**

Fed. R. Civ. P. 23 .........................................................................................................................4, 5

Fed. R. Civ. P. 23(a) ................................................................................................................23, 24

Fed. R. Civ. P. 23(b)(3) ...........................................................................................................23, 24

Fed. R. Civ. P. 23(c)(1)(C) ...........................................................................................................15

Fed. R. Civ. P. 23(c)(2)(B) ...........................................................................................................25

Fed. R. Civ. P. 23(e) .............................................................................................................4, 5, 24

Fed. R. Civ. P. 23(e)(2) ..........................................................................................................4, 5, 6

Fed. R. Civ. P. 23(e)(2)(A) .............................................................................................................6

Fed. R. Civ. P. 23(e)(2)(B) .............................................................................................................8

Fed. R. Civ. P. 23(e)(2)(C) .............................................................................................................9

Fed. R. Civ. P. 23(e)(2)(C)(ii) ......................................................................................................16

Fed. R. Civ. P. 23(e)(2)(C)(iv) .....................................................................................................18

Fed. R. Civ. P. 23(e)(3) ..................................................................................................................5

**Other Authority**

Samuel Francis, *Meet Two-Face: The Dualistic Rule 10b-5 and the Quandary of Offsetting Losses by Gains,* 77 Fordham L. Rev. 3045, 3047 (2009)......................................13

Plaintiffs,[1] on behalf of themselves and the proposed Settlement Class,[2] respectfully submit this memorandum of law in support of their motion for: (i) final approval of the proposed Settlement of the above-captioned class action (the "Action"); (ii) approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund; and (iii) final certification of the Settlement Class.

## PRELIMINARY STATEMENT

As detailed in the Stipulation, Plaintiffs and Defendants Missfresh Limited ("Missfresh" or the "Company"), Zheng Xu ("Xu"), Cogency Global Inc. ("Cogency"), Colleen A. De Vries (together with Cogency, the "Cogency Defendants"), and the Underwriter Defendants[3] (altogether, the "Settling Defendants") have agreed to settle all claims asserted in the Action, or that could have been asserted, arising out of the Company's June 25, 2021 initial public offering (the "IPO") in exchange for the payment of $4,903,900 (the "Settlement Amount") for the benefit of the Settlement Class.

As described below and in the accompanying Joint Declaration of Alfred L. Fatale III and Phillip Kim in Support of (i) Final Approval of Class Action Settlement and Plan of Allocation

---

[1] Plaintiffs refer to (i) Court-appointed Lead Plaintiffs Maso Capital Investments Limited, Blackwell Partners LLC – Series A, Star V Partners LLC (the "Maso Plaintiffs") and Chelsea Fan, and (ii) named plaintiff James Sannito.

[2] All capitalized terms used in this memorandum that are not defined have the same meanings as in the Stipulation and Agreement of Settlement, dated June 12, 2024 (the "Stipulation"). (ECF No. 139). Emphasis is added and internal citations and punction is omitted unless noted.

[3] Underwriter Defendants are: J.P. Morgan Securities LLC, Citigroup Global Markets Inc., China International Capital Corporation Hong Kong Securities Limited, China Renaissance Securities (Hong Kong) Limited, Haitong International Securities Company Limited, CMB International Capital Limited, AMTD Global Markets Limited, ICBC International Securities Limited, Needham & Company, LLC, China Merchants Securities (HK) Co., Limited, ABCI Securities Company Limited, GF Securities (Hong Kong) Brokerage Limited, Futu Inc., and Tiger Brokers (NZ) Limited.

and (ii) an Award of Attorneys' Fees and Payment of Expenses ("Joint Declaration" or "Joint Decl."), the decision to settle was well-informed by two years of complex litigation that included, among other things: (i) a comprehensive investigation involving, among other things, a review of publicly available information from both English and Chinese sources regarding the Company; (ii) engaging an accounting expert and a damages and causation expert; (iii) preparing and filing an initial complaint and amended complaint; (iv) opposing Defendants' motions to dismiss, which the Court granted in part and denied in part; (v) conducting discovery, including drafting and serving discovery requests; (vi) retaining an investigator in China; (vii) preparing and filing a motion for certification of the class; (viii) preparing and filing a motion for alternative service on the Individual Defendants and renewing such motion; (ix) preparing and filing a motion for issuance of a letter of request pursuant to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Evidence Convention") to be served on PricewaterhouseCoopers Zhong Tian LLP in China; and (x) engaging in an extensive arm's-length mediation process with the assistance of a well-respected mediator, David Murphy of Phillips ADR ("Mr. Murphy" or "Mediator"), which was preceded by the exchange of detailed written mediation statements. *See generally* Joint Decl. at §§III-V.[4]

---

[4] The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs in the Joint Declaration.

