# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUAN CHEN, Individually and On Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>MISSFRESH LIMITED, ZHENG XU, JUN WANG, YUAN SUN, ZHAOHUI LI, COLLEEN A. DE VRIES, HANSONG ZHU, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, AMTD GLOBAL MARKETS LIMITED, ICBC INTERNATIONAL SECURITIES LIMITED, NEEDHAM & COMPANY, LLC, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, ABCI SECURITIES COMPANY LIMITED, GF SECURITIES (HONG KONG) BROKERAGE LIMITED, FUTU INC., TIGER BROKERS (NZ) LIMITED, and COGENCY GLOBAL, INC.,<br><br>       Defendants. | Civil Action No. 1:22-cv-09836-JSR |

**JOINT DECLARATION OF ALFRED L. FATALE III AND PHILLIP KIM IN SUPPORT OF (I) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

We, ALFRED L. FATALE III and PHILLIP KIM, declare as follows pursuant to 28 U.S.C. §1746:

1.    We are partners at Labaton Keller Sucharow LLP ("Labaton") and The Rosen Law Firm, P.A. ("Rosen Law"), respectively, which serve as Co-Lead Counsel for Lead Plaintiffs: (i) Chelsea Fan; and (ii) Maso Capital Investments Limited, Blackwell Partners LLC – Series A, and Star V Partners LLC (the "Maso Plaintiffs," and together with Ms. Fan, "Lead Plaintiffs"), as well as named plaintiff James Sannito (together with Lead Plaintiffs, "Plaintiffs") and the proposed class in the above-captioned litigation (the "Action").[1] We have been actively involved throughout the prosecution and resolution of the Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon our close supervision and participation in all material aspects of the Action. If called upon to do so, we could and would competently testify to the facts set forth in this declaration.

2.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, we submit this declaration in support of Plaintiffs' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation. We also submit this declaration in support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses. Both motions have the full support of Plaintiffs.[2]

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated June 12, 2024 (ECF No. 139) (the "Stipulation"). Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this declaration. For clarity, citations to exhibits that have attached exhibits will be referenced as "Ex. __-__." The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

[2] *See* Declaration of Manoj Jain, Co-Chief Investment Officer of the Maso Plaintiffs, submitted on behalf of the Maso Plaintiffs, Ex. 1; Declaration of Chelsea Fan, Ex. 2; Declaration of James Sannito, Ex. 3.

## I.    PRELIMINARY STATEMENT

3.    The proposed Settlement now before the Court provides for the complete resolution of all claims in the Action, and related claims, in exchange for a cash payment of $4,903,900. As detailed herein, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class[3] in light of the significant risks of continuing to litigate the Action.

4.    This case has been vigorously litigated from its commencement in December 2022 through the execution of the Stipulation. The Settlement was achieved only after Co-Lead Counsel, *inter alia,* as detailed herein:  (i) conducted a comprehensive investigation involving, among other things, a review of publicly available information from both English and Chinese sources regarding the Company; (ii) engaged an accounting expert and a damages and causation expert; (iii) prepared and filed an initial complaint and amended complaint; (iv) opposed Defendants' motion to dismiss, which the Court granted in part and denied in part; (v) conducted discovery, including drafting and serving discovery requests; (vi) retained an investigator in China; (vii) prepared and filed a motion for certification of the class; (viii) prepared and filed a motion for alternative service on the Individual Defendants and renewed such motion; (ix) prepared and filed a motion for issuance of a letter of request pursuant to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Evidence Convention") to be served on PricewaterhouseCoopers Zhong Tian LLP in China; and (x) engaged in an extensive arm's-length mediation process with the assistance of a well-respected mediator, David

---

[3] The Settlement Class is defined as "all persons and entities who or which purchased or otherwise acquired Missfresh ADSs pursuant and/or traceable to the Offering Documents issued in connection with the ADSs initial public offering in June 2021 (the "IPO"), and were damaged thereby". Certain people and entities are excluded by definition, including those who request exclusion. *See* Stipulation, ¶1(ll).

Murphy of Phillips ADR ("Mr. Murphy" or "Mediator"), which was preceded by the exchange of detailed written mediation statements.

5.      Plaintiffs and Co-Lead Counsel believe that the Settlement is in the best interests of the Settlement Class. Due to their efforts, Plaintiffs and Co-Lead Counsel are well-informed about the strengths and weaknesses of the remaining claims, and defenses, in the Action. As discussed in detail below, the Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, continued to raise numerous challenging defenses. For example, Defendants would have continued to raise serious arguments concerning the materiality of the handful of allegedly false and misleading statements and omissions remaining in the case following the Court's order on Defendants' motion to dismiss. Additionally, Defendants likely would have vigorously argued their affirmative defenses, including negative causation. Issues relating to damages would have come down to an inherently unpredictable and hotly disputed "battle of the experts," with Defendants' experts focusing on, among other things discussed herein, disaggregation of Missfresh ADS declines caused by the alleged material misstatements and omissions as a percentage of total Missfresh ADS declines. In addition, had Plaintiffs overcome Defendants' legal arguments, they still face the daunting task of obtaining evidence and testimony from China and the near impossibility of enforcing a U.S. securities class action judgment in China. In the absence of a settlement, there was a very real possibility that the class could have recovered nothing or an amount significantly less than the negotiated Settlement.

6.      With respect to approval of the proposed Plan of Allocation for the Settlement proceeds, which will govern the calculation of claims, as discussed below, the proposed Plan was developed with the assistance of Plaintiffs' damages expert. It provides for the distribution of the

Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged wrongdoing.

7.    With respect to the Fee and Expense Application, as discussed in the Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Brief"), the requested fee of 25% of the Settlement Fund would be fair both to the Settlement Class and to Co-Lead Counsel, and warrants the Court's approval. This fee request is well within the range of fee percentages frequently awarded in this type of contingent litigation and, under the facts of this case, is justified in light of the benefits that Co-Lead Counsel have conferred on the Settlement Class, the risks they undertook, the quality of their representation, the nature and extent of the legal services, and the fact that Co-Lead Counsel pursued the case on a contingency basis. Co-Lead Counsel also seek $103,236.02 in Litigation Expenses incurred by Co-Lead Counsel for prosecuting this Action, plus $17,500 to reimburse Plaintiffs for their reasonable costs and expenses, including lost wages, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §77z-1(a)(4).