All exhibits herein are annexed to the Joint Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Joint Declaration and the second reference is to the exhibit designation within the exhibit itself.

Co-Lead Counsel, which have extensive experience and expertise in prosecuting securities class actions, believe that the Settlement represents a favorable resolution of this complex international litigation, especially considering: (i) the specific risks of continued litigation, including the potential failure to certify a litigation class or survive Defendants' likely summary judgment motions in connection with proving materiality and damages; (ii) the near impossibility of enforcing a U.S. securities class action judgment in China; and (iii) the extremely high costs of discovery involving witnesses and evidence primarily located in China.

Plaintiffs include sophisticated institutional investors as well as individual investors that were each actively involved in the Action and have approved the Settlement. *See* Ex. 1, Declaration of Manoj Jain, submitted on behalf of Lead Plaintiffs Maso Capital Investments Limited, Blackwell Partners LLC – Series A, and Star V Partners LLC; Ex. 2, Declaration of Lead Plaintiff Chelsea Fan; and Ex. 3, Declaration of Plaintiff James Sannito.

Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement and finally certify the Settlement Class. In addition, the Plan of Allocation, which was developed by Co-Lead Counsel with the assistance of Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund and should also be approved by the Court.

## **ARGUMENT**

### I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

#### A.    The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class

action context.'").[5]   This policy would be well-served by approval of the Settlement of this complex securities class action, which, absent resolution, could consume years of additional resources of this Court and, likely, the Court of Appeals for the Second Circuit.

### B.    The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement and the settlement's substantive terms. *See Wal-Mart Stores*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09-7359, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Pursuant to the 2018 amendments to Rule 23, a court may approve a class settlement as "fair, reasonable, and adequate" after considering the following factors delineated in Rule 23(e)(2):

(A)    whether the class representatives and class counsel have adequately represented the class;

(B)    whether the proposal was negotiated at arm's length;

(C)    whether the relief provided for the class is adequate, taking into account:

    i.    the costs, risks, and delay of trial and appeal;

    ii.    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    iii.    the terms of any proposed award of attorneys' fees, including timing of payment; and

---

[5] All internal quotations and citations are omitted unless otherwise stated.

iv.       any agreement required to be identified under Rule 23(e)(3); and

(D)       whether the proposal treats class members equitably relative to each other.

In *City of Detroit v. Grinnell Corp*., which predates the recent Rule 23 amendments, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

The Advisory Committee Notes to the 2018 amendments to Rule 23 indicate that the Rule 23(e) factors are not intended to "displace" any factor previously adopted by the Second Circuit, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Comm. Notes to 2018 Amendments. Indeed, "[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the [Second Circuit] factors." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 330 F.R.D. 11, 29 (E.D.N.Y. 2019); *see also Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023) ("Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement.); *cf. In re PPDAI Grp. Inc. Sec. Litig.*, No. 18-6716, 2022 WL 198491, at *8 n.10

(E.D.N.Y. Jan. 21, 2022) (noting the significant overlap between the relevant Second Circuit case law and the Rule 23(e)(2) factors).

Accordingly, Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the Rule 23(e)(2) factors and will also discuss the application of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### 1. Plaintiffs and Co-Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, a court must consider whether the "class representatives and class counsel have adequately represented the class." Rule 23(e)(2)(A). Here, Plaintiffs, like all other members of the Settlement Class, purchased or otherwise acquired publicly traded Missfresh American Depositary Shares ("ADSs") pursuant and/or traceable to the Offering Documents in connection with the IPO, and were allegedly damaged thereby. Thus, the claims of the Settlement Class and Plaintiffs would prevail or fail in unison, and the common objective of maximizing recovery from the Settling Defendants aligns the interests of Plaintiffs and all members of the Settlement Class. *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

In pursuing these objectives, Plaintiffs were active and informed participants in the litigation and, among other things: (i) regularly communicated with counsel regarding the posture and progress of the Action; (ii) received and reviewed material filings in the Action; (iii) completed certifications and declarations in support of filings; (iii) gathered trade documentation and assisted with responding to discovery requests; and (iv) participated in settlement discussions and evaluated and approved the proposed Settlement. *See* Ex. 1 at ¶3; Ex. 2 at ¶3; Ex. 3 at ¶3.