## II.    FACTUAL BACKGROUND

### A.    Summary of Claims

8.    At all relevant times, Missfresh Limited ("Missfresh" or the "Company") sold groceries to customers in China through online portals. The Company went public in the United States on June 8, 2021 through the Offering, selling 24,150,000 ADSs for $13.00 per ADS pursuant to the Offering Documents, raising gross proceeds of $314 million. ¶61.[4]

9.    At the time of the IPO, Missfresh touted itself as having "experienced rapid growth since we commenced our business in 2014." ¶74. Company revenues had grown from RMB 3.5

---

[4] Citations of " ¶ ___ ", unless otherwise noted, refer to the Complaint. ECF No. 34.

billion in 2018 to RMB 6.1 billion in 2020. ¶68. The last quarter reported in its Offering Documents was the quarter ended March 31, 2021 ("Q1 2021"), during which, the Offering Documents reported, Missfresh had earned RMB 1.53 billion. ¶72.

10.    Following the Offering, on April 29, 2022, Missfresh announced that it would not be able to file its annual report for the year ended December 31, 2021 ("2021 Annual Report") on time because it was "in the process of conducting an internal review of certain matters, including those relating to transactions between the Company and certain third-party enterprise." ¶80. On May 24, 2022, Missfresh announced that it had received a non-compliance notification from NASDAQ because of the late filing. ¶81.

11.    On July 1, 2022, Missfresh announced that its investigation was "substantially complete." ¶82. Based on the investigation, Missfresh disclosed that due to the Company's "questionable transactions," it "inaccurately recorded" and overstated RMB 156 million sales of products through online platforms for Q1 2021, which resulted in an 11.7% overstatement in sales of products through online platforms and an 11.4% overstatement in Q1 2021 net revenue. ¶¶69, 82–83.

12.    On July 12, 2022, an initial complaint was filed by Juan Chen, represented by Rosen Law. ECF No. 1.

13.    On December 28, 2022, Plaintiffs filed the amended complaint (the "Complaint") asserting claims against the Defendants[5] under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). ECF No. 34.

---

[5] The "Defendants" consist of the following: (i) Missfresh; (ii) Cogency Global Inc.; (iii) Zheng Xu, Jun Wang, Yuan Sun, Zhaohui Li, Colleen A. De Vries, and Hansong Zhu, (the "Individual Defendants"); and (iv) J.P. Morgan Securities LLC, Citigroup Global Markets Inc., China International Capital Corporation Hong Kong Securities Limited, China Renaissance

14.    The Complaint asserts that in the Offering Documents for the IPO, Defendants allegedly: (i) materially overstated the sales of products through online platforms and net revenues for the first quarter of 2021, (ii) omitted material weakness in internal control over financial reporting, and (iii) omitted the unsustainability of Missfresh's Distributed Mini Warehouses ("DMWs") business. The Complaint alleges that at the time this Action was filed, the price of Missfresh's ADSs were trading at $0.39 per ADS, a 97% decline from the Offering price of $13.00 per ADS. ¶95.

## III.    PROCEDURAL HISTORY

### A.    Commencement of the Action and Appointment of Lead Plaintiffs and Co-Lead Counsel

15.    On July 12, 2022, this Action was commenced in the U.S. District Court for the Eastern District of New York asserting claims under Sections 11, 12(a)(2) and 15 of the Securities Act for alleged misstatements and omissions in the offering documents for Missfresh's June 25, 2021 IPO.

16.    On July 12, 2022, notice of the action was published pursuant to the PSLRA, notifying eligible purchasers of Missfresh ADSs about their right to move for appointment as lead plaintiff.

17.    On October 3, 2022, Judge William F. Kuntz, II of the Eastern District of New York appointed Ms. Fan and the Maso Plaintiffs as Lead Plaintiffs and approved their selection of Rosen Law and Labaton as Co-Lead Counsel.

---

Securities (Hong King) Limited, Haitong International Securities Company Limited, CMB International Capital Limited, AMTD Global Markets Limited, ICBC International Securities Limited, Needham & Company, LLC, China Merchants Securities (HK) Co., Limited, ABCI Securities Company Limited, GF Securities (Hong Kong) Brokerage Limited, Futu Inc., and Tiger Brokers (NZ) Limited (the "Underwriter Defendants").

18.     On November 18, 2022, upon an ordered stipulation by certain of the parties, the Action was transferred to the U.S. District Court for the Southern District of New York and was assigned to Judge Jed S. Rakoff (the "Court").

**B.      The Amended Consolidated Class Action Complaint**

19.     The Complaint filed on December 28, 2022 is the operative complaint in the Action. The Complaint alleges violations of Section 11, 12(a)(2) and 15 of the Securities Act on behalf of a class of all who purchased or otherwise acquired Missfresh ADSs pursuant and/or traceable to the Company's Offering Documents for the IPO and who were damaged thereby.

20.     The Complaint was the result of a significant effort by Co-Lead Counsel that included, among other things, the review and analysis of: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including press releases, Missfresh earnings call transcripts, news articles, and other public statements issued by or concerning Defendants both from English and Chinese-language sources; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; and (v) the applicable law governing the claims and potential defenses. Additionally, Plaintiffs retained a private investigator based in China, and they engaged and consulted with experts on accounting and damages and causation issues.

21.     The Complaint asserts that in the Offering Documents for the IPO, Defendants materially overstated the Company's sales of products through online platforms and net revenues for the first quarter of 2021, (ii) omitted material weakness in the Company's internal control over financial reporting, and (iii) omitted the unsustainability of Missfresh's DMWs business. The Complaint alleges that at the time this Action was filed, the price of Missfresh's ADSs had fallen 97% from its IPO price. ¶95.

22.     As alleged in the Complaint, on April 29, 2022, Missfresh announced that it would not be able to file its report for the year ended December 31, 2021 ("2021 Annual Report") on time because it was "in the process of conducting an internal review of certain matters, including those relating to transactions between the Company and certain third-party enterprise." ¶80. On May 24, 2022, Missfresh announced that it had received a non-compliance notification from Nasdaq because of the late filing. ¶81.

23.     On July 1, 2022, Missfresh announced that its investigation was "substantially complete." Based on the investigation, the Company disclosed that due to the Company's "questionable transactions," it "inaccurately recorded" and overstated RMB 156 million sales of products through online platforms for Q1 2021, which resulted in an 11.7% overstatement in sales of products through online platforms and an 11.4% overstatement in Q1 2021 net revenue. ¶¶69, 72–82.

24.     The Company explained that examples of the "questionable transactions" included "undisclosed relationships between suppliers and customers," "different customers or suppliers sharing the same contact information," and "lack of supporting logistics information." ¶82. The Company also disclosed that the practices had continued through the end of 2021 and, as a result, Missfresh's Q2 and Q3 2021 sales of products through online platforms were also overstated. ¶83.