Additionally, the Maso Plaintiffs are sophisticated institutional funds that took an active role in supervising the litigation, as envisioned by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and endorse the Settlement. Ex. 1 at ¶¶2, 4. A settlement reached "with the endorsement of a sophisticated institutional investor … is entitled to an even greater presumption of reasonableness." *In re Veeco Instruments Inc. Sec. Litig.*, No. 15-1695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Throughout the Action, Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation. The Rosen Law Firm, P.A. ("Rosen Law") and Labaton Keller Sucharow LLP ("Labaton") are both highly qualified and experienced in securities litigation, as set forth in their firm resumes (*see* Exs. 6 - C & 7 - C) and were able to conduct the litigation successfully against skilled opposing counsel.[6] During the course of the litigation, Plaintiffs and Co-Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims. *See generally* Joint Declaration. The judgment of Co-Lead Counsel—law firms with deep expertise in the field of securities class action litigation—that the Settlement is in the best interests of the Settlement Class is also entitled to "great weight." *City of Providence v. Aeropostale Inc. et al.*, No. 05-1695, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).

Accordingly, the Settlement Class has been, and remains, well represented.

---

[6] During the course of the litigation, Defendants have been ably represented by well-regarded firms, including, Stinson LLP, Allen Overy Shearman Sterling US LLP f/k/a Shearman & Sterling LLP, K&L Gates LLP, and Skadden, Arps, Slate, Meagher & Flom LLP.

### 2.    The Settlement Was Reached After Robust Arm's-Length Negotiations

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).

The proposed Settlement was achieved in connection with thorough arm's-length negotiations that included a full day mediation session, with the parties represented by counsel highly experienced in securities class litigation, as well as continued negotiations overseen by Mediator Murphy. ¶¶50-57. A "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *cf. In re Lyft Inc. Sec. Litig.*, No. 19-2690, 2023 WL 5068504, at *10 (N.D. Cal. Aug. 7, 2023) (approving settlement and noting Mr. Murphy's involvement as a third-party neutral).

As discussed in the Joint Declaration, the Parties and their counsel had well-honed understandings of the strengths and weaknesses of the case before agreeing to settle. ¶¶67-78. On October 18, 2023, Plaintiffs and Defendants Missfresh and Xu participated in a full-day, in-person mediation session overseen by Mr. Murphy in an attempt to reach a settlement. Although substantial progress was made, Plaintiffs and Defendants Missfresh, and Xu were unable to reach a resolution on that day. ¶52. Over the course of the following weeks, the parties, with Mr. Murphy's assistance, continued to engage in settlement discussions. On November 20, 2023, Plaintiffs and Defendants Missfresh and Xu accepted a Mediator's proposal, reaching an agreement in principle to settle the Action. On November 28, 2023, the parties notified the Court of an agreement in principle and the Court stayed the proceedings for sixty days. ¶53. While the parties were negotiating the terms of a stipulation of settlement and related papers for submission to the Court, however, they reached an impasse based on Missfresh's inability to fund the

settlement and counsel for Defendant Missfresh and the Cogency Defendants withdrawing from the Action for non-payment of legal fees. This caused any progress on the settlement to come to a halt, and the litigation continued. ¶¶54-55.

After Defendant Missfresh and the Cogency Defendants' new counsel appeared in the case, the Parties, including all Settling Defendants, resumed settlement negotiations. With Mr. Murphy's continued assistance, they ultimately reached a new agreement in principle to settle the Action on April 23, 2024. ¶56. On the same day, the Parties informed the Court of the agreement in principle, and, at the Parties' request, the Court stayed the Action for fifty days. ¶57. The Parties subsequently negotiated the Stipulation, which sets forth the final terms and conditions of the Settlement.

### 3.    The Relief Provided by the Settlement Is Adequate

The Court must consider whether "the relief provided for the class is adequate, taking into account … the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *In re Payment Card Interchange Fee*, 330 F.R.D. at 36.