25.     As a result, Missfresh restated the aforementioned line items for Q1 to Q3 of 2021, which represented nearly 80% of the Next Day Delivery business, and indefinitely shut down that business segment. Under GAAP, a "restatement" is required for correcting material errors. By the restatement, Missfresh admitted that the sales of products through online platforms and net revenue reported in the Offering Documents were materially false when made. ¶¶69–71. For the same

reasons, Defendants' representations in the Offering Documents that financial statements therein were prepared in accordance with GAAP were false when made. ¶¶70–71.

26.     Several days later, the Company further announced that it was required to make additional significant changes in its business strategy, which included shutting down all of its unsustainable on-demand online sales, including sales through its DMWs, effectively eliminating all of the Company's net revenues from sales of products through online platforms. ¶85. The Company was forced to admit that these "significant adjustments [would] have a material and adverse impact on the Company's financial performance." *Id.*

27.     On November 14, 2022, Missfresh finally filed its 2021 Annual Report. The 2021 Annual Report reiterated that Missfresh had misstated its Q1-Q3 financial statements and added that there was substantial doubt concerning Missfresh's ability to continue as a going concern. ¶¶90–91.

28.     The 2021 Annual Report also revealed that there had been a "material weakness" in Missfresh's internal controls which lead to the restatement. ¶92. The material weakness included a "combination of control deficiencies," as revealed by the Company; included lack of "personnel" and "policies" in monitoring and reviewing sales, suppliers, and risk assessment; lack of control over "revenue recogni[tion] relat[ing] to valid sales order;" and lack of monitoring by "internal audit" in the Next Day Delivery segment (the "Omitted Material Weakness"). *Id*. The weakness had permeated virtually every aspect of the operational and financial functions of the Next Day Delivery business unit and resulted in Missfresh's failure to "prevent and detect misstatements related to" the above-referenced "questionable transactions."

29.     By restating the Q1 2021 financial figures contained in the Offering Documents resulting from the Omitted Material Weakness and the questionable transactions, the Complaint

alleges Missfresh admitted the Omitted Material Weakness existed at the time of the IPO but failed to disclose it in violation of the federal securities laws. *Id*.

**C.    Defendants' Motion to Dismiss the Complaint**

30.    On January 27, 2023, Defendants Missfresh, Cogency, and De Vries filed their motion to dismiss the Complaint ("Motion to Dismiss"), which certain Underwriter Defendants joined. ECF Nos. 42–44, 47. The Motion to Dismiss was fully briefed on February 17, 2023. ECF No. 48–53. On July 14, 2023, a newly-served Underwriter Defendant filed a joinder to the Motion to Dismiss (ECF No. 64), to which Plaintiffs responded on July 18, 2023 (ECF No. 65).

31.    Defendants argued Plaintiffs failed to state a claim under Section 11 or 12(a)(2) because the Complaint did not allege a material misrepresentation. Motion to Dismiss at 15–24. Specifically, Defendants asserted the Company disclosed risks regarding its internal controls and the sustainability of its business and its disclosures were not materially misleading. *Id.* Defendants further argued Plaintiffs' claims should be dismissed because it was apparent from the face of the Complaint that the alleged misrepresentations did not cause Plaintiffs' loss. *Id.* at 24–25.

32.    Defendants also argued that because Plaintiffs failed to plead a claim pursuant to Section 11 and 12(a)(2), its control person claim pursuant to Section 15 failed. *Id.* at 25 n.7.

33.    Plaintiffs opposed the Motion to Dismiss and the joinder on February 10, 2023 ("MTD Opposition"). ECF Nos. 48–50.

34.    Plaintiffs argued the Complaint satisfied Section 11 pleading standards because it alleged that the Registration Statement materially overstated sales of products through online platforms and net revenue, the Offering Documents omitted material internal control weakness, and the Offering Documents did not disclose the Company's unsustainability. MTD Opposition at 6–21. Plaintiffs further asserted Missfresh conceded that its sales of products through online platforms and net revenue for Q1 2021 were "***inaccurately recorded***" in the Offering Documents,

establishing Plaintiffs' prima facie case. *Id.* at 7. Plaintiffs also argued that the Defendants did not

meet their substantial burden in proving negative causation at the motion to dismiss stage. *Id.* at

21–24.

35.     Plaintiffs also argued the Complaint adequately pled the Section 12(a)(2) claims

and the claim for control person liability under Section 15. *Id.* at 25.

36.     On February 17, 2023, Defendants Missfresh, Cogency, and De Vries filed a reply

brief in further support of their motion ("MTD Reply") and the Underwriter Defendants filed a

joinder to that reply. ECF Nos. 51–53.

37.     Defendants argued Plaintiffs failed to allege a material misstatement or omission

because Defendant Missfresh had no duty to disclose certain internal control weaknesses, Plaintiffs

unsustainability claim was "improper hindsight pleading," and the restatement was immaterial.

MTD Reply at 2–9. Defendants again argued Plaintiffs' losses were not caused by any alleged

misstatement or omission in the Offering Documents. *Id.* at 9–10.

### D.    The Court's Order on Defendants' Motion to Dismiss the Complaint

38.     On September 12, 2023, the Court issued a "bottom-line" order denying the Motion

to Dismiss as to Plaintiffs' claims predicated upon the misstated revenue and sales of online

products reported in the Offering Documents but granting the Motion to Dismiss in all other

respects. ECF No. 69.

39.     On November 6, 2023, the Court issued an opinion setting forth the reasons for the

September 12, 2023 bottom-line order granting in part, and denying in part, the Motion to Dismiss.

ECF No. 79.

40.     On February 27, 2024, Defendant Missfresh, Defendant Xu, the Underwriter

Defendants, and the Cogency Defendants filed answers to the Complaint. ECF Nos. 112, 114–115,

117.

**E.    Ongoing Efforts to Serve All Defendants**

41.    On November 6, 2023, Plaintiffs filed a motion for alternative service of process on the Individual Defendants (ECF Nos. 80–82), which Missfresh opposed on November 13, 2023 (ECF Nos. 85–86).

42.    On February 21, 2024, Plaintiffs filed a revised motion for alternative service of process on Defendants Zhaohui Li, Hansong Zhu, Jun Wang, and Yuan Sun. ECF Nos. 103–105. On February 28, 2024, Defendant Missfresh responded to the motion. ECF No. 118. On March 5, 2024, the Court granted the motion. ECF No. 119. Plaintiffs served Defendant Li accordingly and filed affidavits of service on March 7, 2024. ECF Nos. 120–21.