### (a)    The Costs, Risks, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature highly complex, and district courts have long recognized that "[a]s a general rule, securities class actions are notably difficult and notoriously uncertain to litigate." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x. 37 (2d Cir. 2016); *In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 WL 1191048,

at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute."). In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for a court to consider in its analysis of a proposed settlement. *See Id*. at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").

As detailed in the Joint Declaration, and discussed below, the case involved, among other things, unique issues related to materiality and negative causation in connection with the alleged accounting misstatements that survived Defendants' motions to dismiss. Completing discovery, certifying a class, prevailing in connection with summary judgment challenges, and then achieving a litigated verdict (and sustaining any such verdict on appeal) would have been difficult undertakings. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense, and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Fact discovery in the Action involved witnesses and evidence primarily based in China. ¶70. "Courts in the Second Circuit have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are cumbersome and inefficient, and hardly make litigation in the United States convenient." *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.,* No. 11-5801, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012). The unique complexity, expense, and likely much longer duration of such discovery strongly favor approval of the Settlement. Moreover, Plaintiffs face a substantial risk that those Defendants that are located in China may not continue to engage in the litigation and thus there could ultimately be no feasible source of

recovery for a successful class. ¶¶72-73.

Trial of the claims would have required extensive expert testimony on issues related to the Company's allegedly materially overstated sales of products through online platforms and net revenues for the first quarter of 2021, as well as damages. ¶¶68-69, 74-77. Courts regularly observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited …").

### (b)    Risks Related to Proving Liability: Material Falsity

As an initial matter, surviving, in part, Defendants' motions to dismiss the Complaint was no guarantee of ultimate success. At summary judgment and trial, Defendants would have likely strenuously maintained that Plaintiffs could not establish that Defendants' statements were materially false and misleading as required by the Securities Act. ¶¶67-68.

Fundamentally, although discovery was underway, Plaintiffs faced considerable obstacles to proving their case if the non-U.S. Defendants failed to cooperate with discovery. Many Defendants and witnesses are located in China, which creates significant hurdles with respect to obtaining the necessary documents and testimony to prove Plaintiffs' claims. ¶70. According to Chinese law, productions of information and data maintained by a company such as Missfresh outside of China must first be reviewed and approved by the necessary Chinese government officials. *Id*. Not only does this requirement slow down litigation, but it introduces the risk of extremely protracted litigation. Additionally, China does not permit depositions on the mainland or virtual depositions, which would require Defendants and witnesses to agree to travel out of China for depositions. *Id*. Moreover, documents produced will likely be in Chinese, which would

require translation or the retention of bilingual attorneys to facilitate document review. *Id*. Therefore, there is no guarantee that Plaintiffs would have been able to obtain the necessary evidence to prove their case through discovery; and even if they could do so, it would be costly, take years, and delay any potential recovery to Settlement Class Members.

With respect to proving the remaining misstatements—material overstatement in revenue in the Offering Documents—Defendants were anticipated to continue to argue, among other things, that the net effect of the overstated revenue and understated costs and expenses resulted in no change to the bottom-line profit, making the accounting misstatements immaterial to investors. Defendants would have also likely argued, as they did in their motions to dismiss, that the Offering Documents warned that existing material weaknesses in internal controls could result in restatement of the reported financials for the period at issue. ¶68.

In addition, each of the Individual Defendants who have appeared and the Underwriter Defendants would have asserted a due diligence defense as to their liability. While Plaintiffs would have worked extensively with due diligence experts with a view towards presenting compelling arguments to show that these Defendants were negligent in connection with the IPO, these Defendants would also have likely put forth well-qualified experts of their own showing that they conducted a reasonable investigation and had reasonable grounds for their belief in the Offering Documents' truthfulness and completeness. ¶69.

While Plaintiffs and Co-Lead Counsel believe their counter arguments with respect to Defendants' positions were strong, even if Plaintiffs prevailed at summary judgment and then trial, it is virtually certain that appeals would be taken, which would have, at best, delayed any recovery. *See, e.g., Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing

the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there was of course the possibility that even a favorable verdict could be reversed by the Court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### (c)    Risks Related to Damages: Negative Causation Defense

Another principal challenge in continuing the litigation was the difficulty of proving damages and overcoming Defendants' anticipated negative causation defense, particularly the "disaggregation" of confounding or unrelated information from the stock price declines. *See* 15 U.S.C § 77k(e); ¶¶74-75. These matters would have been hotly contested by Defendants, particularly in the context of class certification and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings and appeals.