**F.    Plaintiffs' Motion for Class Certification**

43.    On March 26, 2024, Plaintiffs filed the Motion to Certify Class, Appoint Class Representatives, and Appoint Co-Lead Counsel ("Class Certification Motion").[6] ECF Nos. 123–26.

44.    In the motion, Plaintiffs set forth how the proposed class readily satisfied Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. ECF No. 124. Further, Plaintiffs argued that the class satisfied Rule 23(b)(3)'s additional requirement that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute. *Id.*

45.    The parties agreed to settle before Defendants' deadline to file their opposition to class certification.

---

[6] Plaintiffs defined the proposed class as: "All persons and entities who or which purchased or otherwise acquired publicly traded Missfresh ADSs pursuant and/or traceable to the Offering Documents, and were damaged thereby," with certain exclusions related to Defendants. ECF No. 124.

### G.    Second Motion to Dismiss

46.    On March 27, 2024, Defendant Li filed a motion to dismiss the Complaint. ECF No. 127–29. On April 10, 2024, Plaintiffs opposed Defendant Li's motion to dismiss. ECF Nos. 131–32. On April 17, 2024, Defendant Li filed a reply brief in further support of his motion to dismiss. ECF No. 133. The parties agreed to settle before the Court ruled on Defendant Li's motion to dismiss.

## IV.    DISCOVERY

47.    Formal discovery commenced without delay when the PSLRA discovery stay was lifted following the Court's order, denying, in part, the Motion to Dismiss. On September 28, 2023, the Court held the initial pretrial conference telephonically and issued a case management plan with a trial ready date of June 17, 2024. ECF No. 76. On October 26, 2023, Plaintiffs served their initial disclosures and the first set of discovery requests on the defendants.

48.    On November 6, 2023, Plaintiffs filed a motion for issuance of the letter of request pursuant to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters. ECF Nos. 83–84.

49.    On February 20, 2024, after the Action had been temporarily stayed in November 2023, the Court issued a revised case management plan with a trial ready date of September 16, 2024. ECF No. 102. Thereafter, the parties exchanged their initial disclosures and additional discovery requests. Additionally, the Underwriter Defendants served their responses and objections to Plaintiffs' first set of requests for production.

## V.    SETTLEMENT NEGOTIATIONS AND PRELIMINARY APPROVAL

50.    In September 2023, counsel for Plaintiffs and Defendant Missfresh agreed to explore a pre-trial resolution of the Action, retaining Mr. Murphy to serve as mediator in the

Action. Mr. Murphy is a well-respected mediator with substantial experience in securities class actions.

51.    In advance of the mediation, Plaintiffs and Defendant Missfresh exchanged detailed mediation statements that highlighted their respective best facts and arguments, and addressed both liability and damages issues.

52.    On October 18, 2023, counsel for Plaintiffs, Defendant Missfresh, and Defendant Xu participated in a full-day mediation session in person before Mr. Murphy. Although substantial progress was made, Plaintiffs, Defendant Missfresh, and Defendant Xu were unable to reach a resolution on that day.

53.    Over the course of the following weeks, Plaintiffs and Defendant Missfresh, and Defendant Xu, with Mr. Murphy's assistance, continued to engage in settlement discussions. On November 20, 2023, these parties accepted the Mediator's recommendation and reached an agreement in principle to settle the Action. On November 28, 2023, the parties notified the Court of an agreement in principle and the Court stayed the proceedings for sixty days.

54.    However, while the parties were negotiating the terms of a stipulation of settlement and related papers for the agreement in principle, they reached an impasse in December 2023 based on Missfresh's inability to fund the settlement. Thus, the parties resumed litigating the Action.

55.    On January 18, 2024, Skadden, Arps, Slate, Meagher & Flom LLP filed a motion to withdraw as counsel to Defendant Missfresh and the Cogency Defendants. ECF Nos. 89–91. On January 29, 2024, the Court granted the motion to withdraw. ECF No. 95.

56.    Although litigation had recommenced, Plaintiffs and the Settling Defendants continued negotiating a potential settlement with the assistance of the Mediator. Plaintiffs and the

Settling Defendants reached a new agreement in principle to settle the Action and signed a term sheet regarding such agreement on April 23, 2024.

57.    On the same day, the parties informed the Court of the agreement in principle, and, at the parties' request, the Court stayed the Action for fifty days. The parties subsequently negotiated the Stipulation, which sets forth the final terms and conditions of the Settlement, in return for a cash payment on behalf of the Settling Defendants of $4,903,900 for the benefit of the Settlement Class.

58.    As provided for in the Stipulation, in exchange for payment of the Settlement Amount, upon the Effective Date of the Settlement, the Action will be dismissed with prejudice and Plaintiffs and the Settlement Class will forever release all Released Plaintiff's Claims against the Released Defendant Parties. Stipulation ¶4. Released Plaintiff's Claims are all claims that were brought or that could have been brought in the Action or any forum arising out of the allegations and the purchase/acquisition, holding, sale or disposition of shares of Missfresh ADSs issued pursuant and/or traceable to the Offering Documents. Stipulation ¶1(hh).

59.    Also upon the Effective Date of the Settlement, Defendants will forever release all Released Defendants' Claims against the Released Plaintiff Parties. Stipulation ¶5. Released Defendants' Claims are all claims related to the institution, prosecution, or settlement of the claims. Stipulation ¶1(ff).

60.    On June 12, 2024, Plaintiffs filed their unopposed motion for preliminary approval of the proposed Settlement. ECF Nos. 135–39. On June 27, 2024, the preliminary approval hearing was held before the Court. On July 3, 2024, the Court issued an order granting preliminary approval of the Settlement, approving the form and manner of notice, and setting the date for a hearing on final approval of the Settlement for October 10, 2024. ECF No. 144.

## VI.    PLAINTIFFS' COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

61.    Pursuant to the Preliminary Approval Order, the Court appointed Verita Global, LLC ("Verita") as the Claims Administrator and instructed Verita to disseminate copies of the Postcard Notice by first-class mail, postage prepaid, within ten business days of entry of the Preliminary Approval Order to all Settlement Class members who could be identified with reasonable effort. The Court further ordered Verita to post copies of the Notice and the Claim Form on a website developed for the Settlement, from which copies of the Notice and Claim Form could be downloaded and to mail copies of the Notice and Claim Form upon request.