Plaintiffs' consulting damages expert has estimated that maximum damages are approximately $285.5 million.[7] ¶74. However, this "best case" scenario is subject to attack if Defendants were able to disaggregate other confounding factors, which may have impacted the ADSs' declines, or establish a negative causation defense. *See, e.g., McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) (under Section 11, "any decline in

---

[7] These damage estimates assume that gains on pre-class period purchases accrued during the class period are removed or "netted." *See* Samuel Francis, *Meet Two-Face: The Dualistic Rule 10b-5 and the Quandary of Offsetting Losses by Gains,* 77 Fordham L. Rev. 3045, 3047 (2009) ("Courts emphasizing the compensation objective have taken a netting approach to damages that offsets gains and losses stemming from different transactions.").

value is presumed to be caused by the misrepresentation," and the "defendant . . . bears the burden

of proving that the price decline was not related to the misrepresentations"); *see* 15 U.S.C. § 77k(e).

Defendants were likely to argue that before any alleged misrepresentation was revealed to

the market, Missfresh's ADS price had already dropped ***96%*** from its $13.00 IPO price due to

reasons unrelated to this Action—an argument Defendants would claim has been strongly

bolstered by the fact that only Plaintiffs' allegations regarding the materially overstated revenue

were sustained after the motions to dismiss. ¶75. In continuing to argue that Plaintiffs were not

damaged at all by the alleged misstatements leading to the restatement, Defendants would likely

point to the fact that there was no drop in the ADSs price following the restatement. In particular,

Defendants would likely argue that after the restatement was issued, the ADSs' price *increased* by

11.5% and continued to increase through the filing of the Action. *Id.* Plaintiffs' consulting damages

expert analyzed Defendants' negative causation arguments and concluded, assuming the factfinder

were to accept Defendants' defense, that maximum recoverable Section 11 damages would be

approximately $9.6 million. The Settlement thus recovers approximately 51% of these estimated

aggregate recoverable damages. Defendants' arguments, including those highlighted above, if

credited by the Court or a jury, would have eviscerated damages. *Id*.

Additionally, while Co-Lead Counsel would work extensively with Plaintiffs' damages

expert with a view towards presenting compelling arguments to the jury and prevailing at trial,

Defendants would have put forth well-qualified experts of their own. As courts have long

recognized, the substantial uncertainty as to which side's experts might be credited by a jury

presents a serious litigation risk. *See Telik,* 576 F. Supp. 2d at 579-80 (in this "battle of experts, it

is virtually impossible to predict with any certainty which testimony would be credited, and

ultimately, which damages would be found…").

14

###### (d)    The Risks of Achieving and Maintaining Class Certification

Plaintiffs' motion for class certification was pending, and not fully briefed, when the Parties agreed to settle. ¶71. Defendants had not yet submitted their opposition to Plaintiffs' motion. Plaintiffs faced a substantial risk that the Court could have denied the class certification motion in its entirety. Additionally, class certification can be reviewed and modified at any time by a court before final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). The Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification through trial and on appeal. *See Ebbert v. Nassau Cnty.*, No. 05-5445, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of the certified class supported approval of Settlement).

###### (e)    Obstacles to Enforcing a U.S. Judgment

Co-Lead Counsel's understanding is that Missfresh is not financially sound and has lost money since its IPO, eventually causing the Company to shut down its operations. Missfresh sold all its operations for consideration of $1 in September 2023, leaving no recoverable assets from Missfresh, globally, for the Settlement Class.  In February 2024, Missfresh ADSs were delisted from the NASDAQ exchange. As of now, Missfresh ADSs have no value. Additionally, Missfresh is facing various lawsuits in China with approximate aggregate damages of over RMB 1 billion (approximately US$147 million). ¶¶72-73.

If the non-U.S. based Defendants were to seek to avoid a U.S. judgment in the class's favor, enforcing it in China would be close to impossible as Missfresh's assets (if any exist) and the Individual Defendants are all located in China. *Id*. Given there is no agreement between the United States and China to recognize each other's judgments, the only potential way to enforce a judgment against the non-U.S. Defendants would be through reciprocity. ¶73. China's reciprocity system,

however, is one of the most restrictive in the world, regularly denying enforcement of foreign judgments. *Id*. As of June 2022, Chinese courts have only recognized and enforced two judgments from the United States. Neither of which were judgments from securities class action lawsuits. *Id*. Furthermore, the fact that Missfresh had only a contractual interest, and no ownership, in its Chinese operations increased the uncertainty of collecting a judgment from those operations. *Id*.