62.    As detailed in the Declaration of Lance Cavallo Regarding: (A) Provision of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of Telephone Hotline and Settlement Website; and (D) Report on Requests for Exclusion Received to Date ("Mailing Decl."), attached hereto as Ex. 4, among other things, Verita mailed or emailed Postcard Notices to potential Settlement Class Members, as well as banks, brokerage firms, and other third-party nominees whose clients may be Class Members. In total, to date, a total of 10,163 Postcard Notices or Notice Packets have been mailed or emailed to potential Settlement Class Members and nominees. *Id.* at ¶9.

63.    On July 29, 2024, Verita also caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the internet using *PR Newswire*. *Id.* at ¶10 and Exhibit C thereto.

64.    Collectively, the notices provided potential Settlement Class Members with information about the terms of the Settlement and contained, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Settlement Class Members' right to participate in the Settlement; (iv) an explanation

of Settlement Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement. *See generally*, Ex. 4-A & B. The Notice also informed Settlement Class Members of Co-Lead Counsel's intention to apply for an award of attorneys' fees of 25% of the Settlement Fund and for payment of expenses.

65.    Verita also maintains and posts information regarding the Settlement on a website established for the Settlement, www.Missfreshsecuritiessettlement.com, to provide Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Notice Packet, the Stipulation, and other documents. Ex. 4 at ¶¶12-13. Co-Lead Counsel also posted copies of the Notice and Claim Form on their firms' websites.

66.    Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is September 19, 2024. To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received, and no request for exclusion has been received. *Id*. at ¶14. Should any objections or requests for exclusion be received, Plaintiffs will address them in their reply papers, which are due on October 3, 2024.

## VII.    RISKS FACED BY PLAINTIFFS IN THE ACTION

67.    As detailed above, the core allegations in this Action were that Defendants, in the Offering Documents for the IPO: (i) materially overstated the sales of products through online platforms and net revenues for the first quarter of 2021, (ii) omitted material weakness in internal control over financial reporting, and (iii) omitted the unsustainability of Missfresh's DMWs business. Only the allegations regarding Missfresh's materially overstated revenue have survived

the Motions to Dismiss. Although Plaintiffs and Co-Lead Counsel believe the claims to be strong, they acknowledge that Defendants could advance several substantial arguments which could have reduced, or altogether eliminated, any recovery for Missfresh investors.

### A.    Risks Concerning Proving Liability, Continued Litigation & Recovery

68.    Protracted litigation posed several risks for Missfresh investors. First, although the Court denied, in part, the Motion to Dismiss, Plaintiffs would have faced significant hurdles in connection with summary judgment challenges and ultimately proving materiality of the allegedly false and misleading statements, which is necessary for their Securities Act claims. Plaintiffs would need to prove that the overstatement in revenue in the Offering Documents were material to investors. However, the Defendants would likely continue to argue that the net effect of the overstated revenue and the understated costs and expenses resulted in no change to the Company's bottom-line profit, making the accounting misstatements immaterial to investors. The Defendants would also continue to argue that the Offering Documents warned that existing material weaknesses in internal controls could result in the restatement of the reported financials.

69.    Second, each of the Individual Defendants who appeared in the Action and the Underwriter Defendants have asserted a due diligence defense to their liability. While Plaintiffs would have worked extensively with due diligence experts with a view towards presenting compelling arguments to the jury to show that these Defendants were negligent in connection with the IPO, these Defendants would also have likely put forth well-qualified experts of their own showing that they conducted a reasonable investigation and had reasonable ground for their belief in the Offering Documents' truthfulness and completeness.

70.    Third, although discovery was initiated, Plaintiffs faced considerable obstacles if discovery were to continue. Many Defendants and witnesses are located in China, which creates

significant hurdles to obtaining the necessary documents and testimony to prove a case. For instance, according to Chinese law, productions of information and data maintained by a company such as Missfresh outside of China must first be reviewed and approved by the necessary Chinese government officials. *See* ECF No. 137, Declaration of Phillip Kim in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement ("Kim Preliminary Approval Decl.") at ¶2. Not only does this requirement slow down litigation, but it introduces the potential risk of extremely protracted litigation. Additionally, China does not permit depositions on the mainland or virtual depositions, which would require Defendants and witnesses to agree to travel out of China for depositions. *Id*. Moreover, documents produced in the case will likely be in Chinese, which would require translation or the retention of bilingual attorneys to facilitate document review. *Id*. Therefore, there is no guarantee that Plaintiffs would have been able to obtain the necessary evidence to prove their case through discovery and, even if they could do so, it would be costly, take years, and any potential recovery to Settlement Class Members would be delayed.

71.    Fourth, Plaintiffs' motion for class certification was pending, and not fully briefed when the Parties agreed to settle the Action. The Settling Defendants had not yet submitted their opposition to Plaintiffs' motion. Thus, Plaintiffs faced a substantial risk that the Court could have denied their motion. Additionally, class certification can be reviewed and modified at any time by a court before final judgment.

72.    Fifth, many of the defendants are located in China. There is a risk that they may not continue to engage in the litigation and thus, as discussed below, there would be no real source of a recovery for Missfresh investors. This risk was far from unlikely. Here, Missfresh's original counsel withdrew because the Company was not paying them and the Company determined it was

unable to fund a settlement under the initial agreement in principle to settle the Action. Fortunately, new counsel was retained and this Settlement was reached, but not without great uncertainty.

73.    Finally, even if Plaintiffs were able to obtain a judgment, enforcing that judgment in China would be close to impossible as Missfresh's assets[7] and the Individual Defendants are all located in China. Given there is no agreement between the United States and China to recognize each other's judgments, the only potential way to enforce a judgment would be through reciprocity. Kim Preliminary Approval Decl., ¶3. China's reciprocity system, however, is one of the most restrictive in the world, regularly denying enforcement of foreign judgments. *Id*. As of June 2022, Chinese courts have only recognized and enforced two judgments from the United States. *Id*. Neither of which were judgments from securities lawsuits. *Id*. Furthermore, the fact that Missfresh had only a contractual interest, and no ownership, in its Chinese operations increased the uncertainty of collecting a judgment from those operations. *Id.* at ¶6. Thus, Plaintiffs and their counsel undertook this litigation without a guarantee that the foreign defendants would participate in the litigation or that any money could be recovered for Missfresh investors.