Given these financial impediments, the certain recovery offered by the Settlement is substantial for investors.

**(f)    The Effective Process for Distributing Relief to the Settlement Class**

Rule 23(e)(2)(C)(ii) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Here, the proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Verita Global, LLC ("Verita" or "Claims Administrator").[8] The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Namely, class members can submit, either by mail or online using the Claims Administrator's website, the Court-approved Claim Form. Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation,[9] and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation at ¶24; Ex. 4 - B at ¶¶65-81. Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified

---

[8] Verita was formerly known as KCC Class Action Services, LLC.

[9] Approval of the Plan of Allocation is discussed in Section II, below.

of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation at ¶30(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶39) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Plaintiffs recommend that any *de minimis* balance that still remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses, be contributed to Consumer Federation of America, a non-sectarian, not-for-profit charitable organization serving the public interest, or such other nonsectarian, not-for-profit charitable organization approved by the Court. *Id*. at ¶27.[10]

### (g) The Requested Attorneys' Fees and Expenses Are Reasonable

As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 25%

---

[10] CFA is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education before the judiciary, Congress, the White House, federal and state regulatory agencies, and state legislatures. *See generally* www.consumerfed.org. With respect to victims of financial fraud, CFA has an Investor Protection program that works nationwide to promote consumer-oriented policies that safeguard investors against fraud through: (i) the development of educational material for investors; (ii) drafting policies and legislation; (iii) and providing testimony and comments on legislation and regulations. See www.consumerfed.org/issues/ investor-protection. CFA has been approved as a cy pres beneficiary in numerous securities settlements, including *In re Broadcom Corp. Sec. Litig*., No. 01-CV-00275-MLR (C.D. Cal.), *DePalma v. Rent-A-Center*, et al., No. 16-CV-00978 (E.D. Tex.).

of the Settlement Fund, payable as ordered by the Court, and Litigation Expenses incurred by Co-Lead Counsel are reasonable in light of Co-Lead Counsel's efforts and the risks in the litigation. Most importantly, with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of the attorneys' fees request is not part of the Settlement, *i.e.,* neither Plaintiffs nor Co-Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or litigation expenses.

### (h)     The Relief Provided in the Settlement Is Adequate Taking Into Account all Agreements Related to the Settlement

Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the Parties in connection with the proposed Settlement. On April 23, 2024, the Parties entered into a settlement term sheet, and on June 12, 2024, they entered into the Stipulation and the confidential Supplemental Agreement Regarding Requests for Exclusion (the "Supplemental Agreement"), which was previously shared with the Court. The Supplemental Agreement sets forth the conditions under which Settling Defendants have the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold. The Supplemental Agreement, Stipulation, and term sheet are the only agreements concerning the Settlement entered into by the Parties.

### 4.     Application of the Remaining *Grinnell* Factors Supports Approval

### (a)     The Ability of Defendants to Withstand a Greater Judgment

This factor weighs in favor of final approval. As discussed above, during the course of the litigation, Missfresh was heavily in debt and has sold all its operations, leaving no recoverable assets for the Settlement Class. In February 2024, Missfresh ADSs were delisted from the NASDAQ exchange. As of now, Missfresh ADSs have no value. Additionally, Missfresh is facing various lawsuits in China with approximate aggregate damages of over RMB 1 billion

(approximately US$147 million). ¶¶72-73.  As such, even if Plaintiffs were to prevail at trial or on appeal, substantial doubt exists about the Defendants' ability to satisfy any judgment larger than the Settlement Amount.

### (b)    The Reaction of the Settlement Class to Date

The reaction of a class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67.

Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Verita, mailed or emailed copies of the Postcard Notice and Notice Packet to potential Settlement Class Members and their nominees. *See* Declaration of Lance Cavallo Regarding: (A) Provision of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of Telephone Hotline and Settlement Website; and (D) Report on Requests for Exclusion Received to Date ("Mailing Decl."), Ex. 4 at ¶¶2-9. As of September 4, 2024, 10,163 copies of the Postcard Notice and Notice Packet have been mailed or emailed to potential Settlement Class Members and their nominees. *Id*. at ¶9. In addition, on July 29, 2024 the Summary Notice was published in *Investor's Business Daily* and transmitted over the internet using *PRNewswire*. *Id*. at ¶10.