**B.    Risks Related to Negative Causation and Damages**

74.    Furthermore, even if Plaintiffs overcame the hurdles to establishing liability and had the means to recover funds from Defendants, Plaintiffs would have to convince a jury to accept their damages evidence over that of Defendants. Plaintiffs' expert has estimated that maximum

---

[7] This assumes that Missfresh even has assets from which to satisfy a judgment.  Co-Lead Counsel's understanding is that Missfresh is not financially sound, is heavily in debt, and has lost money since its IPO, eventually causing the Company to shut down operations. Missfresh sold all its operations for consideration of $1 in September 2023, leaving no recoverable assets from Missfresh, globally, for the Settlement Class. In February 2024, Missfresh ADSs were delisted from the NASDAQ exchange. As of now, Missfresh ADSs have no value. Additionally, Missfresh is facing various lawsuits in China with approximate aggregate damages of over RMB 1 billion (approximately US$147 million).

damages are approximately \$285.5 million.[8] However, this "best case" scenario is subject to attack

if Defendants were able to disaggregate other confounding factors that may have impacted the

ADSs' declines or establish a negative causation defense.

75.     In their Motion to Dismiss, Defendants argued that before any alleged

misrepresentation was revealed to the market, Missfresh's ADS price had already dropped 96% from

its \$13.00 IPO price due to reasons unrelated to this Action— an argument Defendants would claim

has been strongly bolstered by the fact that only Plaintiffs' allegations regarding the materially

overstated revenue were sustained after the Motion to Dismiss. In continuing to argue that Plaintiffs

were not damaged at all by the alleged misstatements leading to the restatement, Defendants would

point to the fact that there was no drop in the ADSs price following the restatement. In particular,

Defendants would argue that after the restatement was issued, the ADSs' price *increased* by 11.5%

and continued to increase through the filing of the Action. Plaintiffs' damages expert analyzed

Defendants' negative causation arguments and concluded, assuming the factfinder were to accept

Defendants' defense, that maximum recoverable Section 11 damages would be approximately \$9.6

million. The Settlement recovers approximately 51% of these estimated aggregate damages. Even

if only some of Defendants' damages arguments were accepted by the Court at summary judgment

or by a jury after trial, recoverable damages could be greatly reduced well below Plaintiffs'

estimates.

76.     Accordingly, the Settlement represents approximately 1.7% of the total maximum

potential damages or approximately 51% of maximum recoverable damages after considering

---

[8] Plaintiffs' damages expert's estimates assume that gains on pre-class period purchases accrued during the class period are removed or "netted." *See* Samuel Francis, *Meet Two-Face: The Dualistic Rule 10b-5 and the Quandary of Offsetting Losses by Gains,* 77 FORDHAM L. REV. 3045, 3047 (2009) ("Courts emphasizing the compensation objective have taken a netting approach to damages that offsets gains and losses stemming from different transactions.").

Defendants' negative causation arguments. Over the past five years, the median settlement in securities class actions has hovered around 1.8% of investor losses. *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), Fig. 22, Ex. 5.

77.     Under any circumstances, the issues of negative causation and damages would likely come down to a battle of the experts. Accordingly, Plaintiffs and Co-Lead Counsel recognized that the Court and the jury would be presented with very different opinions from highly qualified experts. If the Court or the jury found Defendants' expert's testimony to be more credible, Plaintiffs and the Settlement Class could recover nothing at all.

78.     Plaintiffs and Co-Lead Counsel carefully considered these challenges during the months leading up to the Settlement and during the settlement discussions with the Settling Defendants.

## VIII.   THE PLAN OF ALLOCATION

79.     Pursuant to the Preliminary Approval Order, and as set forth in the notices, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, that is postmarked no later than October 5, 2024. After deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, and Taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation" or the "Plan").

80.     The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 4-B at ¶¶65-82), was designed to achieve an equitable and rational distribution of the Net Settlement Fund. The Plan is intended to be generally consistent with an assessment of, among other things, the damages that Plaintiffs and Co-Lead Counsel believe were recoverable in the Action. Co-Lead

Counsel developed the Plan of Allocation in close consultation with Plaintiffs' damages expert and believe that the plan provides a fair and reasonable method for equitably distributing the Net Settlement Fund to members of the Settlement Class who timely submit valid Claim Forms that show a "Recognized Claim" according to the Plan of Allocation approved by the Court ("Authorized Claimants").

81.     An individual Settlement Class Member's recovery will depend on: (i) the total number and value of claims submitted; (ii) when the Claimant purchased or acquired Missfresh publicly traded ADSs; and (iii) whether and when the Claimant sold his, her, or its shares of Missfresh publicly traded ADSs. The computations under the Plan of Allocation are a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund. The Claims Administrator will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim, which will be the sum of his, her, or its "Recognized Loss Amounts." Each *pro rata* share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

82.     The objective of the Plan of Allocation is to equally distribute the Net Settlement Fund among claimants who allegedly suffered economic loss as a result of the alleged violations of the Securities Act of 1933 asserted in the Action and, more specifically, with respect to shares of Missfresh ADSs purchased or otherwise acquired during the period from June 25, 2021, the date of Missfresh's IPO, through July 12, 2022. Section 11 of the Securities Act, which provides a statutory formula for the calculation of damages under that provision, serves as the basis for the calculation of the "Recognized Loss Amounts." The formulas stated in the Plan of Allocation,

which were developed by Plaintiffs' consulting damages expert, generally track the statutory formula.

83.     Once the Claims Administrator has processed all submitted claims, notified Claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will distribute the Net Settlement Fund. If there are any claim disputes that cannot be resolved, they will be presented to the Court. After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund after six months from the date of initial distribution, Co-Lead Counsel will, if cost effective, re-distribute the balance among eligible Claimants who have cashed their checks. These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible or economical to distribute. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical to reallocate, after payment of any outstanding Notice and Administration Expenses and Taxes, shall be contributed to Consumer Federation of America, a non-sectarian, not-for-profit, charitable organization serving the public interest, or such other non-sectarian, not-for-profit, charitable organization approved by the Court.

84.     To date, there have been no objections to the Plan of Allocation.

85.     In sum, the proposed Plan of Allocation, developed in consultation with Plaintiffs' damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Co-Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.    CO-LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.    Consideration of Relevant Factors Justifies an Award of a 25% Fee

86.     Consistent with notice to the Settlement Class, Co-Lead Counsel seek a fee award

of 25% of the Settlement Amount, plus accrued interest, on behalf of Plaintiffs' Counsel.[9] Co-Lead Counsel also request payment of expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $103,236.02, plus a request of $17,500 to Plaintiffs to reimburse them for the time they dedicated to the Action, consistent with the PSLRA. Co-Lead Counsel submit that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### 1. Plaintiffs Support the Fee and Expense Application

87.    Plaintiffs have evaluated and fully support the fee and expense application. Ex. 1 at ¶5; Ex. 2 at ¶5; Ex. 3 at ¶5. In coming to this conclusion, Plaintiffs—investors that were involved throughout the prosecution of the Action and negotiation of the Settlement—considered the recovery obtained, as well as Co-Lead Counsel's substantial efforts to prosecute the claims on behalf of the class. Plaintiffs took their roles as representatives for the class seriously in order to ensure an able and vigorous prosecution of the claims. *Id.*