While the deadline set by the Court for Settlement Class Members to object (September 19, 2024) has not yet passed, to date, no objections to the Settlement or Plan of Allocation have been received and no request for exclusion has been received.  ¶66; Ex. 4 ¶14; *see In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Plaintiffs will file their reply papers no later than October 3, 2024, addressing any objections and any requests for exclusion.

### (c) The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

"[A] sufficient factual investigation must have been conducted to afford the Court the opportunity to 'intelligently make … an appraisal of the settlement.'" *Puddu v. 6D Global Tech., Inc.*, No. 15-8061, 2021 WL 1910656, at *4 (S.D.N.Y. May 12, 2021). Here, as detailed in the Joint Declaration, prior to agreeing to settle, Co-Lead Counsel developed a deep understanding of the facts of the case and merits of the claims through: (i) a comprehensive investigation that involved, among other things, a review of publicly available information regarding the Company from both English and Chinese sources; (ii) engaging an accounting expert and a damages and causation expert; (iii) defeating, in part, the motions to dismiss; (iv) commencing discovery, including serving discovery requests; (v) preparing and filing the motion for class certification; (vi) preparing and filing a motion for alternative service; (vii) preparing and filing a motion for a letter of request pursuant to the Hague Evidence Convention to be served on PricewaterhouseCoopers Zhong Tian LLP in China; and (viii) preparing for and participating in extensive arm's-length negotiations between experienced counsel with the assistance of a well-respected Mediator. Plaintiffs and Co-Lead Counsel were fully informed about the Action's strengths and weaknesses. *See* Joint Decl. at §§III-V; VI.

Armed with this substantial base of knowledge, Plaintiffs were in a position to balance the proposed Settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation. The fact that the Parties have not completed discovery does not weigh against preliminary approval. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425–26 (S.D.N.Y. 2001) ("To approve a proposed settlement, however, the Court need not find that the parties have engaged in extensive discovery. Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make. . . an appraisal of

the Settlement."); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties."). Accordingly, Plaintiffs and Co-Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01-11814, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). The Court thus should find that this factor also supports approval.

> **(d)    The Range of Reasonableness of the Settlement Amount
> in Light of the Best Possible Recovery and All the Attendant
> Risks of Litigation Support Approval of the Settlement**

Courts agree that the determination of a "reasonable" settlement "is not susceptible [to] a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead, "in any case there is a range of reasonableness with respect to a settlement. . . ." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Courts typically analyze the last two *Grinnell* factors together, "consider[ing] and weigh[ing] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-3400, 2010 WL 4537550, at *20 (S.D.N.Y. Nov. 8, 2010).

As discussed above and in the Joint Declaration, the Settlement represents approximately 1.7% of the total maximum damages estimated by Plaintiffs' consulting damages expert or approximately 51% of recoverable damages after considering Defendants' negative causation arguments. Because "there is no reason … why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery," *Grinnell*, 495

F.2d at 455 n.2, for the reasons set forth herein, a certain recovery of approximately 2% of the "best case" damages recovery is fair and reasonable in light of the significant risks of continued litigation. *See, e.g., In re 3D Sys. Sec. Litig.*, No. 21-1920, 2024 WL 50909, at *12 (E.D.N.Y. Jan. 4, 2024) (settlement representing approximately 1% of maximum damages approved as reasonable); *see also* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), Fig. 22, Ex. 5 (showing that over the past five years, the median settlement in securities class actions has hovered around 1.8% of investor losses).

In light of the circumstances before the Court, and all of the delay and uncertainty that would be inherent in continued litigation, the Settlement falls well within the range of possible recovery considered fair, reasonable, and adequate.

## II.     THE PROPOSED PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT TREATS CLASS MEMBERS EQUITABLY AND SHOULD BE APPROVED BY THE COURT

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation with a "rational basis" satisfies this requirement. *FLAG Telecom*, 2010 WL 4537550, at *21 ; *Initial Pub. Offering*, 671 F. Supp. 2d at 497. A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision." *In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) *aff'd,* 117 F.3d 721 (2d Cir. 1997).