### 2. The Time and Labor of Co-Lead Counsel

88.    The many tasks undertaken by Co-Lead Counsel in this case are detailed above. The investigation, prosecution, and settlement of the claims asserted in the Action required extensive efforts on the part of Co-Lead Counsel, given the complexity of the legal and factual issues raised by Plaintiffs' claims and the vigorous defense mounted by Defendants. The Action was prosecuted for approximately two years. Among other efforts, Co-Lead Counsel conducted a comprehensive investigation into the class's claims; researched and prepared a detailed Complaint;

---

[9] Plaintiffs' Counsel are Labaton Keller Sucharow LLP, The Rosen Law Firm, P.A., and The Schall Law Firm. Lead Plaintiff Chelsea Fan retained Rosen Law and The Schall Law Firm to jointly represent her in this Action. Additionally, named plaintiff James Sannito is represented by The Schall Law Firm with the assistance of Rosen Law.

briefed thorough oppositions to Defendants' motions to dismiss; moved for class certification; moved for alternative service on the Individual Defendants; engaged in discovery efforts; moved for issuance of a letter of request pursuant to the Hague Evidence Convention; and engaged in a hard-fought settlement process with experienced defense counsel.

89.    Among other efforts, Co-Lead Counsel conducted a comprehensive investigation into the class's claims; researched and prepared a detailed Complaint; briefed thorough oppositions to Defendants' motions to dismiss; moved for class certification; engaged in discovery efforts; and engaged in a hard-fought settlement process with experienced defense counsel.

90.    At all times throughout the pendency of the Action, Co-Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial. Co-Lead Counsel carefully staffed the Action from the beginning, and litigated the case with a targeted team.  For instance, an attorney proficient in both Chinese and English, with law degrees from both China and the U.S., was assigned to the Action to ensure the quality of the investigation in support of the pleadings against the China-based Defendants and to address discovery matters involving Chinese regulations.

91.    Attached hereto are Labaton's and Rosen Law's time and expense declarations, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration of Alfred L. Fatale III on Behalf of Labaton Keller Sucharow LLP, Ex. 1; Declaration of Phillip Kim on Behalf of The Rosen Law Firm, P.A., Ex. 2. The declarations report the amount of time spent by the attorneys and professional support staff of each firm and the associated "lodestar" calculation, *i.e.*, hours multiplied by the firm's current hourly rates. The lodestar reports were prepared from time records regularly prepared and maintained by

each firm, which are available at the request of the Court. Also included with each declaration is a breakdown of the firm's litigation expenses by category (the "Fee and Expense Schedules").

92.     Co-Lead Counsel expended 1,762.4 hours prosecuting and settling the Action. *See* Ex. 6–A; Ex. 7-A. The resulting lodestar is $1,343,386.00. *Id*.; *see also* Ex. 8 (Summary Table of Time & Expenses). The requested fee of 25% of the Settlement Fund results in a negative "multiplier" of .9 on the lodestar, meaning that counsel are seeking 90% of the value of their time.

93.     The hourly rates of Co-Lead Counsel here range from $900 to $1,275 for partners, $850 to $925 for of counsels, and $500 to $650 for associates. *See* Exs. 6-A; 7-A. It is respectfully submitted that the hourly rates of the attorneys and paralegals included in the time schedules are reasonable and customary within the commercial litigation bar. Exhibit 9, attached hereto, are tables of hourly rates for defense firms compiled by Labaton from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2023. The analysis shows that across all types of attorneys, Co-Lead Counsel's rates are consistent with, or lower than, the firms surveyed.

### 3.     The Magnitude and Complexity of the Litigation

94.     This Action presented substantial challenges from the outset of the case, which were skillfully navigated by Co-Lead Counsel. The specific risks Plaintiffs faced in proving Defendants' liability and damages are detailed in Section VII above. These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by highly complex case law interpreting the federal securities laws and was undertaken on a contingent basis, as discussed below.

### 4.     The Skill and Efficiency of Co-Lead Counsel

95.     Co-Lead Counsel are highly experienced and skilled securities litigation law firms. The expertise and experience of their attorneys are described in Exhibits 6–C and 7-C annexed hereto.

96.     Since the passage of the PSLRA, Labaton has been approved by courts to serve as Lead Counsel in numerous securities class actions throughout the United States. For example, Labaton has served as Lead Counsel in a number of high profile matters: *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 6-C.

97.     Likewise, courts in this Circuit, and around the country have recognized the quality of Rosen Law's work. *See Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019) (approving 25% fee in $250 million settlement, the Court stated that "[t]he quality of representation by [Rosen Law] and Defendants' counsel was high in this case . . ."); *Mikhlin*, 2021 WL 1259559, at *4 ("The Rosen Law Firm, P.A . . . [is] capable and experienced in class litigation."); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 242 (E.D.N.Y. 2011) ("[T]he Rosen Law Firm is well-qualified to serve as lead counsel."); *Pace v. Quintanilla*, 2014 WL 4180766, at *3 (C.D. Cal. Aug. 19, 2014) ("[Rosen Law] has appeared before this Court several times before, and the Court is confident that it has the necessary skill and knowledge to effectively prosecute this action."); *Yedlowski v. Roka Bioscience, Inc.,* 2016 WL 6661336, at *21 (D.N.J.

Nov. 10, 2016) ("[Rosen Law] is highly experienced in the complex field of securities fraud class action litigation."). *See* Ex. 7-C.

### 5.      Standing and Caliber of Defendants' Counsel

98.      The quality of the work performed by Co-Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Skadden, Arps, Slate, Meagher & Flom LLP, Stinson LLP, Allen Overy Shearman Sterling US LLP, and K&L Gates LLP, prestigious and experienced defense firms, which vigorously represented their clients. In the face of this experienced, formidable, and well-financed opposition, Co-Lead Counsel were nonetheless able to persuade the Settling Defendants to settle the case on terms favorable to the Settlement Class.

### 6.      The Risk of Nonpayment

99.      From the outset, Co-Lead Counsel understood they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Co-Lead Counsel received no compensation during the course of the Action but have incurred 1,762.4 hours of time for a total lodestar of $1,343,386.00 and have incurred $103,236.02 in expenses in prosecuting the Action for the benefit of the Settlement Class.