Here, the proposed Plan of Allocation, which was developed by Co-Lead Counsel in consultation with Plaintiffs' damages expert, provides a fair and reasonable method to allocate the

Net Settlement Fund among class members who submit valid claims. The Plan is set forth in full in the long-form Notice, which is posted on the Settlement website, www.Missfreshsecuritiessettlement.com. *See* Ex. 4 - B, at ¶¶65-82. Verita, as the Court-approved Claims Administrator, will determine each Claimant's Recognized Claim, calculated according to the formulas in the Plan of Allocation.  The formulas, which were developed by Plaintiffs' damages expert, generally track the statutory formula for damages under Section 11 of the Securities Act. The Plan provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their calculated Recognized Claim. *Id*. ¶78. Each *pro rata* share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id*. The proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among the Settlement Class.

Co-Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See Giant Interactive*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"). To date, no objections to the proposed plan have been received. ¶84.

## III.    THE COURT SHOULD FINALLY CERTIFY THE SETTLEMENT CLASS

Plaintiffs' Preliminary Approval Motion and motion seeking certification of a class set forth the bases for the certification of the Settlement Class. *See* ECF. No. 136 at 20-21; ECF Nos. 123-126. In connection with the Preliminary Approval Motion, the Court found that the Settlement Class satisfied the requirements of Rule 23(a) and (b)(3) and issued its Order preliminarily certifying a class for settlement purposes. ECF. No. 144 at 3, ¶2. Nothing has happened since preliminary approval was granted that would alter the Court's findings.  Plaintiffs now request that

the Court finally certify the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes only, and appoint Plaintiffs as Class Representatives and Rosen Law and Labaton as Class Counsel. *See Rodriguez v. CPI Aerostructures, Inc.*, No. 20-982, 2023 WL 2184496, at *5 (E.D.N.Y. Feb. 16, 2023) (recommending final certification of the settlement class, noting that there had been no objections or opt-outs from class members, and no other material information had emerged that would alter the court's findings since its preliminary approval order).

## IV.    NOTICE SATISFIED RULE 23 AND DUE PROCESS

Plaintiffs provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e), the PSLRA, and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Wal-Mart Stores*, 396 F.3d at 114—and be the best notice practicable under the circumstances. Both the substance of the notice program and the method of dissemination satisfied these standards.

Collectively, the forms of notice describe, among other things: (i) the terms of the Settlement and the recovery; (ii) the reasons for the Settlement; (iii) the maximum attorneys' fees and expenses that may be sought; (iv) the procedures for requesting exclusion from the Settlement Class and objecting; (v) the procedure for submitting a Claim Form; (vi) the proposed Plan of Allocation for distributing the settlement proceeds to the Settlement Class; and (vii) the date, time and place of the Settlement Hearing. *See* Mailing Decl., Exs. A & B.

In addition to mailing and emailing the Postcard Notice and posting the long-form Notice, Verita caused the Summary Notice to be published in *Investor's Business Daily* and to be released over the internet using *PR Newswire.* Mailing Decl. at ¶¶2-10. Verita also established a website

for the Settlement, www.Missfreshsecuritiessettlement.com, which provides information about the Settlement, including important dates and downloadable copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order. *Id.* at ¶12-13.  The website also provides a portal for submitting claims electronically. Co-Lead Counsel also posted copies of the Notice and Claim Form on their websites. Joint Decl. at ¶65.

This combination of individual mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice … practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-8144, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and finally certify the Settlement Class for purposes of the Settlement only. Proposed orders will be submitted with Plaintiffs' reply papers, after the deadline for objecting or seeking exclusion has passed.


DATED: September 5, 2024                **LABATON KELLER SUCHAROW LLP**

                                        */s/ Alfred L. Fatale III*
                                        Alfred L. Fatale III
                                        David J. Schwartz
                                        Charles Wood
                                        140 Broadway
                                        New York, NY 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        afatale@labaton.com
                                        dschwartz@labaton.com
                                        cwood@labaton.com

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim
Laurence M. Rosen
Jing Chen
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
philkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the
Proposed Settlement Class*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (877) 590-0482
Email: brian@schallfirm.com

*Additional Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.


*/s/ Alfred L. Fatale III*
Alfred L. Fatale III