100.      Co-Lead Counsel also bore the risk that no recovery would be achieved. Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. Co-Lead Counsel know from experience that the commencement of a class action

does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

101.   Co-Lead Counsel are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

102.   Federal Circuit court cases include countless opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig*., 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp*., 249 F.3d 29 (1st Cir. 2001).

103.   Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), or substantially lost as to the main case, such as *In re Clarent Corp. Sec. Litig.*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

104.   Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury

verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al*., 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011)); *Robbins v. Koger Props., Inc*., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

105.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Plaintiffs' success was by no means assured. Defendants disputed whether the alleged misstatements were actionable and whether the alleged misstatements caused Plaintiffs' loss, and would no doubt contend, as the case proceeded to summary judgment and trial, that even if liability existed, the amount of damages was substantially lower than Plaintiffs alleged. If the Settlement was not achieved, Plaintiffs and Co-Lead Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery. Co-Lead Counsel respectfully submit that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### 7.    The Favorable Settlement Achieved

106.    As discussed above, the $4,903,900 Settlement is a favorable result when considered in view of the substantial risks and obstacles to recovery and the damages issues in the case, if the Action were to continue through a decision on class certification and summary judgment to trial, and through likely post-trial motions and appeals.

107.    The recovery was the result of thorough and efficient prosecutorial and investigative efforts, complicated motion practice, and vigorous settlement negotiations. As a result of the Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses, and it avoids the very substantial risk of no recovery in the absence of a settlement.

### B.    Request for Litigation Expenses Incurred by Co-Lead Counsel

108.    Co-Lead Counsel seek payment from the Settlement Fund of $103,236.02 in Litigation Expenses reasonably and necessarily incurred by Co-Lead Counsel in connection with commencing and prosecuting the claims against Defendants.

109.    From the beginning of the case, Co-Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Co-Lead Counsel were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

110.    As set forth in the Fee and Expense Schedules, Co-Lead Counsel's Litigation Expenses total $103,236.02. *See* Ex. 8. Co-Lead Counsel's declarations identify the specific category of expense—*e.g.*, expert and consultant fees, service fees, translation fees, mediation fees, investigation costs, online/computer research, and duplicating. *See* Exs. 6-B and 7-B. As attested to, these expenses are reflected on the books and records maintained by Co-Lead Counsel. These

books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses. *Id*.

111.    Of the total of Co-Lead Counsel's expenses, $30,840, or approximately 30% of total expenses, was incurred for experts and consultants. In connection with class certification and mediation, Co-Lead Counsel retained an expert to opine on causation and damages and to draft the proposed Plan of Allocation. Co-Lead Counsel also retained an accounting expert to analyze Missfresh's alleged accounting misstatements, and hired an investigator based in China to locate certain of the Individual Defendants' work and residential addresses.

112.    Of the total amount of expenses, $49,600, or approximately 48% of the total, was incurred by Plaintiffs in connection with the mediation process and the retention of Mr. Murphy.

113.    Another significant category of expenses was the cost of providing notice of the pendency of the Action pursuant to the PSLRA, 15 U.S.C. § 77z–1 (a)(3)(A)(i)), which totals $12,419.91, or approximately 12% of the total amount of expenses.

114.    Another category of expenses was translation costs, which total $2,055.67, or approximately 2% of the total amount of expenses. These expenses were paid to translation agencies for: (i) translating complaints and summonses for purpose of serving them on Individual Defendants based in China; and (ii) translating the letter of request pursuant to the Hague Evidence Convention served on PricewaterhouseCoopers Zhong Tian LLP in China.

115.    The other expenses for which Co-Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and regularly paid by private clients in non-contingent cases. These expenses include, among others, work-related travel costs, filing fees, service fees, duplicating costs, long distance telephone costs, and express delivery expenses.

116.    All of the Litigation Expenses incurred by Co-Lead Counsel, which total $103,236.02, were necessary to the successful prosecution and resolution of the claims against Defendants.

## X.    REIMBURSEMENT OF PLAINTIFFS' EXPENSES IS FAIR AND REASONABLE

117.    Additionally, in accordance with 15 U.S.C.A. §77z-1, Plaintiffs seek reimbursement of their reasonable costs and expenses (including lost wages) incurred in connection with their work representing the Settlement Class in the aggregate amount of $17,500. The amount of time and effort devoted to the Action by each Plaintiff is detailed in their accompanying declarations. *See* Exs. 1-3.

118.    As discussed in Plaintiffs' supporting declarations, each has been committed to pursuing the Settlement Class's claims since becoming involved in the litigation. Plaintiffs have actively and effectively fulfilled their obligations as representatives of the Settlement Class, complying with all of the demands placed upon them during the litigation and settlement of the Action, and providing assistance to Co-Lead Counsel. For instance, Plaintiffs (i) regularly communicated with counsel regarding the progress of the Action; (ii) gathered and reviewed their trading; (iii) completed certifications and declarations in support of case filings; (iv) received and reviewed material court filings, in both draft and final form, including the Complaint, the briefing for defendants' motions to dismiss the Complaint, and the motion to certify the class; (v) assisted with responding to discovery requests; and (vi) were involved throughout the settlement process. Ex. 1 at ¶3; Ex. 2 at ¶3; and Ex. 3 at ¶3.

## XI.    THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

119.    As mentioned above, consistent with the Preliminary Approval Order, to date a total of 10,163 Postcard Notices or Notice Packets have been mailed or emailed to potential Settlement

Class Members and nominees advising them that Co-Lead Counsel would request a fee of 25% of the Settlement Fund (*i.e.*, $1,225,975, plus accrued interest). *See* Ex. 4-A. Additionally, the long-form Notice and the Stipulation have also been available on the settlement website maintained by the Claims Administrator. Ex. 4 at ¶¶12-13.[10] While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received. Co-Lead Counsel will respond to any objections received in their reply papers, which are due on October 3, 2024.

**XII.    MISCELLANEOUS EXHIBITS**

120.    Attached hereto as Exhibit 10 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

**XIII.    CONCLUSION**

121.    In view of the favorable recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate. In view of the favorable recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Co-Lead Counsel, as described above and in the accompanying memorandum of law, Co-Lead Counsel respectfully submit that a fee in the amount of 25% of the Settlement Amount, plus accrued interest, be awarded and that Litigation Expenses, including an award to Plaintiffs, be paid in full.

---

[10] Plaintiffs' motion for approval of the Settlement and Co-Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of September, 2024.

_____
ALFRED L. FATALE III

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of September, 2024.

_____
PHILLIP KIM

36

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of September, 2024.

_____
                    ALFRED L. FATALE III


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of September, 2024.

_____
                    PHILLIP KIM